2016-2017, -2026, -2027

IN THE

# United States Court of Appeals
# for the Federal Circuit

CROSSROADS SYSTEMS, INC.,

Appellant,

v.

CISCO SYSTEMS, INC., QUANTUM CORP.,
ORACLE CORPORATION, DOT HILL SYSTEMS
CORPORATION,

Appellees.

Appeal from the United States Patent and
Trademark Office, Patent Trial and Appeal
Board in Nos. IPR2014-01226, IPR2015-
00825, IPR2015-00852, IPR2015-00854,
IPR2014-01463, and IPR2014-01544.

**OPENING BRIEF OF APPELLANT CROSSROADS SYSTEMS, INC.**

John A. Dragseth
Robert Courtney
Conrad Gosen
FISH & RICHARDSON P.C.
3200 RBC Plaza, 60 South 6th St.
Minneapolis, MN 55402
Telephone: 612-335-5070

July 11, 2016          *Attorneys for Appellant*

## CERTIFICATE OF INTEREST

Counsel for the Appellant Crossroads Systems, Inc. certifies the following:

- The full name of every party or amicus represented by me is:

Crossroads Systems, Inc.

- The name of the real party in interest represented by me is:

N/A

- All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Crossroads Systems, Inc. has no parent company and no other publicly held company owns 10% or more of Crossroads Systems, Inc.'s stock.

- The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Fish & Richardson P.C.: John A. Dragseth, Robert Courtney, Conrad Gosen

Blank Rome LLP: Russell Wong, James Hall, Keith A. Rutherford, Steve Edwards, Domingo Manuel Llagostera

Sprinkle IP Law Group: Steven R. Sprinkle, John L. Adair, Scott S. Crocker, Elizabeth Brown Fore

Floyd Walker Law Firm: R. Floyd Walker

Date: July 11, 2016                    _/s/ John A. Dragseth_____
                                       Signature of counsel

                                       _John A. Dragseth_____
                                       Printed name of counsel

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ............................................................... 1

STATEMENT OF JURISDICTION .................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 2

INTRODUCTION ........................................................................................... 2

STATEMENT OF THE FACTS and the case .................................................. 3

    A.    The '041 and '147 Patents' Dependent Claims .............. 9

    B.    The Parties' Dispute and the Present IPRs ................... 12

        1.    *CRD-5500 User's Manual* ........................................... 12

        2.    Board Proceedings ..................................................... 15

SUMMARY OF THE ARGUMENT ................................................................ 16

STANDARD OF REVIEW ............................................................................. 17

ARGUMENT ................................................................................................. 18

I.    THE BOARD'S INTERPRETATION OF THE "MAPS BETWEEN DEVICES" LIMITATION WAS ERRONEOUS ............ 18

    A.    The Board's Conclusion that the Device-to-Device Mapping Limitation Covered the *CRD-5500 User's Manual* Was Wrong as a Matter of Law .......................... 18

    B.    No Reasonable Interpretation of the Challenged Claims Could Cover the *CRD-5500 User Manual*'s Channel-Oriented Mapping .................................................. 22

# TABLE OF CONTENTS (cont'd)

**Page**

    1.    The Specifications and File Histories Establish that the Claims Require Device-Oriented Mapping, Not Channel-Oriented Mapping ......................................................................... 22

    2.    The Reference to "Representations" in the Board's Construction Cannot Expand the Claim to Cover Channel-Oriented Mapping ...... 29

    3.    The Legal Error in the Board's Approach Was its Vitiation of the Device-Oriented Mapping Requirement, Not its Citation to "Intermediate Identifiers" ........................................ 32

    4.    Under the Proper Construction, the Independent Claims are Nonobvious ................. 33

II.    THE BOARD COMMITTED FURTHER LEGAL ERRORS IN ITS ANALYSIS OF THE "UNIQUE IDENTIFIER," "WORLD WIDE NAME," AND "HOST DEVICE ID" DEPENDENT CLAIMS ..................................................................................... 34

CONCLUSION ................................................................................ 41

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bell Atl. Network Servs. v. Covad Commc'ns Grp.*,
    262 F.3d 1258 (Fed. Cir. 2001)................................................................31

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004)................................................................27

*CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG*,
    224 F.3d 1308 (Fed. Cir. 2000)................................................................31

*Crossroads Sys., (Tex.), Inc. v. Chaparral Network Storage, Inc.*,
    No. 1:00-cv-217, slip op. (W.D. Tex. Nov. 15, 2001) (No. 179),
    *aff'd without op.*, 56 F. App'x 502 (Fed. Cir. 2003)............................4

*Crossroads Systems, Inc. v. Oracle Corp.*,
    Nos. 2016-1930, -1931 (Fed. Cir. consolidated April 28,
    2016)................................................................................................................1

*Dell Inc. v. Acceleron LLC*,
    818 F.3d 1293 (Fed. Cir. 2016)................................................................19

*Dickinson v. Zurko*,
    527 U.S. 150 (1999)....................................................................................17

*In re Donaldson Co.*,
    16 F.3d 1189 (Fed. Cir. 1994) ................................................................17

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000)................................................................17

*Pause Tech. LLC v. TiVo, Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005)................................................................30

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
   815 F.3d 747 (Fed. Cir. 2016) ................................................................. 30

*Randall Mfg. v. Rea*,
   733 F.3d 1355 (Fed. Cir. 2013) .............................................................. 17

*See Microsoft Corp. v. Proxyconn, Inc.*,
   789 F.3d 1292 (Fed. Cir. 2015) .............................................................. 29

*Tempo Lighting, Inc. v. Tivoli, LLC*,
   742 F.3d 973 (Fed. Cir. 2014) ................................................................ 31

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) .............................................................................. 17

## STATEMENT OF RELATED CASES

No other appeal in or from this case has been before either this Court or any other appellate court.  Counsel is aware of the following cases this Court's decision will directly affect: *Crossroads Systems, Inc. v. Oracle Corp.*, No. 1:13-cv-895 (W.D. Tex. filed Oct. 7, 2013); *Crossroads Systems, Inc. v. Dot Hill Systems Corp.*, No. 1:13-cv-800 (W.D. Tex. filed Sept. 11, 2013); *Crossroads Systems, Inc. v. Cisco Systems, Inc.*, No. 1:14-cv-148 (W.D. Tex. filed Feb. 18, 2014); *Crossroads Systems, Inc. v. Netapp, Inc.*, No. 1:14-cv-149 (W.D. Tex. filed Feb. 18, 2014); *Crossroads Systems, Inc. v. Quantum Corp.*, No. 1:14-cv-150 (filed Feb. 18, 2014).

Counsel is also aware of the following consolidated appeals, currently pending before this Court, that concern the patents on appeal here and related patents: *Crossroads Systems, Inc. v. Oracle Corp.*, Nos. 2016-1930, -1931 (Fed. Cir. consolidated April 28, 2016).

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1295 (a)(4)(A).  The Board issued its final written decisions in these cases January 29, 2016 (appeal nos. -2017 and -2027) and March 16, 2016 (appeal no. -2026) and Crossroads timely filed its notices of appeal in the three

consolidated cases on March 31, 2016.  Under Rule 28(a)(5),

Crossroads represents that the judgments appealed from are final.

## STATEMENT OF THE ISSUES

This appeal concerns a single issue:

1.      Did the PTAB err in finding all claims from three related

patents obvious over *CRD 5500 User's Manual* combined with various

secondary references, where it misconstrued the claimed

requirements for a "map" between "devices"?

## INTRODUCTION

This appeal challenges a fundamental legal error by the Board in

joined IPR proceedings, where the error turns on the Board's improper

notion of what the patents at issue cover.

Namely, the Board misconstrued what it means to provide a

"map" describing a relationship between a device on a computer

network and storage space elsewhere on the network.  The Board

believed that a more simplistic map—one describing a relationship

between a physical network interface and storage space—was legally

the same as the device-to-device map in the claims.  That reasoning

ignores that hard-wired physical connections between network

elements are different than a device-to-device mapping maintained by

a storage router—which the claims here require—and lack benefits of such mapping.  For example, a device-to-device map allows flexibility and security—i.e., easy reprogramming of mappings through a storage router, and security by preventing access even in the presence of unauthorized physical connections.

As explained below, the Board's error compels reversal.

## STATEMENT OF THE FACTS AND THE CASE

This case results from Crossroads' mid-1990s development of a new computer networking device known as a "storage router."  Such a device sits in a computer network and automatically mediates access by various computers to different storage devices (e.g., hard disk drives).  The storage router does so by using a device-to-device "map" that defines which computer can have access to which portions of storage.  The map provides flexibility and security—flexibility by allowing the storage router to define and redefine particular mappings by updating its mapping tables, and security by controlling access that any particular computer can have to storage devices and thus to the data on the devices.  All of this is transparent to users and their computers—i.e., the storage looks as if it is local to a particular

computer because the device-to-device mapping obscures the particular physical arrangement of the system.

These innovations cut the cost and complexity of sharing remote storage while increasing its usefulness, enabling deployment in contexts from small offices to "cloud" storage data centers.  After other companies began using Crossroads' technology, it licensed fifty-one of them on reasonable terms, and obtained a jury verdict of infringement and damages in 2001 that this Court affirmed.[1]  These appeals are from IPRs subsequently instituted on Crossroads' patents.

### 1.    Crossroads' Invention—Device-to-Device "Maps" That Control Access of Computer Devices to Storage Devices.

The patents at issue address techniques that a storage router uses to mediate computer access to data storage over a computer network.  *See* '147 patent, Appx19691–704.[2]  Annotated Figure 3,

---

[1] *Crossroads Sys., (Tex.), Inc. v. Chaparral Network Storage, Inc.*, No. 1:00-cv-217, slip op. (W.D. Tex. Nov. 15, 2001) (No. 179), *aff'd without op.*, 56 F. App'x 502 (Fed. Cir. 2003) (involving the parent patent to the ones in this appeal).

[2]  The patents are U.S. Patents 6,425,035 (Appx198–211), 7,934,041 (Appx8044–58), and 7,051,147 (Appx19691–704).  For the Court's convenience, this brief generally omits parallel citations to identical passages in the written descriptions or figures, and in documents that are copies among the various PTAB trial numbers.

below, shows a storage router 56 placed physically between five

networked computer workstations on the left and three storage

devices on the right:



FIG. 3

*Id.* at fig.3, Appx19696; *see also id.* at 4:20–60, Appx19699.[3]  The

coloring in the figure shows how computer workstations make

requests to write data to or read data from storage, and the storage

router controls what parts of storage each workstation can access.  *Id.*

at 4:32–40, Appx19699.  Specifically, all workstations can access all

parts of storage device 60 (it shows all colors), only workstation E can

---

[3] Unless otherwise noted, all coloring, emphasis, and annotations
added.

access storage device 64 (they are both pink), and each of the other four workstations can access its own individual portion of storage device 62. *Id.* at 4:30–40, Appx19699; *see also id.* at 4:63–5:4, Appx19699–700 . Although all workstations communicate over a single Fibre Channel loop 52 "transport medium," they see their own allocated storage as their own local drives, and are not even aware of the other storage in the system. *Id.*

The storage router uses device-to-device "mapping" for such control—which is explicit in the specification and claims, and is critical to the invention's overall concept. Specifically, the storage router's map may take the form of a table that connects each workstation (the first device) on one end, with its corresponding assigned storage (on the second device) on the other. *See, e.g.*, *id.* at 2:16–19, Appx19698; *see also id.* at 4:20–29, Appx19699. Each workstation has a unique identifying address—a critical component that allows the device to be identified regardless of its physical location in the system, and even though all devices share a common network medium. *See id.* at 7:3–15, Appx19701. When a particular workstation requests access to storage (whether to read or write), the storage router consults the map to

determine whether the particular workstation should be able to see the particular requested storage. *See id.* at 4:56–5:4, Appx19699.

This device-to-device mapping provides capabilities not available in the prior art. For example, it provides great flexibility because an administrator at a "central management station" can change the mapping tables and thus easily update what storage is available to any particular computer or group of computers, such as when adding access to shared storage for a new employee's computer or deleting a computer's access in the event of a security breach. *E.g.*, *id.* at 2:43–53, 4:41–66, 5:5–9, Appx19698–700. As shown in Figure 3 above, the storage router can change storage allocation in various manners to meet the changing needs of the computer users. As another critical advantage, the device-to-device mapping allows the system to be secure by imposing access control—i.e., no computer can get to storage that the map has not allocated to it, even if it is on the same physical network wire. *E.g.*, *id.* at 3:67–4:9, 4:20–29, Appx19699.

Claim 21 of the '147 patent is representative of Crossroads' claimed technology. It describes (1) how the storage router "map[s] between" the various devices on the "first transport medium" (in the figure, the Fibre Channel connection), and (2) the requirement of

"access controls" that control the access of devices on that first

medium to the storage devices (Appx19703):[4]

21. A system for providing virtual local storage on remote storage devices, comprising:

a first controller operable to connect to and interface with a first transport medium operable according to a Fibre Channel protocol;

a second controller operable to connect to and interface with a second transport medium operable according to a Fibre Channel protocol; and

at least one device connected to the first transport medium;

at least one storage device connected to the second transport medium; and

an access control device coupled to the first controller and the second controller, the access control device operable to:

map between the at least one device and a storage space on the at least one storage device; and

control access from the at least one device to the at least one storage device using native low level, block protocol in accordance with the map.

---

[4] All the independent claims across the three challenged patents have essentially these issues, with distinctions between the claims not affecting these appeals.

## A.     The '041 and '147 Patents' Dependent Claims

One of the major issues in this appeal is what the "maps between" language in each patent's independent claim actually requires.  As discussed *infra*, the PTAB held that it covered a router that maps to a "transport medium."

While the language of the independent claims runs counter to that conclusion, the dependent '041 and '147 claims are stronger evidence yet.  For example, claims 14 and 15 of the '041 patent explicitly require device-discrimination capability by reciting that each device on one "transport medium: must have a "unique identifier" name, and this name is used in the device-to-device map.[5]  As shown below, claim 14 requires that each device on one "transport medium" have some "unique identifier" name that can be used for building the map between workstations and storage devices.

_____

[5] The device-discrimination capability of claims 14 and 15 is also required, in substantially-similar verbiage, elsewhere, including claims 33, 34, 50, and 51 of the '041 patent and claims 17, 24, 31, and 36 of the '147 patent. See '041 patent, Appx8056–58; '147 patent, Appx19703–04.

> 14. The storage router of claim 1, wherein the representations of devices connected to the first transport medium are unique identifiers.

'041 patent, Appx8056.

Claim 15 goes even further, requiring that these unique identifiers be globally unique, permitting the system to discriminate among all the devices anywhere in the world:

> 15. The storage router of claim 14, wherein the unique identifiers are world wide names.

*Id.*

In a similar vein, dependent claims in the '147 patent further emphasize the invention's ability to have differential access rights for any number of workstations, even if those workstations share a single network "channel."  For example, claim 24 of that patent requires an

express mapping that links "host device ID"—that is, an ID specific to

that host—to a "remote storage device":[6]

> 24. The system of claim 21, wherein the access control device is further operable to maintain a configuration including the map, wherein the map provides a mapping from a host device ID to a virtual LUN [logical unit] representation of the at least one storage device to a physical LUN of the at least one storage device.

Appx19703; *see also id.* 7:48-50 (defining "LUN"), Appx19701.

---

[6] Technically, the claim requires mapping a host device ID to a "virtual LUN representation" of a storage device, and from there to a physical device. As the patent describes, a LUN ("logical unit") is an arbitrary identifier that signifies a set of storage. The boundaries of the virtual LUN's set could be physical (e.g., "this physical drive") or logical (e.g., "these drives together"). The claim thus requires a tripartite relationship: a host device, mapped by its ID to a virtual LUN, which is mapped to another LUN (a "physical LUN") corresponding to at least one storage device. Claims 17, 31, and 36 of the '147 patent, for example, use similar language for this device-discrimination capability. Appx19703–04.

**B.    The Parties' Dispute and the Present IPRs**

The PTAB instituted the appealed-from IPRs between January and April 2015, on petitions from Cisco and Quantum.[7]  *See* -1226 Inst. Dec., Appx2282; -1463 Inst. Dec., Appx12334; -1544 Inst. Dec., Appx23376.  All the attacks have failed—save one set of issues that are the focus of this appeal.  The remaining issues, on which the Board focused in all three decisions appealed from here, concern obviousness rejections over a single primary reference, *CRD-5500 User's Manual*, and two secondary references, "HP Journal" and "The Fibre Channel Standard."

**1.    CRD-5500 User's Manual**

The *CRD-5500 User's Manual* discusses a system that sends communications to its particular input/output ports, but does not map to devices that exist beyond those ports.  *See CRD-5500 User's Manual*, Appx438–529.  Relevant to this appeal, the *Manual* describes

---

[7] The PTAB then joined these IPRs with three follow-on IPRs filed by Oracle and, for the '147 patent, Dot Hill Systems, that presented the same arguments.  The remainder of this brief generally uses "Cisco" to refer to the petitioners.  All claims of all three patents are at issue in this appeal, and all turn on the same primary reference.

connecting four "hosts"—e.g., computers in an office (colored blue)—

to an array of disks (orange) via the CRD-5500 controller (pink):



Appx448.  These connections are over links, or cable paths, that the

*Manual* calls "channels," and to which the controller assigns channel

numbers 0 through 3 (above, yellow).[8]

---

[8] In deep technical detail, a "channel" denotes one of nine "SCSI I/O modules" inside the controller's body.  *Manual* at 1-1, Appx446.  The controller can send and receive signals on the wiring ("buses") attached to each module through these channels.  Because each "module" is relevant here only as an intermediary between an attached SCSI bus and the CRD-5500 controller, this brief elides the role of the modules and treats the *Manual*'s references to "channels" as effectively referring to the SCSI wires that carry data in and out of the modules.

The CRD-5500 assigns storage resources (which are logical subsets of the storage in the array, called "redundancy groups") to these channels rather than to the actual hosts.[9]  Each channel is assigned certain "host logical unit numbers," or "Host LUNs," that each correspond to a particular redundancy group in the storage, where the correspondence is tracked by a "Host LUN Mapping Table" for each channel.  The table below shows which host LUNs correspond to which redundancy groups for "channel 0":



*Id.* at 4-5, Appx481.  Here, a host on channel 0 would have no ability to access redundancy groups 2, 3, or 4, because there is no Host LUN

---

[9] Each "redundancy group" can cover different storage.  One group could represent a single storage device; another could represent just a part of the storage on a different device; a third could represent storage from multiple devices.  *See generally Manual* at 1-2, Appx447.

corresponding to those groups.  Such restrictions would apply to ***that
entire channel***, i.e., to all hosts connected to that channel.  Because the
Host LUN Mapping Tables are per-channel only, the *Manual* teaches no
ability to differentiate based on "device" (i.e., computer)—but instead
only by channel.  The "Host LUNs" do not map computers to storage;
they are arbitrarily-selected integers used to implement the *Manual*'s
channel-oriented mapping.

Even where a single device is connected to a particular channel,
as shown in the simplified system diagram from the *Manual* above,
there is no device-to-device mapping as the challenged claims require.
In the claims, a map is something maintained by the router itself, not
something achieved by physical hard-wiring.  The map can be readily
remapped, which hard-wiring cannot.  And the map can ensure, at the
controller, that only the proper devices communicate, whereas a
reliance on hard wiring does not provide such security.

## 2.    Board Proceedings

Before the Board, Crossroads argued that the *CRD-5500 User's
Manual*, even accounting for various secondary references, rendered
no reviewed claim obvious.  Before the Board, Crossroads pointed out
that the *Manual* failed to organize resources by "device," and instead

operated only by "channel."  Crossroads urged that this "channel-oriented mapping" was qualitatively different from the "device-oriented mapping" required by the challenged claims.  *See, e.g.*, -1226 Resp. 25–33, Appx2392–400; -1463 Resp. 23–33, Appx12442–52; -1544 Resp. 24–33, Appx23489–98.  Crossroad further argued that, even if the independent claims were held obvious, certain dependent claims added limitations (those discussed above) so central to the device-to-device mapping of the patents that they should survive any obviousness attack.  *See, e.g.*, -1463 Resp. 44–47, 48–49, Appx12463–66, 12467–68; -1544 Resp.  47–49, Appx23512–14.

The Board rejected those positions, finding all claims of the '035, '041, and '147 patents unpatentable over the *Manual*, variously combined with secondary references called *HP Journal*, Fibre Channel Standard, and QLogic Data Sheet (discussed, where relevant, below). Those decisions led to this appeal.

## SUMMARY OF THE ARGUMENT

The claims require a map or mapping in the router from one end device (e.g., a computer) to the other end device (e.g., a disk drive). The mere presence of a connection between devices that depends on how a network is hard-wired cannot meet that requirement because

16

the map in the router must itself define the connection between the devices—that connection cannot be defined by hard-wiring outside the router.  Indeed, a system that depends on hard-wiring is vastly inferior because the wiring cannot be changed or controlled from the router—thus robbing such a system of the flexibility and security that a true mapping between devices offers.  The Board's rejections, based on an improper construction, should be reversed.

## STANDARD OF REVIEW

The propriety of a Board decision that declares patent claims obvious is a question of law with underlying issues of fact.  *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).  Absent disputed fact issues, this Court reviews the claim construction determinations *de novo*.  *In re Donaldson Co.*, 16 F.3d 1189, 1192 (Fed. Cir. 1994) (*en banc*); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840–41 (2015).  Where the claim construction determinations involve resolution of disputed fact issues, this Court examines the Board's subsidiary fact finding on extrinsic evidence for substantial evidence.  *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999); *Teva Pharms.*, 135 S. Ct. at 840–41; *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000).

## ARGUMENT

### I.   THE BOARD'S INTERPRETATION OF THE "MAPS BETWEEN DEVICES" LIMITATION WAS ERRONEOUS

In matching the claims to the CRD-5500 User's Manual, the Board committed serious claim construction errors.  Specifically, it gave the claims far broader scope than the patent reasonably supports, and in so doing abridged the "broadest reasonable interpretation" standard.  That error led the Board to conclude that the vastly-different technology in the CRD-5500 User's Manual made the claims under review obvious.  The Court should reverse.

#### A.   The Board's Conclusion that the Device-to-Device Mapping Limitation Covered the *CRD-5500 User's Manual* Was Wrong as a Matter of Law

As in *Acceleron*, the Board's error in assessing the *CRD-5500 User's Manual* was in how it resolved the legal question of claim scope—are the claims under review so broad as to cover the technology in the *Manual*?[10]  *Dell Inc. v. Acceleron LLC*, 818 F.3d 1293,

---

[10] The Board's ultimate obviousness determinations applied combined disclosures from *CRD-5500 User's Manual*, the *HP Journal*, the *Fibre Channel Standard* and/or the *Q Logic Data Sheet*.  E.g., -1226 Dec. 2, Appx2; -1463 Dec. 2, Appx41; -1544 Dec. 5, Appx86.  The Board relied only on the *Manual* for the "device-oriented mapping" requirements (which appear, in various forms, in all independent claims).

1300–01 (Fed. Cir. 2016) (reversing Board's erroneous determination that a prior art device practiced the claim under review). And, as in *Acceleron*, legal error by the Board in answering this question requires reversal.

As discussed above, it is not in dispute—and, indeed, the Board acknowledged—that the *Manual* describes a system in which attached devices' access to storage is arranged on a channel-by-channel, not device-by-device, basis. -1226 Dec. 19, Appx19 (acknowledging "the host LUN mapping feature [of the *CRD-5500 User's Manual*] only maps storage devices to host **channels**, not the specific hosts themselves"); -1463 Dec. 19, Appx58 (same); -1544 Dec. 14, Appx95 (same). Such a "channel-oriented" approach is qualitatively different from the device-to-device mapping the challenged claims require.

Because the *Manual* can only organize access control regimes by channel, and not by device, it is inflexible, inefficient, and difficult to customize. If anything, it highlights how the device-to-device mapping of the claims was a major advance. As discussed above, in the *Manual*'s system, access control decisions are dependent on the physical arrangement of a network. If an administrator wants to give one device different access options than another, the administrator must

19

make sure the two devices are not on the same channel.[11]  This is because, as discussed, the channel-oriented approach in the *Manual* can only ever treat all devices on a channel the same.  Crossroads' invention, by contrast, is **device-to-device**, and can differentiate access rights among any number of devices, no matter how they are physically connected to the network.

After recognizing the distinction between the "channel-oriented" approach in the *Manual* and the device-to-device approach the claims require, the Board entered the following construction for the crucial "map between" limitation, purportedly to help it determine if the *Manual*'s more limited approach could fall within the challenged claims:

---

[11] The *Manual* suggests some configurations in which a single "channel" could be physically connected to more than one device.  *E.g.*, *CRD-5500 User's Manual* 6-10–6-15, Appx508–13.  But in such a configuration, the channel-oriented access control of the *Manual* would include no capability to differentiate access control among the two devices.

| Term | Construction |
|------|--------------|
| **"map between the device and the remote storage device"** | "To create a path from a device on one side of the storage router to a device on the other side of the router.  A 'map' contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices." |

-1226 Dec. 10, Appx10; -1463 Dec. 10, Appx49; -1544 Dec. 8, Appx89.

The reversible legal error comes not from the words of this construction itself, but in the Board's later expansion of the construction when it applied the claims to the *Manual*.

Specifically, the Board wrongly interpreted its phrase "a representation of devices" by finding that a "channel" (in the *Manual*) could be a "representation" of the device.  That conclusion was incompatible with any proper claim interpretation.

For the following reasons, the specification and file history establish beyond doubt that the challenged claims' requirement of ***device-to-device mapping*** cannot be satisfied merely by pointing to the "channels" set up by physical wiring, as the Board did.  The Court should correct the Board's error and reverse the obviousness determination.

**B.    No Reasonable Interpretation of the Challenged Claims Could Cover the *CRD-5500 User Manual*'s Channel-Oriented Mapping**

**1.    The Specifications and File Histories Establish that the Claims Require Device-Oriented Mapping, Not Channel-Oriented Mapping**

Each independent claim expressly recites a ***device-oriented*** mapping feature—that is, a flexible map that links first some particular "device" (e.g., a workstation on a network) with appropriate storage (on a second particular device) available to it.  For example:

*'147 Patent*

14.    "operable to control access . . . ***according to a map between*** the ***device*** and the remote storage device"

('147 patent 11:17–22, Appx19703)

21.    "the access control device operable to: ***map between*** the at least one ***device*** and a storage space on the at least one storage device; and control access from the at least one ***device*** to the at least one storage device . . ."

(*Id.* at 11:61–64, Appx19703)

_'035 Patent_

1. "operable to **map between devices** connected to the first transport medium and the storage devices . . ."

('035 patent, Appx205)

11. "**mapping between devices** connected to the first transport medium and the storage devices . . ."

(_Id._ at 10:47–48, Appx205)

_'041 Patent_

1. "**maintain a map** to allocate storage space on the remote storage devices to **devices** connected to the first transport medium . . ."

('041 patent 9:42–44, Appx8056)

37. "**maintaining a map** at the storage router to allocate storage space on the remote storage devices to **devices** connected to the first transport medium . . ."

(_Id._ at 12:12–14, Appx8057)

The Board's application of its construction is contrary to the plain language of the claims for multiple reasons. First, a "map" by its ordinary meaning is something that defines the endpoints of the route it is mapping. A map does not map something that is outside the bounds of the map and that is not mentioned in any way in the map. Second, the claims explicitly recite that these points are from the one

endpoint device (e.g., a computer host device) all the way to the other endpoint device (e.g., a hard disk storage device)—and not to some intermediate point like a port on the router that represents a channel. And third, claims like claim 21 of the '147 patent state explicitly that the "access control device"/router itself maintains the mapping. That is, the connection is not dependent on external factors (e.g., how a technician has physically connected devices on the network). This router-maintained map is what allows the inventive system to establish access rights on a ***device-by-device*** basis, including managing multiple computers on a single connection. It is by using the device-to-device "map" explicit in the claims that the inventive storage router can establish—on a device-by-device basis, in which the authorization regime is not dependent on specific network wiring or other physical details—access rights for storage.

The patent's figures and written description are explicit in making device-to-device mapping central to the invention. In particular figure 3 and the associated text (*infra*) set forth in detail how "mapping tables" are used to set up discrete access permissions for "each" device on the network. They teach a system in which all the "devices"—workstations A–E—are on a single network wire. They are

all attached to Fibre Channel interconnect 52. With device-to-device mapping tables, this creates no difficulty. Such mapping tables readily distinguish one "device" from another, even if all their communication comes over a single network wire. And the patents describes that distinction expressly:



FIG. 3

According to the present invention, storage router 56 has enhanced functionality to implement security controls and routing such that **each workstation 58 can have access to a specific subset** of the overall data stored in storage devices 60, 62, and 64. . . . Storage router 56 allows the configuration and modification of the storage allocated to **each** attached workstation 58 through the use of mapping tables or other mapping techniques.

As shown in fig. 3 [*supra*], . . . . [s]torage device 62 can be configured to provide partitioned subsets 66, 68, 70 and 72, where each partition is allocated to **one** of the workstations 58 (workstations A, B, C and D). These subsets 66, 68, 70 and 72 can **only be accessed**

> *by the associated workstation 58* and appear to the
> associated workstation 58 as local storage[.]

'147 patent, fig.3, Appx19696; 4:20–38, Appx19699.

Nothing in any of this disclosure embraces the "channel-oriented" approach in the *CRD-5500 User's Manual*.  To the contrary, the embodiment of figure 3 would be inoperative under the "channel-oriented" approach ventured by the Board.  In the figure, all of the "devices" (network workstations 58) share a single network channel (Fibre Channel interconnect 52).  If a "channel-oriented" approach were applied—if storage router 56 only organized storage based on channel, and not based on device identity—it would be impossible for any workstation on interconnect 52 to have different access privileges than any other workstation on that interconnect.  *See, e.g.*, Levy Decl. ¶¶ 72–73, Appx23568–69; *see also* Levy Decl. App'x A (Levy CV), Appx23606–09.  Figure 3 thus cements the notion that the "map" in Crossroads' invention *must be device-to-device* for this reason—from one end device to another, and not just to a cable connected to one of the router's output ports, or channels.

Other sections of the patents reaffirm the centrality of device-to-device mapping.  Further confirmation is in the "Summary of the Invention," which has particular relevance to understanding the claims'

scope.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir.

2004).  The Summary, too, points to device-to-device mapping:

> The storage router maps between ***the workstations***
> [not "channels"] and the SCSI storage devices and
> implements access controls for storage space on the
> SCSI storage devices.  The storage router then allows
> access from the workstations to the SCSI storage
> devices . . . ***in accordance with the mapping*** and the
> access controls.

'147 patent, 2:17–23, Appx19698.  Other references to mapping

between "devices" and storage suffuse the rest of the patents.[12]

Examination of the file history further confirms that the

challenged claims require "device-to-device" mapping and, in doing so,

---

[12] *E.g., id.* at 2:29–31 (discussing, in "Summary of the Invention," how
the invention "maps between Fibre Channel devices and the SCSI
storage devices"), Appx19698.  In one instance, the '147 patent
describes in detail how it is necessary to use "addressing information"
to distinguish one attached device from another when the two devices
share a network wire such as an "arbitrated loop."  *Id.* at 7:16–24
("[A]ddressing information [i.e., addresses of devices themselves] is
needed to map from FC addressing [Fiber Channel, used to connect
workstations and other "devices"] to SCSI addressing and vice versa."),
Appx19701.  The patents refer from time to time to SCSI ("Small
Computer Serial Interface") as technology for connecting a storage
router to storage such as hard drives.  SCSI is a set of standards for
connecting peripheral devices to computers.  Fibre Channel, a network
technology that certain claims recite, is a wiring/interconnection
standard sometimes used to implement SCSI.

demonstrate the Board's error.  During initial prosecution of the '147 patent, for example, the applicants ***expressly defined*** what was meant by the "mapping between" limitation, highlighting that it expressly required representations of devices—not "channels":

> Mapping between devices connected to the first transport medium and storage devices in the present application refers to a mapping between ***workstations/host computers and storage devices such that a particular workstation/host computer on the first transport medium is associated with a storage device, storage devices or portion thereof on the second transport medium. . . . [T]he Specification points out that mapping provides a correlation between a host device and a storage device*** so as to create a path the storage router can use to connect a host device to the storage device.

'147 FH, Resp. of Jul. 27, 2005, at 14, Appx20042.

The Board's expansion of the claims to cover "channel-oriented" in the *Manual* is thus wholly unjustified.  No support exists ***anywhere*** in the intrinsic record for such an expansion.  Where, as here, the Board expands a claim beyond anything reasonably supported by the intrinsic record, reversal is appropriate.

**2.    The Reference to "Representations" in the Board's Construction Cannot Expand the Claim to Cover Channel-Oriented Mapping**

The Board relied heavily on in its construction referring to the map containing "representations" of attached devices—reasoning that a port or channel can be a "representation" of a device.  *See* -1226 Dec. 19–21, Appx19–21; -1463 Dec. 19–20, Appx58–59; -1544 Dec. 14–15, Appx95–96.  But such broadening of "representations"—which properly addresses the fact that a map would need to include names, IDs, or similar representations for devices because it could not store the devices themselves—runs contrary to the claim language and the intrinsic record.  *See Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298–99 (Fed. Cir. 2015) (confirming that constructions incompatible with the intrinsic record may not be the "broadest reasonable interpretation").

The Board's expansion of its construction is wrong for multiple reasons.  First, it ignores the express claim language that requires that the things being mapped are devices themselves and not other structures in a network that stand in for the devices.  It also ignores the uniform teachings of the specification and prosecution history discussed above.  Moreover, the Board's expansion is wrong because

the claims and intrinsic record explicitly distinguish the "devices" from the structures that connect them—e.g., the ports/channels of the router.  *E.g.*, '147 cl.21 (requiring a "device connected to the first transport medium"), Appx19703; *id.* at 2:11 (Summary of the Invention: "A plurality of Fibre Channel ***devices***, such as workstations, are connected to a Fibre Channel ***transport medium***[.]"), Appx19698; *id.* fig.3 (Figure 3:  depicting numerous workstations 58 sharing a single Fibre Channel interconnect (i.e., "transport medium") 52), Appx19696.  The express distinction between, and relationship between, these structures further emphasizes that one cannot stand in for the other, and highlight that the Board abrogated that distinction by equating the *Manual*'s channel (which, like the "transport medium" in the patents, is the connecting structure) with a device.

The Court has repeatedly found error in claim interpretations that fail to respect the conceptual distinctions clearly present in a patent claim.  *E.g.*, *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 752 (Fed. Cir. 2016) ("There is a canon of construction: 'the general assumption is that different words have different meanings.'"); *Pause Tech. LLC v. TiVo, Inc.*, 419 F.3d 1326, 1334 (Fed. Cir. 2005) ("In construing claims, however, we must give

each claim term the respect that it is due."); *CAE Screenplates Inc. v. Heinrich Fielder GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.").  Those cases should control.

The Board erred in relying on extrinsic evidence to collapse the distinction between "channel" and "device." *See* -1226 Dec. 20 ("[T]he CRD Manual explicitly refers to mapping hosts and host channels interchangeably[.]"), Appx20; -1463 Dec. 20, Appx59; -1544 Dec. 15, Appx96.  While the Board was moved by the *Manual*'s interchangeable use of the terms "host" and "host channel" in the context of the "mapping," such use outside the patents here is not controlling,[13] and in any event, simply highlights the simplistic view of the authors of the *Manual*—i.e., to them, the distinction did not matter because they were not trying to achieve the security and flexibility that the inventors here achieved with their device-based mapping.

---

[13]  *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977–78 (Fed. Cir. 2014) ("Extrinsic evidence may be used only to assist in the proper understanding of the disputed limitation; it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history.") (quoting *Bell Atl. Network Servs. v. Covad Commc'ns Grp.*, 262 F.3d 1258, 1269 (Fed. Cir. 2001)).

3.    **The Legal Error in the Board's Approach Was its Vitiation of the Device-Oriented Mapping Requirement, Not its Citation to "Intermediate Identifiers"**

The Board devoted a substantial portion of its Decisions to reasoning that the patents did not bar a "map" that used "intermediate identifiers" to represent devices.  -1226 Dec. 8–10, 21, Appx8–10, 21; -1463 Dec. 8–10, 20, Appx47–49, 59; -1544 Dec. 6–8, 15, Appx87–89, 96.  But "intermediate identifiers" are not the issue.  Certainly it is possible to use an "intermediate identifier" such as a device's name or network address in a "map" so as to practice the challenged claims, as these identifiers signify the device itself.  Indeed, the patents describe the use of some "intermediate identifiers" such as addressing information.  E.g., '147 patent, 7:16–18 ("[A]ddressing information is needed to map from [Fibre Channel] addressing to SCSI addressing and vice versa."), Appx19701.  The patents also describe communicating with certain Fibre Channel devices by using the device's "unique port identifier" or its "loop-unique ID (AL_PA)."  *Id.* at 8:1–26, Appx19701.  Again, such identifiers are suitable for use in the claimed "map" because they signify and identify the device itself.

The Board's error was in looking to physical intermediaries to the devices, rather than to the devices themselves (including by identifiers), as the claims and intrinsic record require.  The "channel numbers" on which the Board relied, though they might be "intermediate identifiers," are not identifiers for the device.  That a "channel" might in some implementations have just one host on it is no basis to abrogate the explicit requirement that the map refer to devices—a requirement that provides the security and flexibility discussed in the patents.

### 4.    Under the Proper Construction, the Independent Claims are Nonobvious

The Board's conclusion that any independent claims of the challenged patent covered the "channel-oriented" mapping operation described in the *Manual* was wrong as a matter of law.  The Court should correct this error by making explicit what, in Crossroads' view, was implicit in the previous construction of the claims: the claims require a map that is fundamentally "device-to-device"—i.e., the term "representation of a device" in the previously-entered construction must signify the device connected to the first transport medium, and not the transport medium itself.

With this correction, the Court should conclude as a matter of law that the claims under review are not obvious because there is no material fact question as to whether the *Manual* teaches such a "map" between devices.

## II.    THE BOARD COMMITTED FURTHER LEGAL ERRORS IN ITS ANALYSIS OF THE "UNIQUE IDENTIFIER," "WORLD WIDE NAME," AND "HOST DEVICE ID" DEPENDENT CLAIMS

The Board also committed serious errors in its treatment of several dependent claims: including claims 14, 15, 33, 34, 50, and 51 of the '041 patent and claims 17, 24, 30, and 36 of the '147 patent. Each of these claims recites more detail to the device-oriented mapping described above, and adds an additional requirement, such as that the map contain a "unique identifier" ('041 claims 14, 33, and 50), a "world wide host name" ('041 claims 15, 34, and 51), or a "host device ID" ('147 claims 17, 24, 30, and 36). In each claim, the extra features impose additional limitations on the device-to-device mapping of the independent claims. Not only must the "map" identify and be able to differentiate access rights among ***devices***—irrespective of how those devices are physically connected to the network—it must do so using the specific "unique identifiers," "world wide names," and/or "host device IDs."

The claim language at issue is as follows:

> ('041 patent) 14. The storage router of claim 1, wherein the representations of devices connected to the first transport medium are **unique identifiers**.

> ('041 patent) 15. The storage router of claim 14, wherein **the unique identifiers are world wide names**.

> ('147 patent) 24. The system of claim 21, wherein the access control device is further operable to maintain a configuration including the map, wherein the map provides a mapping from a **host device ID** to a virtual LUN [logical unit

'041 patent 10:36–40, Appx8056.

These additional features require reversal even if the Court affirms for the independent claims.  These limitations **expressly require** that the map identify connected "devices" (e.g., workstations) using specific technologies, and not some intermediary part of the system like a channel.

**Unique identifiers.**  The *CRD-5500 User's Manual* nowhere describes using "unique identifiers" to identify connected devices; the Board's conclusion to the contrary is unsupported by the evidence. The Board reasoned that, in one figure of the *Manual*, "the channel numbers do uniquely identify the hosts, as each channel contains one

host." -1463 Dec. 26, Appx65; *see also Manual* fig.1-2, Appx448. It therefore reasoned that the "channel number" identified in the Host LUN Mapping Table would, in such a circumstance, be a "unique identifier" for a device on the network:



*CRD-5500 User's Manual* at 4-5, Appx481.[14]

Such reasoning is simply wrong. The channel numbers in the *Manual* are precisely that: channel numbers. They identify "channels" and are not "unique identifiers" of a device. For the reasons already discussed, these channel numbers do not, and cannot, provide the

---

[14] The "Host LUNs" in the left-most column of the Host LUN Mapping Table also do not satisfy the "unique identifiers" limitation, nor did the Board contend otherwise. As discussed *supra*, the Host LUNs are arbitrarily-assigned lookup numbers that a device attached to "channel 0" may use when communicating with the various redundancy groups set up in the CRD-5500 array. The Host LUNs do not identify specific devices on the network.

device-to-device mapping required by both the independent and dependent claims. Nor can those "channel numbers" serve as "unique identifiers" for devices attached to the channels. The very term "unique identifier" requires that the identifiers be selected so that no identifier applies to more than one item. The Board appears to have thought it enough that, where a single device is connected to a particular channel, the channel number will result in data being stored on the device, but that does not make the channel number a unique identifier for the device itself. The Board's analysis would wrongly expand that term so that one "unique identifier" enumerates both a channel and any devices on that channel (and the "uniqueness" falls apart)—a severe distortion of the "unique identifier" term, and unsupported anywhere in the record.

**World wide names.** Though all claims reciting the "world wide names" limitation depend from claims requiring "unique identifiers," the Board's analysis for the "world wide names" limitations makes no effort to argue that the "channel numbers" discussed above are, or could somehow be, "world wide names." *See* -1463 Dec. 29–31, Appx68–70. The reason is simple—the channel numbers described in the *Manual* are not "world wide names." Instead, the Board reasons

that the channel-oriented "map" of the *CRD-5500 User's Manual* could have been populated with "world wide names" by bringing in a further secondary reference, the Fibre Channel Standard.[15]  The Fibre Channel standard sets forth the different types of names that can be used in various configurations of Fibre Channel-compatible networks, and identifies the appropriate naming authorities (i.e., the authorities ensuring uniqueness).  Among other things, it describes that, in some Fibre Channel networks, devices may be given "worldwide names" by some authority such as the IEEE or CCITT:

| Table 42 - Network addresses | | |
|---|---|---|
| NAA | Name_Identifier | Network |
| IEEE | WWN | Heterogeneous |
| CCITT - individual address | WWN | Heterogeneous |
| CCITT - group address | WWN | Heterogeneous |
| IP | WWN | Heterogeneous |
| IEEE extended | FCN | FC Networks |
| Local | FCN | FC Networks |
| Note:<br>WWN - Worldwide Name (worldwide unique address)<br>FCN - Fibre Channel Name (Fibre Channel unique address) | | |

Fibre Channel Standard at 114 tab.42, Appx10339.

That "world wide names" were known in the Fibre Channel Standard is not disputed.  But such names attached to devices—not the

---

[15] ANSI X3.230 Standard, *Fibre Channel: Physical & Signaling Interface* (1994) ("the Fibre Channel Standard"), Appx10192-669.

"channels" used in the *Manual*.  Because, as discussed, the *Manual* was intrinsically ***channel-oriented***, the Board's reasoning suffers from a serious gap.  With no "devices" in the "map" established by the *Manual*, there is nothing in the "map" to which one might attach a "world wide name"—even knowing of such names' existence (e.g., in the Standard).

The Board offers nothing to fill this gap, nor can it be filled using anything in the available record.  There is no disclosure in the *Manual*, or in the Fibre Channel Standard, of somehow reshaping the channel-oriented map in the *Manual* so that it becomes a device-to-device map, nor of doing so in a way that uses "world wide names."  Furthermore, even if "world wide names" were somehow incorporated into the Host LUN map of the *Manual* (despite the fact that there is no disclosure in either reference as to how to or why one would do so), the result would simply be to identify *channels* by world wide name, not devices.  Device identifiers simply do not exist in the channel-oriented mapping of the *Manual*.

**Host device IDs.**  The Board's "host device ID" analysis fails to properly apply the plain meaning of this term.  As it did for the "unique identifiers" term, the Board attempts to reason that a "channel number" in the *CRD-5500 User's Manual* can serve as a "host device ID."

*See* -1544 Dec. 21–22, Appx102–103.  For similar reasons as in the "unique identifiers" discussion, the Court should reject such reasoning.

The "channels" identified in the Host LUN Mapping Tables of the *Manual* do no more than identify a channel (i.e., a physical wire) connected to the system.  They do not identify devices in any respect. The discussion *supra* describes how, for the independent claims, it was error as a matter of law for the Board to conclude that this "channel" was not legally distinct from the claims' requirement of a "device."  For the "host device ID" claims, it is doubly improper for the Board to go further and conclude that this "channel" is legally indistinct from a "host device ID."  As already discussed, the "channel" does not identify a device, but only the path through which device communications may flow.  It is possible that arbitrarily-many hosts might be attached to a "channel"; the Host LUN Mapping Table of the *Manual* would look no different if there were three hosts or thirty.

**Conclusion.**  Separate from the independent claims, the dependent claims discussed above—the "unique identifier," "world wide names," and "host device ID" claims—add limitations that are fundamentally incompatible with the channel-oriented approach of the *Manual*, whether that reference is considered alone or with other

40

references.  The Court should reverse the obviousness finding for these claims.

## **CONCLUSION**

For the foregoing reasons, Crossroads respectfully requests that the Court reverse the findings of the Board and enter judgment that the claims under review are patentable over the cited art.


Dated: July 11, 2016

*/s/ John A. Dragseth*
John A. Dragseth
Robert Courtney
Conrad Gosen
FISH & RICHARDSON P.C.
3200 RBC Plaza, 60 South 6th St.
Minneapolis, MN 55402
612-335-5070

*Attorneys for Appellant*
*Crossroads Systems, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The Opening Brief for Appellant complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). The relevant portions of the Brief, including all footnotes, contain 7,410 words, as determined by Microsoft Word 2013.

*/s/ John A. Dragseth*
John A. Dragseth

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Federal

Circuit by using the appellate CM/ECF system on July 11, 2016.

I further certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the appellate

CM/ECF system, in addition to service via email to Appellee by serving

the email address of record as follows:

> Jared Bobrow
> Jared.Bobrow@weil.com
> Derek C. Walter
> Derek.Walter@weil.com
> Andrew S. Ehmke
> Andy.Ehmke@haynesboone.com
> David L. McCombs
> David.mccombs.ipr@haynesboone.com
> Debra J. McComas
> Debbie.McComas@haynesboone.com
> Scott T. Jarratt
> Scott.Jarratt@haynesboone.com
> Orion Armon
> oarmon@cooley.com
> Peter Sauer
> psauer@cooley.com

Dated:  July 11, 2016               */s/ John A. Dragseth*
                                    John A. Dragseth

43

# ADDENDUM

Trials@uspto.gov                                    Paper 51
571-272-7822                              Entered:  January 29, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

CISCO SYSTEMS, INC., QUANTUM CORPORATION, ORACLE
CORPORATION, and DOT HILL SYSTEMS CORPORATION,
Petitioners,

v.

CROSSROADS SYSTEMS, INC.,
Patent Owner.
_____

Case IPR2014-01226[1]
Patent 6,425,035 B2
_____

Before NEIL T. POWELL, KRISTINA M. KALAN, J. JOHN LEE, and
KEVIN W. CHERRY, *Administrative Patent Judges*.

CHERRY, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

I.      INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C.
§ 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a)
and 37 C.F.R. § 42.73.  For the reasons discussed below, we determine that

_____

[1] Case IPR2015-00825 has been joined with this proceeding.

IPR2014-01226
Patent 6,425,035 B2

Petitioners have shown by a preponderance of the evidence that claims 1–14 of U.S. Patent No. 6,425,035 B2 (Ex. 1001, "the '035 patent") are *unpatentable*.

###    A.    *Procedural History*

Cisco Systems, Inc. and Quantum Corporation filed a Petition (Paper 3, "Pet.") requesting institution of an *inter partes* review of claims 1–14 of the '035 patent.  Patent Owner Crossroads Systems, Inc. ("Patent Owner") filed a Preliminary Response (Paper 8, "Prelim. Resp.").  In a Decision to Institute (Paper 9, "Dec. Inst.") issued January 30, 2015, we instituted an *inter partes* review of claims 1–14 on the following grounds of unpatentability:

1. Claims 1–5 and 7–14 under 35 U.S.C. § 103(a) for obviousness over CRD-5500 Manual[2] and HP Journal[3]; and

2. Claim 6 under 35 U.S.C. § 103(a) for obviousness over CRD-5500 Manual, HP Journal, and QLogic Data Sheet[4].

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 22, "PO Resp.") and Petitioners filed a Reply (Paper 36, "Pet. Reply").  On September 17, 2015, we granted Oracle Corporation's and Dot Hill Systems Corporation's motion for joinder and joined IPR2015-00825 to

---

[2] CMD Technology, Inc., CRD-5500 SCSI RAID Controller User's Manual (1996) (Ex. 1004).

[3] Petitioners cite the following articles in Exhibit 1006 as one reference: Meryem Primmer, *An Introduction to Fibre Channel*, 47 HEWLETT-PACKARD J. 94–98 (1996) and Judith A. Smith & Meryem Primmer, *Tachyon:  A Gigabit Fibre Channel Protocol Chip*, 47 HEWLETT-PACKARD J. 99–112 (Oct. 1996) (Ex. 1006).

[4] QLogic Corp., FAS216/216U/236/236U Fast Architecture SCSI Processor (1996) (Ex. 1007).

2

IPR2014-01226
Patent 6,425,035 B2

this proceeding.  Case IPR2015-00825, Paper 20.  Oral hearing was held on October 30, 2015.[5]

Petitioners submitted the Declaration of Andrew Hospodor, Ph.D., dated July 31, 2014 (Ex. 1003, "Hospodor Declaration"), in support of their Petition.

Patent Owner submitted the Declaration of Dr. John Levy, Ph.D., dated April 20, 2015 (Ex. 2027, "Levy Declaration").  Patent Owner also submitted other declarations in support of its contentions of secondary considerations of non-obviousness.  *See* Ex. 2039; Ex. 2043.

Patent Owner filed a Motion to Exclude (Paper 40) and Reply in support of their Motion to Exclude (Paper 45).  Petitioners filed an opposition to Patent Owner's Motion to Exclude (Paper 43).

   *B. Related Proceedings*

The '035 patent is the subject of multiple district court proceedings. Pet. 2–3; Exs. 1026, 1034–1036; Paper 10, 2.

The '035 patent is also involved in IPR2014-01197 and IPR2015-00822.  The '035 patent belongs to a family of patents that are the subject of multiple *inter partes* review petitions including IPR2014-01207, IPR2014-01209, IPR2014-01463, IPR2014-01544, IPR2015-00852, and IPR2015-00854.

---

[5] A transcript of the oral hearing ("Tr.") is included in the record as Paper 50.

IPR2014-01226
Patent 6,425,035 B2

## II.    DISCUSSION

### A. The '035 Patent

The '035 patent relates to a storage router and method for providing virtual local storage on remote Small Computer System Interface ("SCSI") storage devices to Fiber Channel ("FC") devices.  Ex. 1001, 1:16–19.  SCSI is a storage transport medium that provides for a "relatively small number of devices to be attached over relatively short distances."  *Id.* at 1:23–26.  FC is a high speed serial interconnect that provides "capability to attach a large number of high speed devices to a common storage transport medium over large distances."  *Id.* at 1:29–32.  Computing devices can access local storage through native low level, block protocols and can access storage on a remote network server through network interconnects.  *Id.* at 1:37–49.  To access the storage on the remote network server, the computing device must translate its file system protocols into network protocols, and the remote network server must translate network protocols to low level requests.  *Id.* at 1:51–60.  A storage router can interconnect the SCSI storage transport medium and the FC high speed serial interconnect to provide devices on either medium access to devices on the other medium so that no network server is involved.  *Id.* at 3:30–40.

Figure 4 of the '035 patent is reproduced below:



4

IPR2014-01226
Patent 6,425,035 B2

Figure 4 is a block diagram of an embodiment of a storage router.  *Id.* at 2:59–60, 5:6–7.  Storage router 56 can comprise FC controller 80 that interfaces with FC 52 and SCSI controller 82 that interfaces with SCSI bus 54.  Buffer 84 connects to FC controller 80 and SCSI controller 82, and provides memory work space.  *Id.* at 5:7–9.  Supervisor unit 86 connects to FC controller 80, SCSI controller 82, and buffer 84.  *Id.* at 5:10–12.  Supervisor unit 86 controls operation of storage router 56 and handles mapping and security access for requests between FC 52 and SCSI bus 54.  *Id.* at 5:12–17.

Claims 1, 7, and 11 are the independent claims at issue in this trial, and claim 1 is reproduced below:

> 1. A storage router for providing virtual local storage on remote storage devices to devices, comprising:
>
> a buffer providing memory work space for the storage router;
>
> a first controller operable to connect to and interface with a first transport medium;
>
> a second controller operable to connect to and interface with a second transport medium; and
>
> a supervisor unit coupled to the first controller, the second controller and the buffer, the supervisor unit operable to map between devices connected to the first transport medium and the storage devices, to implement access controls for storage space on the storage devices and to process data in the buffer to interface between the first controller and the second controller to allow access from devices connected to the first transport medium to the storage devices using native low level, block protocols.

*Id.* at 9:13–31.

IPR2014-01226
Patent 6,425,035 B2

### B. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Tech., LLC*, 793 F.3d 1268, 1278–79 (Fed. Cir. 2015). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only those terms which are in controversy need be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

In our Decision to Institute, we construed the "map" limitations of the independent claims (i.e., "to map between devices connected to the first transport medium and the storage devices," as recited by claim 1; "to map between the workstations and the storage devices," as recited by claim 7; and "mapping between devices connected to the first transport medium and the storage devices," as recited by claim 11) (Dec. Inst. 5–6); "native low-level block protocol" (*Id.* at 6–7); and "remote" (*Id.* at 7).

Patent Owner proposes a new construction for the "map" limitations and a construction for the "access control" limitations (i.e., "a supervisor unit . . . operable . . . to implement access controls for storage space on the storage devices . . ." (Claim 1); "[a] storage router operable to . . . implement access controls for storage space on the storage devices" (Claim 7); and

6

IPR2014-01226
Patent 6,425,035 B2

"implementing access controls for storage space on the storage devices" (Claim 11). PO Resp. 5–13.

Neither party contests our construction for "native low-level block protocol" (Dec. Inst. 6–7) and "remote" (*Id.* at 7). We adopt our previous constructions and analysis for those terms. *See id.* at 6–7. Thus, we construe "native low-level block protocol" as "a protocol in which storage space is accessed at the block level, such as the SCSI protocol." *Id.* at 6–7. We also construe "remote" as "indirectly connected through a storage router to enable connections to storage devices at a distance greater than allowed by a conventional parallel network interconnect." *Id.* at 7.

### *"map" limitations*

In our Decision to Institute, we found the broadest reasonable construction of the various "map" limitations to be "to allocate storage on the storage device on the first transport medium to facilitate routing and access controls." *Id.* at 6. Patent Owner submits that the parties agree that this construction requires "identification of the particular hosts within the map." PO Resp. 6. Patent Owner argues that this understanding is consistent with the prior district court construction, the testimony of Petitioners' expert, and the intrinsic evidence. *Id.* at 6–8. Patent Owner asserts that "'allocate storage on storage devices to devices on the first transport medium to facilitate routing and access controls' means the 'map' must identify within the map the **precise** host to which storage has been allocated within the map." *Id.* at 8 (citing Ex. 2027 ¶¶ 37–38). In other words, Patent Owner contends that the proper construction requires "that the map specifically identify the host and storage so that the storage router can allocate storage to particular hosts." *Id.* at 11. According to Patent Owner,

7

IPR2014-01226
Patent 6,425,035 B2

it is not enough to map between a storage device and an intermediate identifier associated with a particular device because the identifier is not directly and immutably associated with the device itself—in other words, mapping to an identifier is insufficient unless the identifier is associated with a particular device and *cannot* be associated with any other device. *See id.* at 18–23 (arguing that mapping to a channel identifier does not suffice, even if the channel is connected to only one host device, because the channel identifier *could* be associated with another device if another device were connected to that channel).

Petitioners object that, for two reasons, Patent Owner's proposed construction is not the broadest reasonable construction. First, Petitioners argue that the specification of the '035 patent simply teaches associating hosts and storage. Pet. Reply 3. Petitioners argue that the specification contains no implementation details and is silent as to the specific manner in which such associations are created. *Id.* Thus, Petitioners contend that Patent Owner's requirement of a particular map with specific characteristics cannot be the broadest reasonable construction. *Id.* at 3–4. Second, Petitioners assert that Patent Owner seeks a construction that not only must the mapping include precise identifiers, but that these identifiers must be intrinsically tied to a host. *Id.* at 4.

Upon reviewing a full record, we revisit our construction of the "map" limitations. We conclude that, given the evidence and arguments presented, our original construction requires some additional clarification. With a full record, we find that Petitioners do not explain sufficiently what it means to "facilitate" routing and access controls. Thus, we determine that our original construction is too vague. We also conclude that the construction proposed

8

IPR2014-01226
Patent 6,425,035 B2

by Patent Owner is overly narrow.  Although Patent Owner emphasizes that the map must identify specific host devices, it does not explain persuasively why the claim language should be construed to exclude doing so via intermediate identifiers.  *See* PO Resp. 5–11.  Patent Owner does not identify any disclosure in the '035 patent's specification that clearly disavows mapping to a device indirectly, or mapping to a device via an intermediate identifier that could identify a different host if the system were configured differently.  *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (holding that "words of manifest exclusion or explicit disclaimers in the specification are necessary to disavow claim scope" (internal quotations omitted)).  Patent Owner's discussion of Figure 3, for example, is insufficient to compel a narrow construction of the term because Patent Owner analyzes only a preferred embodiment of the invention.  *See* PO Resp. 8–10; *see*, *e.g.*, *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004) (holding that limitations should not be imported from preferred embodiments into the claims absent a clear disclaimer of claim scope in the specification).

Moreover, the '035 patent specifically discusses mapping with identifiers that are not immutable.  For example, the specification discusses addressing devices on an FC loop using an AL_PA (arbitrated loop physical address) identifier, and the possibility of "FC devices changing their AL-PA due to device insertion or other loop initialization."  Ex. 1001, 8:29–34; *see* Tr. 54:5–55:15 (counsel for Patent Owner acknowledging an AL_PA is a "temporarily assigned ID" that can point to different devices); Pet. Reply 5–8 (discussing evidence supporting the use of intermediate identifiers, including testimony by Patent Owner's proffered expert).

IPR2014-01226
Patent 6,425,035 B2

For the reasons above, we are not persuaded that the broadest reasonable interpretation of the "map" limitations mandates mapping directly or immutably to a host device itself, or excludes mapping to devices using intermediate identifiers.

The parties note that a district court in a related case construed the "map" limitations as follows:

> To create a path from a device on one side of the storage router to a device on the other side of the router. A "map" contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices.

Ex. 1009, 12. Although we are not bound by the construction or reasoning of the district court, we do not disregard the analysis and conclusions of a court construing the same claim term in a concurrent proceeding concerning the same patent. *See Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–27 (Fed. Cir. 2015). After considering the construction of the district court, we determine this construction corresponds to the broadest reasonable interpretation and adopt it for purposes of this Decision.

### *"access control" limitations*

Patent Owner also seeks to have us construe the various "access control" limitations. PO Resp. 11–13. Patent Owner contends that the access controls of the '035 Patent refer to controls that limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map. *Id.* at 11. In other words, Patent Owner asserts that "the access controls are device specific in that they limit a particular device's access to specified storage according to the map." *Id.* at 12 (citing Ex. 2027 ¶ 43). Patent Owner argues that, as described in the specification

10

IPR2014-01226
Patent 6,425,035 B2

of the '035 patent, the storage router implements access controls according to the map so that the allocated storage can only be accessed by the host(s) associated with that storage in the map. *Id.*

Petitioners disagree with Patent Owner's understanding of the meaning of these limitations. Pet. Reply 8–10. In particular, Petitioners argue that Patent Owner seeks to impermissibly narrow the "access control" limitations by arguing that to meet these limitations the prior art must additionally provide different storage access to different hosts. *Id.* at 8. Petitioner also submits that "Patent Owner seeks to read into the 'access control' limitation a requirement that access to storage by particular hosts must be maintained between physical reconfigurations of the hosts." *Id.* at 9. Thus, Petitioners argue that the "access control" limitations "should be at least as broad as the District Court's construction of 'controls which limit a [device]'s access to a specific subset of storage devices or sections of a single storage device according to a map." *Id.* at 10.

We agree with Petitioners that the "access controls" limitations are not as limited as Patent Owner contends. Beginning with the language of the claims, we note that dependent claims 2, 8, and 12 already recite that subsets of storage are allocated to associated devices and that the subsets are accessible only by the associated devices. Patent Owner provides no explanation why we should adopt a construction for "access controls" that would render these dependent claims superfluous. *See InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324–25 (Fed. Cir. 2012). This counsels against reading this limitation into the independent claims. As for the specification, Patent Owner fails to point us to any express or implicit disclaimer that would limit the "access controls" to only

IPR2014-01226
Patent 6,425,035 B2

device-specific access controls that can only limit a particular device's access to specified storage. For example, the discussion of Figure 3 of the '035 patent is insufficient to compel a narrow construction of the term because it analyzes only a preferred embodiment of the invention. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer . . . It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation.").

Thus, we agree with Petitioners that the broadest reasonable interpretation of the term "access controls" is "controls which limit a device's access to a specific subset of storage devices or sections of a single storage device according to the map." Ex. 1026, 40; Ex. 2027 ¶ 34.

### C. Obviousness of Claims 1–5, and 7–14 over CRD-5500 Manual and HP Journal

#### CRD-5500 Manual (Ex. 1004)

The CRD-5500 Manual describes the features and operation of the CRD-5500 SCSI RAID Controller. Ex. 1004, 9. In general, the CRD-5500 RAID controller routes commands and data between hosts (i.e., initiators) and storage devices (i.e., targets) coupled to the controller. *Id.* at 9, 12. Figure 1-2, as annotated by Petitioners, illustrates the architecture of the storage network in which the CRD-5500 RAID controller operates:

12

IPR2014-01226
Patent 6,425,035 B2



CQ-1004, Figure 1-2 (annotated)

Figure 1-2 shows the architecture of a network using the CRD-5500 with hosts attached to SCSI buses on one side of the controller and storage devices also attached to SCSI buses on the other side.  *Id.* at 10–13.

The CRD-5500 Manual describes that a Host LUN (Logical Unit Number) Mapping feature that allows a user to assign redundancy groups to a particular host.  *Id.* at 10.  The logical unit number is the number that the host uses to address the drive.  *Id.* at 18.  A redundancy group is defined as each RAID (Redundant Array of Independent Disks) set or partition of a RAID set (i.e., storage space).  *Id.* at 19.  The CRD-5500 Manual describes that the Host LUN Mapping feature is part of the Monitor Utility included in the firmware of the controller.  *Id.* at 40, 44.  The CRD-5500 Manual includes a screen shot of the Monitor Utility's Host LUN Mapping feature:

13

IPR2014-01226
Patent 6,425,035 B2

```
                          Monitor Utility                    02-09-96
                         HOST LUN MAPPING                     13:14:00
                            Channel 0

  +-------------------------------+    +-------------------------------+
  | Host LUN | Redundancy Group |    | Host LUN | Redundancy Group |
  +-------------------------------+    +-------------------------------+
  | 0        | 0                |    | 16       | 16               |
  | 1        | 1                |    | 17       | 17               |
  | 2        | -                |    | 18       | 18               |
  | 3        | -                |    | 19       | 19               |
  | 4        | 5                |    | 20       | 20               |
  | 5        | -                |    | 21       | 21               |
  | 6        | 6                |    | 22       | 22               |
  | 7        | 7                |    | 23       | 23               |
  | 8        | 8                |    | 24       | 24               |
  | 9        | 9                |    | 25       | 25               |
  | 10       | 10               |    | 26       | 26               |
  | 11       | 11               |    | 27       | 27               |
  | 12       | 12               |    | 28       | 28               |
  | 13       | 13               |    | 29       | 29               |
  | 14       | 14               |    | 30       | 30               |
  | 15       | 15               |    | 31       | 31               |
  +-------------------------------+    +-------------------------------+

  ARROW KEYS: MOVE CURSOR | N: NEXT CH | P: PREV CH | ENTER: SELECT | CTRL-Z: EXIT
```

*Id.* at 44. This screen shot shows a table matching the various Host LUNs to different redundancy groups for the host on Channel 0 of a CRD-5500. *Id.* Each "host channel" corresponds to an I/O module that provides an external interface port for the CRD-5500. *Id.* at 21; Ex. 2027 ¶ 68.

### *HP Journal*

Volume 47, issue 5 of the Hewlett-Packard Journal includes a number of articles that address the growing problem in 1997 of "I/O channels becom[ing] bottlenecks to system performance." Ex. 1006, 5. Specifically, one article in the issue provides an introduction to the Fibre Channel I/O interface and describes it as "a flexible, scalable, high-speed data transfer interface that can operate over a variety of both copper wire and optical fiber at data rates up to 250 times faster than existing communications interfaces." *Id.* at 94. The article additionally provides many reasons a Fibre Channel communication link is superior to a SCSI bus (e.g., longer distances and higher bandwidth, smaller connectors). *Id.* It further notes that SCSI commands may be "encapsulated and transported within Fibre Channel frames" to support existing storage hardware. *Id.* at 94–95.

14

IPR2014-01226
Patent 6,425,035 B2

The HP Journal describes a Fibre Channel protocol chip made by HP called "Tachyon." *Id.* at 99–112. The article states that the Tachyon chip implements the Fibre Channel standard and "enables low-cost gigabit host adapters on industry-standard buses." *Id.* at 101.

Analysis

1. *Reason to Combine the CRD Manual and the HP Journal*

Applicable to all of the challenged claims, the Petition provides a detailed analysis of why a person of ordinary skill in the art would have been motivated to combine the CRD Manual and the HP Journal[6] in the manner asserted by Petitioners. Pet. 22–26 (citing Ex. 1003 ¶¶ 54–62). Specifically, Petitioners contend: (1) the CRD Manual explains that the disclosed CRD-5500 controller has a modular design capable of accepting various I/O modules; (2) the HP Journal describes the benefits of FC technology over SCSI technology; (3) the HP Journal discloses the replacement of SCSI with FC, including the use of SCSI commands with FC frames. *Id.* For example, the HP Journal discusses various advantages of FC over SCSI as a transport medium technology, including advantages in bandwidth and addressability, and explains how some FC controllers are compatible with SCSI devices. *Id.*; *see, e.g.*, Ex. 1006, 94–95, 99–101. Patent Owner does not dispute in its

------

[6] These portions of the *HP Journal* relied on by Petitioners share a common author (Meryem Primmer), and similar subject matter (FC technology and its implementation), as well as the same apparent publication date in the same issue of the journal. Patent Owner did not dispute that one of ordinary skill would have combined the teachings of the different articles in the *HP Journal*. Based on the full record after trial, we agree and consider them collectively, as the parties have done throughout the proceeding, for simplicity and to avoid confusion.

15

IPR2014-01226
Patent 6,425,035 B2

Patent Owner Response that a person of ordinary skill[7] would have had reason to combine the teachings of these references.

Based on the full record after trial, Petitioners have articulated a sufficient reason to combine the CRD Manual and the HP Journal with rational underpinnings supported by the evidence. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

    2.    *Claims 1–5 and 7–14*

        a.    *Claim 1*

Petitioners contend the CRD Manual teaches a storage router, the CRD-5500 controller, which routes data between host computers ("a device") and SCSI disk drives ("remote storage devices"). Pet. 26–27; Ex. 1004, 9–11. According to Petitioners, the CRD Manual teaches the buffer limitation of claim 1 through its disclosure of an "onboard cache" that temporarily stores data from the hosts before eventually writing that data to the storage devices. Pet. 27–28; Ex. 1004, 12.

With respect to the first controller operable to connect to and interface with a first transport medium, Petitioners rely on teachings from the combination of the CRD Manual and the HP Journal, as follows. Pet. 28–29. First, the CRD Manual discloses multiple "I/O modules," which interface with SCSI buses that connect to the hosts and the disk drives. Ex. 1004, 9, 21, 24, 32. Second, the HP Journal discusses the Tachyon FC controller chip, which enables interfacing with a high-speed FC connection. Ex. 1006, 101, 111. The HP Journal further discloses that the Tachyon

---

[7] The level of ordinary skill in the art is reflected by the prior art of record. *See Okajima v. Boudreau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

IPR2014-01226
Patent 6,425,035 B2

controller is designed to be compatible with SCSI commands as well.  *Id.*
at 101.  Based on these disclosures and the testimony of their proffered
expert, Dr. Andrew Hospodor, Petitioners argue a person of ordinary skill
would have been taught to replace the SCSI technology of the CRD Manual
I/O modules with the FC controller chip and FC interconnects of the HP
Journal to arrive at the first controller operable to connect to and interface
with a first transport medium of claim 1.  Pet. 27–29 (citing Ex. 1003, 43–
48).[8]  As for the second controller operable to connect to and interface with a
second transport medium, Petitioners rely on the CRD Manual's disclosure
of multiple "I/O modules," which interface with SCSI buses that connect to
the hosts and the disk drives.  Pet. 30–31 (citing Ex. 1004, 9, 21, 24, 32).

Next, the Petition identifies the central processor, system circuitry,
and firmware disclosed in the CRD Manual as teaching the recited
"supervisor unit."  Pet. 31 (citing Ex. 1004, 9, 11, 40, 53; Ex. 1003, 53–54).
As to the requirement that the supervisor unit be operable to "map between
the devices connected to the first transport medium and the storage devices,"
Petitioners rely on the CRD Manual's discussion of the Host LUN Mapping
feature.  *Id.* at 31.  Specifically, the CRD Manual describes a feature of its
Monitor Utility used to "map LUNs on each host channel to a particular
redundancy group."  Ex. 1004, 44.  A host channel corresponds to an I/O

_____

[8] Patent Owner argues that Dr. Hospodor's testimony should be accorded
"diminished" weight due to his alleged bias and certain deposition testimony
that Patent Owner believes undermines his credibility.  PO Resp. 55–59.  All
of these considerations were taken into account, and Dr. Hospodor's
testimony was accorded the weight appropriate in light of the full record.
Further, we determine that Dr. Hospodor was a credible witness overall,
despite the issues identified by Patent Owner, because his testimony
generally was supported by the record as explained in this Decision.

17

IPR2014-01226
Patent 6,425,035 B2

module, which is assigned to a host. *Id.* Each host channel has multiple LUNs, each of which can be mapped to a specific redundancy group. *Id.* Redundancy groups may be one or more disk drives, or partitions thereof. *Id.* at 19. Thus, Petitioners assert the CRD Manual teaches that the Monitor Utility maintains Host LUN Mapping settings that map a host on a host channel (the recited "device") and redundancy groups (the recited "remote storage devices"). Pet. 31 (citing Ex. 1003, 51–54).

Petitioners contend the CRD Manual teaches the "access controls" limitation as well. *Id.* at 31–32. Specifically, Petitioners identify the CRD Manual's discussion of using host LUN mapping settings to make certain redundancy groups available to certain host channels while blocking access to other host channels. *Id.* (citing Ex. 1004, 44).

Finally, according to Petitioners, the combination of the CRD Manual and the HP Journal teaches "process[ing] data in the buffer to interface between the first controller and the second controller to allow access from devices connected to the first transport medium to the storage devices using native low level, block protocols," as recited in claim 1. Pet. 32–33 (citing Ex. 1003, 55–57). Specifically, Petitioners note that the CRD Manual discloses host computers (initiator devices) writing data to disk drives (remote storage devices) via an onboard cache (buffer) using a SCSI interface. *Id.*; Ex. 1004, 9, 12, 24–25. As the '035 patent discloses, SCSI is an example of a "native low level, block protocol" within the meaning of the claims. *See* Ex. 1001, 5:6–17, 5:34–38. In addition, Petitioners rely on the HP Journal's discussion of using encapsulated SCSI commands over an FC link through the Tachyon FC controller (Ex. 1006, 101), arguing these disclosures would have taught a person of ordinary skill to process data from

18

IPR2014-01226
Patent 6,425,035 B2

host computers via an onboard cache to access (e.g., write data to) storage drives using encapsulated SCSI commands over an FC network.  Pet. 32–33.

Based on the full record after trial, we find that the combination of the CRD Manual and the HP Journal, as described above with Petitioners' citations and arguments that we adopt, teach or suggest each limitation of claim 1 of the '035 patent.  Patent Owner's counterarguments are unpersuasive.

First, Patent Owner argues the asserted combination does not teach the "map" limitation of claim 1.  PO Resp. 25–33; *see also id.* at 13–23 (arguing the CRD Manual fails to teach mapping).  According to Patent Owner, the CRD Manual fails to teach the recited mapping because the Host LUN Mapping feature only maps storage devices to host channels, not to the specific hosts themselves.  *Id.* at 13–15, 25–28 (citing Ex. 2027 ¶¶ 51–54, 61– 66, 73, 81, 82).  This argument, however, relies on the overly narrow claim construction rejected above, and is unpersuasive as a result.  For example, Patent Owner addresses Figure 1-2 of the CRD Manual, which is reproduced below:

IPR2014-01226
Patent 6,425,035 B2



Figure 1-2 of the CRD Manual depicts a configuration of the CRD-5500 controller where each of four different hosts is assigned to a different channel, i.e., channel 0 through channel 3. Ex. 1004, 10. These hosts may then access redundancy groups via the CRD-5500 controller. *Id.*

The specific configuration depicted in Figure 1-2 meets the mapping limitation because each host channel is dedicated to a single host—thus, in effect, mapping to a host channel is tantamount to mapping to a particular host. *See* Pet. Reply 12–13. In recognition of this fact, the CRD Manual explicitly refers to mapping to hosts and host channels interchangeably, which Patent Owner acknowledges at least with respect to Figure 1-2. *See* Ex. 1004, 9; PO Resp. 30–31; Pet. Reply 11. The analysis presented by Patent Owner regarding other configurations different from that in Figure 1-2—i.e., configurations where two hosts are connected to the same host channel (PO Resp. 20–22, 31)—does not cancel or negate the configuration disclosed by Figure 1-2. Similarly, whether the Figure 1-2 configuration would teach the mapping limitation if it were hypothetically altered by

20

IPR2014-01226
Patent 6,425,035 B2

switching cables is irrelevant.  *See* PO Resp. 19–20.  As discussed above, the broadest reasonable interpretation of the mapping limitation is not limited only to mapping directly and immutably to a specific host device, and does not exclude categorically the use of intermediate identifiers.  Consequently, Patent Owner has not shown persuasively why the configuration disclosed in the CRD Manual falls outside the scope of the claim language.

Patent Owner additionally contends that the CRD Manual fails to teach the access controls limitation of claim 1.  *Id.* at 33–38.  Making arguments similar to its arguments relating to the mapping limitation, Patent Owner purports to show how the redundancy group access controls of the CRD Manual can be defeated by changing the disclosed configuration in Figure 1-2, i.e., by rewiring the hosts such that multiple hosts are connected to the same host channel.  *Id.* at 37–38.  Patent Owner has not persuasively demonstrated, however, that the purported inadequacy of the access control method disclosed for the Figure 1-2 configuration, when directly applied to a different configuration, shows that the CRD Manual fails to teach implementing access controls at least for the configuration of Figure 1-2.

Although Patent Owner argues that Petitioners rely on such a configuration because they propose combining the CRD Manual with the HP Journal, Patent Owner inaccurately characterizes Petitioners' contentions as bodily incorporating only one aspect of the HP Journal's teachings—placing all hosts on a single FC arbitrated loop—while ignoring the HP Journal's other teachings regarding implementing such FC loops.  *See* PO Resp. 34–38; *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that

21

IPR2014-01226
Patent 6,425,035 B2

the claimed invention must be expressly suggested in any one or all of the references.  Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.").  As noted in the Petition (Pet. 20–21), the HP Journal provides detailed disclosures on the implementation of FC arbitrated loops, including configurations with multiple host devices.  *See* Pet. Reply 13–20; Ex. 1006, 100–111.  The record as a whole supports Petitioners' contention that a person of ordinary skill would have been able to combine the teachings of the CRD Manual and the HP Journal to arrive at a system utilizing FC loops, which maps redundancy groups to particular hosts and implements access controls as taught by the CRD Manual, but applying FC addressing capabilities taught by the HP Journal in lieu of the host channel-based implementation of the CRD Manual.  *See* Pet. Reply 13–20; Ex. 1003 ¶¶ 56–61.

Lastly, Patent Owner argues the asserted prior art fails to teach that the data in the CRD Manual's onboard cache is processed "to allow access from Fibre Channel initiator devices to the remote storage devices," as recited in claim 1, because the host already has access when that data is processed.  PO Resp. 39–40.  Thus, Patent Owner appears to argue that the data in the cache must be processed as part of determining whether access can be granted.  Patent Owner does not, however, explain why the claim should be construed in that manner.  Based on Petitioners' evidence and not disputed by Patent Owner, once the data in the CRD Manual's onboard cache is processed, it is written to the target storage device.  *See* Pet. 32–33.  As discussed above, Petitioners' contention that writing to a storage device teaches allowing access to those devices is persuasive based on the record

22

IPR2014-01226
Patent 6,425,035 B2

evidence, and we are not persuaded that Patent Owner's position is commensurate with the full scope of the claim language.

In sum, based on the full record after trial, we find that a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of claim 1 of the '035 patent.

   *b.*    *Claims 2–5*

Claims 2–5 depend, directly or indirectly, from claim 1.  Petitioners presented evidence and argument to support their contention that the combination of the CRD Manual and the HP Journal teaches each limitation of these dependent claims.  Pet. 34–38.  We agree that the cited evidence teaches or suggests the limitations of these claims.  For example, Petitioners rely on the redundancy groups of the CRD Manual as teaching the "subsets of storage space" recited in claim 2, and identify the Host LUN Mapping and access control features in the CRD Manual as teaching allocating those subsets to associated devices such that each subset is only accessible by the associated device.  *Id.* at 34–35.  The Petition identifies portions of both the CRD Manual and the HP Journal that describe workstations, including workstations in an FC loop, as teaching devices comprising workstations, as recited in claim 3.  *Id.* at 35–36; Pet. Reply 13–17 (discussing use of AL_PA in the combination).  As discussed above, we find this explanation of the combination using AL_PA in mapping persuasive to show that the combination teaches the limitations of claim 2.  With respect to claim 4, Petitioners rely on the CRD Manual as disclosing hard disk drives as storage devices.  *Id.* at 36.  Further, Petitioners rely on the HP Journal's discussion of an FC frame manager, FIFO queues, and inbound/outbound block

23

IPR2014-01226
Patent 6,425,035 B2

movers, as teaching the FC protocol unit, first-in-first-out queue, and DMA interface limitations of claim 5.  *Id.* at 36–38.  We find Petitioners' contentions persuasive and supported by the record.

Patent Owner argues that the asserted prior art does not teach the limitations of claim 2 because it contends, as it did for claim 1, that the CRD Manual teaches associating storage devices (or subsets thereof) with host channels and not host devices directly.  *See* PO Resp. 40–42.  Patent Owner did not present other arguments specifically directed to claims 2–5.  *See id.* For the same reasons as discussed above for claim 1, this argument is unpersuasive.

Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of claims 2–5 of the '035 patent.

    *c.*    *Claims 7–10*

The limitations recited in independent claim 7 are similar to those of claims 1 and 2, and both parties rely on essentially the same arguments with respect to those limitations as for claims 1 and 2.[9]  *See* Pet. 38–48; PO Resp. 42–45.  Claim 7 requires explicitly that the storage router map

_____

[9] Patent Owner also argues in a footnote that it "strenuously disagrees that the [CRD Manual] discloses a storage network."  PO Resp. 42 n.8.  This contention is not explained, nor is any evidentiary support cited except three paragraphs of Dr. Levy's Declaration.  *Id.*  This conclusory statement is insufficient and, to the extent it seeks to incorporate by reference the explanations provided in the Levy Declaration, is contrary to 37 C.F.R. § 42.6(a)(3).  Thus, the argument was not considered.  Further, even were it considered, it is unpersuasive, and we find Dr. Hospodor's contrary testimony better explained and supported, and thus, more credible on this issue.  *See* Ex. 1003, 70–71.

24

IPR2014-01226
Patent 6,425,035 B2

between a "plurality of workstations" and a "plurality of storage devices." As discussed above for claims 1 and 2, Petitioners established sufficiently that the combination of the CRD Manual and the HP Journal teach multiple workstations and multiple storage devices (e.g., multiple disk drives), as well as mapping between them, and Petitioners advance the same arguments and evidence for claim 7 (Pet. 38–44; Pet. Reply 13–20).  For reasons similar to those discussed above with respect to claims 1 and 2, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claim 7.

Claims 8–10 depend, directly or indirectly, from claim 7.  Claim 8 recites "wherein the access controls include an allocation of subsets of storage space to associated workstations, wherein each subset is only accessible by the associated workstation," Ex. 1001, 10:12–16, which is similar to dependent claim 2, *id.* at 9:32–36.  Claim 9 recites limitations similar to dependent claim 4, by requiring that the storage devices be hard disk drives.  *Id.* at 10:17–18.  Claim 10 recites limitations similar to certain limitations relating to the buffer and the data written to the buffer found in claim 1.  *Id.* at 10:19–40.  Both parties rely on essentially the same arguments as those discussed above for the previous claims.  *See* Pet. 44–48; PO Resp. 45–48.  For reasons similar to those discussed above for the previous claims, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claims 8–10.

d.    *Claims 11–14*

The limitations recited in independent method claim 11 are similar to those of claim 1, and both parties rely on essentially the same arguments with respect to those limitations as for claim 1.  *See* Pet. 48–54; PO

25

IPR2014-01226
Patent 6,425,035 B2

Resp. 48. Claim 11 is a method claim that recites the steps of interfacing with a first and second transport medium, "mapping between devices connected to the first transport medium and the storage devices and that implements access controls for storage space on the storage devices," and "allowing access from devices connected to the first transport medium to the storage devices using native low level, block protocols." Ex. 1001, 10:41–53. As discussed above for claim 1, Petitioners established sufficiently that the combination of the CRD Manual and the HP Journal teaches interfacing with a first and second transport medium, as well as mapping between them and allowing access using native low-level block protocols, and Petitioners advance the same arguments and evidence for claim 11 (Pet. 48–52). For reasons similar to those discussed above with respect to claim 1, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claim 11.

Claims 12–14 depend, directly or indirectly, from claim 11 and recite limitations similar to those recited in claim 1 and its dependent claims 2–4. Both parties rely on essentially the same arguments as those discussed above for the previous claims. *See* Pet. 38–41; PO Resp. 48. For reasons similar to those discussed above for the previous claims, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claims 12–14.

### D.    Obviousness Claim 6 over CRD-5500 Manual, HP Journal, and Q Logic Datasheet

#### *Q Logic Data Sheet*

The QLogic Data Sheet describes the features and operation of a family of Fast Architecture SCSI Processors manufactured by QLogic

IPR2014-01226
Patent 6,425,035 B2

Corporation (the "QLogic SCSI Processors"). Ex. 1007, 1–2, 8. The QLogic SCSI Processors are designed to facilitate SCSI-2 and SCSI-3 data transfers, and are used in SCSI I/O adapter cards. *Id.* at 2.

*Analysis*

1. *Reasons for Combining*

As explained by Petitioners' Declarant, Dr. Hospodor, the CRD-5500 RAID controller includes at least one SCSI I/O module that interfaces with a SCSI bus, and the CRD-5500 RAID controller used a QLogic Fast Architecture SCSI Processor in its I/O modules. Ex. 1003 ¶¶ 65–68.

Patent Owner argues that Dr. Hospodor's testimony that the QLogic processors were used in the CRD-5500 RAID controller is not appropriate support for an obviousness challenge in an *inter partes* review. PO Resp. 49. Patent Owner concludes that, absent this knowledge, there is no reason a person of ordinary skill would be motivated to combine these references. *Id.* Patent Owner also asserts that "regardless of when the QLogic Data Sheet was allegedly available, Petitioners did not present evidence that one of ordinary skill in the art would have had any reason to 'look[] to the documentation made available by QLogic Corporation . . . to learn more about the components and functionality of the CRD-5500 RAID controller's SCSI I/O' until after the QLogic processors were actually used in the CRD-5500," and that this happened prior to the priority date of the '035 patent. *Id.*

We agree with Petitioners that one of ordinary skill in the art would have looked to the documentation made available by QLogic Corporation describing the QLogic SCSI Processors to learn more about the components and functionality of the CRD-5500 RAID controller's SCSI I/O modules.

27

IPR2014-01226
Patent 6,425,035 B2

*Id.* ¶ 68.  We disagree with Patent Owner that we may not consider the testimony of Dr. Hospodor regarding his inspection of the product as a basis for the motivation to combine.  Indeed, the obviousness inquiry must be "expansive and flexible" and "not only permits, but *requires*, consideration of common knowledge and common sense."  *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (emphasis in original).  As for Patent Owner's argument regarding the timing of the use of the QLogic processors in the CRD-5500, Dr. Hospodor also testified that the CRD-5500 Manual describes that the controller uses at least one SCSI I/O module and that it was well-known that QLogic processors were used in such modules at the time of the invention.  *Id.* ¶ 68.  Thus, Patent Owner is not correct that, absent Dr. Hospodor's inspection, Petitioners have not provided any rationale for combining the references.  Based on the full record after trial, Petitioners have articulated a sufficient reason to combine the CRD Manual, the HP Journal, and the QLogic Datasheet with rational underpinnings supported by the evidence.  See *KSR*, 550 U.S. at 418.

### 2. *Claim 6*

Claim 6 depends from claim 1 and recites that the second controller comprises "a second protocol unit operable to connect to the second transport medium," "an internal buffer coupled to the transport medium," and "a direct memory access (DMA) interface coupled to the internal buffer and to the buffer of the storage router."  Ex. 1001, 9:51–57.  Petitioners rely on the evidence and argument we discussed above with respect to independent claim 1 for those limitations of claim 6, and on the QLogic Datasheet for the remaining limitations of claim 6 recited above.  *See* Pet. 56–57; Ex. 1003 ¶ 69.  Besides the arguments directed to independent

28

IPR2014-01226
Patent 6,425,035 B2

claim 1, Patent Owner does not dispute this disclosure.  For the reasons discussed above, we have found that Petitioners have shown by a preponderance of the evidence that the combination discloses the subject matter of claim 1.  We also have reviewed Petitioners' citations and the testimony of Dr. Hospodor regarding the separate limitations of claim 6, and we are persuaded that Petitioners have shown by a preponderance of the evidence that the combination teaches those elements as well, as set forth in the Petition's analysis.  *See* Pet. 56–57.

E.    *Objective Indicia of Non-Obviousness*

Factual inquiries for an obviousness determination include secondary considerations based on objective evidence of non-obviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill in the art.  *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).

Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise.  *See Graham*, 383 U.S. at 17; *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

To be relevant, evidence of non-obviousness must be commensurate in scope with the claimed invention.  *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971)); *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998).  In that regard, in order

29

IPR2014-01226
Patent 6,425,035 B2

to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining non-obviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). The burden of producing evidence showing a nexus lies with the patent owner. *Id.*; *Prometheus Labs, Inc. v. Roxane Labs, Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

### 1. *Long-Felt Need*

Patent Owner presents arguments regarding long-felt need in its Response. PO Resp. 48. Patent Owner's evidence of long-felt need includes selected quotes from an article by an expert used by Petitioners in a co-pending lawsuit and citations to testimony by the same expert to the effect that "before [Patent Owner's] invention, there was no such thing as a storage router and that the term 'storage router' did not exist." *Id.* (citing Ex. 2038, 14; Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14).

"Establishing long-felt need requires objective evidence that an art-recognized problem existed in the art for a long period of time without solution." *Ex parte Jellá*, 90 USPQ2d 1009, 1019 (BPAI 2008) (precedential).

We have reviewed the cited testimony (Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14), and find it insufficient to establish a long-felt need. The testimony is directed to whether the term "storage router" was used in the art in the late 1990s. *See, e.g.*, *id.* at 104:24–105:1. It does not address what the

30

IPR2014-01226
Patent 6,425,035 B2

needs or problems of the art were at that time. Thus, we do not find it supports Patent Owner's contention.

The article cited by Patent Owner (Ex. 2038), which suggests that a problem might have existed in file system performance generally, nevertheless also does not establish that there was long-felt need for the claimed invention. Patent Owner presented no evidence as to how long this problem had been recognized, the extent of the problem, whether it remained unresolved at the time of the invention, or whether the invention resolved this need. *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332–33 (Fed. Cir. 2009). As such, we find that Patent Owner has not shown adequately that there was any long-felt need for the claimed invention.

### 2. *Commercial Success*

Patent Owner submits evidence of the number of products it has sold, revenue from those sales, and the relative sales of its various products as allegedly demonstrating the commercial success of the claimed invention. PO Resp. 48–52 (citing Ex. 2043, Ex. A; Ex. 2044). Petitioner argues that Patent Owner's attempt to establish a nexus between the alleged secondary considerations and the claimed invention falls short. Reply 9–10.

Evidence of commercial success "is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer "proof that the sales [of the allegedly successful product] were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors

31

IPR2014-01226
Patent 6,425,035 B2

unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).

As a threshold matter, Patent Owner has not established a sufficient nexus between its commercial product and the features of its claimed invention. Patent Owner has not shown that the items listed in Exhibit 2044 embody the claimed invention, or that sales of the listed products resulted from novel, non-obvious features of the claimed invention rather than other features. *See Ormco Corp.*, 463 F.3d at 1312–13 (evidence did not show that commercial success was due to claimed and novel features).

Even if Patent Owner had established a nexus between its marketed technology and the invention claimed in the patent, its commercial success argument would not be persuasive. Patent Owner's declarant's statements that certain products include "mapping" or "access controls" (Ex. 2043 ¶¶ 5–6) are insufficient to show commercial success of the claimed invention. An important component of the commercial success inquiry is determining market share associated with the alleged success, relative to all competing products. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012). Even sales volume, if provided without market share information, is only weak evidence, if any, of commercial success. *Id.* at 1299. Here, the fact that Patent Owner sold a certain number of these devices and that they made up a certain share of its own sales is insufficient to establish commercial success without some context about the larger market. *See In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

### 3. *Licensing*

Patent Owner argues that "[a]s shown in Exhibit 2040, a large number of licensees have taken licenses directed specifically to Crossroads' '972

32

IPR2014-01226
Patent 6,425,035 B2

patent family." PO Resp. 54 (citing Ex. 2040). Patent Owner submits that "[t]he total license payments through FY2014 are over $60 million" and that "[p]rominent members of the industry have paid millions of dollars to Crossroads in exchange for a license." *Id.* Patent Owner concludes that because these companies were willing to pay millions of dollars to license the invention claimed in the '972 patent family, the claims are not obvious. *Id.*

"While licenses can sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without showing a clear nexus to the claimed invention." *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015); *see also Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'"); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) ("[T]he mere existence of these licenses is insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art that would have motivated one of ordinary skill to modify [other prior art].").

Indeed, the mere existence of several licenses, without more specific information about the circumstances surrounding the licensing, is often not a good indicator of nonobviousness. In *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985), the Court of Appeals for the Federal Circuit stated that such licensing programs "are not infallible guides to patentability. They sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is

33

IPR2014-01226
Patent 6,425,035 B2

cheaper to take licenses than to defend infringement suits, or for other reasons unrelated to the unobviousness of the licensed subject matter."

Here, we lack sufficient information about the circumstances surrounding these licenses to be able to assess whether they truly weigh in favor of non-obviousness. Patent Owner directs us to no testimony from any licensee regarding why the licensee took a license from Patent Owner. It is unknown how much of the decision to take a license stems from a business cost-benefit analysis with regard to defending an infringement suit or from another business reason, rather than from acknowledged merits of the claimed invention. Patent Owner does not provide any information about how many entities refused to take a license, or why they refused.

In addition, as Patent Owner admits, these licenses are directed to an entire family of patents. Without more evidence, we are unable to determine whether the claimed subject matter of the '035 patent was the motivator for taking the license. Given these circumstances, we determine that Patent Owner has failed to establish an adequate nexus between the claimed invention of the '035 patent and the licenses. Thus, we find Patent Owner's evidence of licensing does not weigh in favor of non-obviousness.

### F.    Conclusion as to Asserted Grounds of Unpatentability

Having considered all of the evidence and contentions of the parties regarding the obviousness of claims 1–14, including secondary evidence and indicia of non-obviousness presented by Patent Owner, we determine that Petitioner has established by a preponderance of evidence that claims 1–14 are unpatentable under the asserted grounds. The relatively weak secondary evidence of non-obviousness, diminished further by Patent Owner's failure to show an adequate nexus to the claimed invention, is insufficient to

overcome the relatively strong evidence of obviousness presented by Petitioner. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (requisite nexus between secondary indicia and invention must be shown for evidence to be accorded substantial weight, and where a claimed invention represents no more than the predictable use of prior art elements according to established functions, evidence of secondary indicia is often inadequate to establish non-obviousness).

### III.   PATENT OWNER'S MOTION TO EXCLUDE

We have reviewed Patent Owner's Motion to Exclude ("PO Mot. to Exclude," Paper 40), Petitioners' Opposition to the Motion (Paper 45), and Patent Owner's Reply in Support of the Motion (Paper 70). We *deny* the motion to exclude.

Patent Owner seeks to exclude certain cross examination testimony of Dr. Levy because "it was obtained pursuant to objectionable questioning and/or mischaracterizes his testimony." PO Mot. to Exclude 1. In the alternative, Patent Owner requests that we consider additional portions of Dr. Levy's testimony pursuant to the Rule of Completeness (Fed. R. Evid. 106). Petitioners respond that these objections were not preserved, that the Rule of Completeness is inapplicable to these proceedings because the entirety of the transcript of Dr. Levy's deposition is part of the record, that these objections go to the weight that should be given the evidence not its admissibility, and that Patent Owner's allegations of mischaracterizations are baseless. Pet. Opp. Mot. to Exclude 1. We agree with Petitioners that Patent Owner's objections go to the weight that should be given the evidence, not its admissibility. Moreover, as the entirety of Dr. Levy's

IPR2014-01226
Patent 6,425,035 B2

deposition is in the record of this proceeding, we have considered the additional passages of Dr. Levy's testimony that Patent Owner identifies as well as the rest of his testimony.  Accordingly, Patent Owner's Motion to Exclude is *denied*.

## IV.    PATENT OWNER'S MOTION TO SEAL

Patent Owner filed several exhibits (Exhibits 2040, 2042, 2044, and 2045) under seal, along with a Motion to Seal (Paper 28) and a protective order (Paper 20).  We previously granted Patent Owner's Motion for Entry of the Default Protective Order.  Paper 41.  Petitioners oppose Patent Owner's Motion to Seal.  Paper 26.  Patent Owner filed a reply.  Paper 27.  For the reasons discussed below, Patent Owner's Motion to Seal is *granted*.

Petitioners argue that there is a strong public interest in unsealing these exhibits because they are a critical part of the substantive basis of Patent Owner's patentability analysis.  Pet. Opp. Mot. Exclude 4.  However, we did not see any need to rely on any of these exhibits in this Decision.  We have reviewed the exhibits at issue and agree with Patent Owner that they contain confidential sales and licensing information.  Given the sensitive nature of this information and the fact that we did not rely on it in rendering our Decision, we agree with Patent Owner that good cause has been shown to seal the information.

However, we note that confidential information subject to a protective order ordinarily becomes public 45 days after final judgment in a trial, unless a motion to expunge is granted.  37 C.F.R. § 42.56; Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14, 2012).  In view of the foregoing, the confidential documents filed in the instant proceeding

36

IPR2014-01226
Patent 6,425,035 B2

will remain under seal, at least until the time period for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has concluded. The record for the instant proceeding will be preserved in its entirety, and the confidential documents will not be expunged or made public, pending appeal. Notwithstanding 37 C.F.R. § 42.56 and the Office Patent Trial Practice Guide, neither a motion to expunge confidential documents nor a motion to maintain these documents under seal is necessary or authorized at this time. *See* 37 C.F.R. § 42.5(b).

## V.    CONCLUSION

For the reasons expressed above, we determine that Petitioners have shown by a preponderance of the evidence that:

(1) CRD-5500 Manual and HP Journal renders claims 1–5 and 7–14 of the '035 patent unpatentable as obvious; and

(2) CRD-5500 Manual, HP Journal, and QLogic Data Sheet renders claim 6 of the '035 patent unpatentable as obvious.

## VI.    ORDER

For the reasons given, it is:

ORDERED that claims 1–14 of the '035 patent have been shown to be *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*;

FURTHER ORDERED that Patent Owner's Motion to Seal is *granted*;

37

IPR2014-01226
Patent 6,425,035 B2

FURTHER ORDERED that the information sealed during this *inter partes* review remain under seal, and the record preserved, until the time period for filing a notice of appeal of this Decision has expired or, if an appeal is taken, the appeal process has concluded; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-01226
Patent 6,425,035 B2

PETITIONERS:

David L. McCombs
Andrew S. Ehmke
Scott T. Jarratt
Phillip Philbin
Gregory P. Huh
HAYNES AND BOONE, LLP
david.mccombs.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
scott.jarratt.ipr@haynesboone.com
phillip.philbin@haynesboone.com
gregory.huh@haynesboone.com

Clement S. Roberts
DURIE TANGRI LLP
croberts@durietangri.com

Matthew C. Gaudet
DUANE MORRIS LLP
MCGaudet@duanemorris.com


PATENT OWNER:

Steven R. Sprinkle
John L. Adair
SPRINKLE IP LAW GROUP
crossroadsipr@sprinklelaw.com

Russell Wong
James Hall
Keith Rutherford
BLANK ROME LLP
CrossroadsIPR@blankrome.com

Appx00039

Trials@uspto.gov                                    Paper No. 49
571-272-7822                                   Filed: March 16, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

CISCO SYSTEMS, INC., QUANTUM CORPORATION,
and ORACLE CORPORATION,
Petitioners,

v.

CROSSROADS SYSTEMS, INC.,
Patent Owner.
_____

Case IPR2014-01463[1]
Patent 7,934,041 B2
_____

Before NEIL T. POWELL, KRISTINA M. KALAN, J. JOHN LEE, and
KEVIN W. CHERRY, *Administrative Patent Judges*.

POWELL, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

## I.    INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C.

§ 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a)

and 37 C.F.R. § 42.73.  For the reasons discussed below, we determine that

_____

[1] Case IPR2015-00854 has been joined with this proceeding.

IPR2014-01463
Patent 7,934,041 B2

Petitioners have shown by a preponderance of the evidence that claims 1–53
of U.S. Patent No. 7,934,041 B2 (Ex. 1001, "the '041 patent") are
*unpatentable*.

    *A.*    *Procedural History*

    Cisco Systems, Inc. and Quantum Corporation filed a Petition
(Paper 3, "Pet.") requesting institution of an *inter partes* review of claims 1–
53 of the '041 patent.  On December 19, 2014, Crossroads Systems, Inc.
("Patent Owner") filed a Preliminary Response (Paper 7, "Pelim. Resp.").  In
a Decision to Institute (Paper 9, "Dec. Inst.") issued March 17, 2015, we
instituted an *inter partes* review of claims 1–53 on the following grounds of
unpatentability:

    1. Claims 1–14, 16–33, 35–50, and 53 under 35 U.S.C. § 103(a) for
        obviousness over CRD-5500 Manual[2] and HP Journal[3]; and

    2. Claims 15, 34, 51, and 52 under 35 U.S.C. § 103(a) for
        obviousness over CRD-5500 Manual, HP Journal, and Fibre
        Channel Standard[4].

    After institution of trial, Patent Owner filed a Patent Owner Response
(Paper 19, "PO Resp.") and Petitioners filed a Reply (Paper 32, "Pet.
Reply").  On March 6, 2015, in IPR2015-00854, Oracle Corporation filed a

---

[2] CMD Technology, Inc., CRD-5500 SCSI RAID Controller User's Manual
(1996) (Ex. 1004).
[3] Petitioners cite the following articles in Exhibit 1006 as one reference:
Meryem Primmer, *An Introduction to Fibre Channel*, 47 HEWLETT-
PACKARD J. 94–98 (1996) and Judith A. Smith & Meryem Primmer,
*Tachyon:  A Gigabit Fibre Channel Protocol Chip*, 47 HEWLETT-PACKARD
J. 99–112 (Oct. 1996) (Ex. 1006).
[4] American National Standards Institute, Inc., *Fibre Channel Physical and
Signaling Interface (FC-PH) X3.230* (June 1, 1994) ("Fibre Channel
Standard") (Ex. 1007).

IPR2014-01463
Patent 7,934,041 B2

Petition requesting *inter partes* review of claims 1–53 of the '041 patent, along with a motion for joinder. *Oracle Corp. v. Crossroads Sys., Inc.*, Case IPR2016-00854, Papers 1 & 3 (PTAB). On September 15, 2015, we granted Oracle Corporation's motion for joinder and joined IPR2015-00854 to this proceeding. Case IPR2015-00854, Paper 14. Oral hearing was held on October 30, 2015.[5]

Petitioners submitted the Declaration of Andrew Hospodor, Ph.D., dated September 5, 2014 (Ex. 1003, "Hospodor Declaration"), in support of their Petition.

Patent Owner submitted the Declaration of Dr. John Levy, Ph.D., dated May 26, 2015 (Ex. 2027, "Levy Declaration"). Patent Owner also submitted other declarations in support of its contentions of secondary considerations of non-obviousness. *See* Ex. 2039; Ex. 2043.

Patent Owner filed a Motion to Exclude (Paper 37) and Reply in support of its Motion to Exclude (Paper 43). Petitioners filed an Opposition to Patent Owner's Motion to Exclude (Paper 41).

  B. *Related Proceedings*

The '041 patent is the subject of multiple district court proceedings. Pet. 1; Paper 6, 2–3. The '041 patent belongs to a family of patents that are the subject of multiple *inter partes* review petitions, including IPR2014-01197, IPR2014-01207, IPR2014-01209, IPR2014-01226, IPR2014-01544, IPR2015-00822, and IPR2015-00852.

---

[5] A transcript of the oral hearing ("Tr.") is included in the record as Paper 48.

3

IPR2014-01463
Patent 7,934,041 B2

## II.    DISCUSSION

### A. The '041 Patent

The '041 patent relates to a storage router and method for providing virtual local storage on remote Small Computer System Interface ("SCSI") storage devices to Fiber Channel ("FC") devices.  Ex. 1001, 1:44–47.  SCSI is a storage transport medium that provides for a "relatively small number of devices to be attached over relatively short distances."  *Id.* at 1:51–54.  FC is a high speed serial interconnect that provides "capability to attach a large number of high speed devices to a common storage transport medium over large distances."  *Id.* at 1:56–59.  Computing devices can access local storage through native low level, block protocols and can access storage on a remote network server through network interconnects.  *Id.* at 1:65–2:10.  To access the storage on the remote network server, the computing device must translate its file system protocols into network protocols, and the remote network server must translate network protocols to low level requests.  *Id.* at 2:12–20.  A storage router can interconnect the SCSI storage transport medium and the FC high speed serial interconnect to provide devices on either medium access to devices on the other medium so that no network server is involved.  *Id.* at 3:58–4:1.

Figure 4 of the '041 patent is reproduced below:



4

IPR2014-01463
Patent 7,934,041 B2

Figure 4 is a block diagram of an embodiment of a storage router. *Id.* at 3:22–23, 5:34–35.  Storage router 56 can comprise FC controller 80 that interfaces with FC 52 and SCSI controller 82 that interfaces with SCSI bus 54.  Buffer 84 connects to FC controller 80 and SCSI controller 82, and provides memory work space. *Id.* at 5:35–37.  Supervisor unit 86 connects to FC controller 80, SCSI controller 82, and buffer 84. *Id.* at 5:37–39.  Supervisor unit 86 controls operation of storage router 56 and handles mapping and security access for requests between FC 52 and SCSI bus 54. *Id.* at 5:39–44.

Claims 1, 20, and 37 are the independent claims at issue in this trial, and claim 1 is reproduced below:

1.    A storage router for providing virtual local storage on remote storage devices, comprising:

a first controller operable to interface with a first transport medium, wherein the first medium is a serial transport media; and

a processing device coupled to the first controller, wherein the processing device is configured to:

maintain a map to allocate storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices, wherein each representation of a device connected to the first transport medium is associated with one or more representations of storage space on the remote storage devices;

control access from the devices connected to the first transport medium to the storage space on the remote storage devices in accordance with the map; and

**Appx00044**

IPR2014-01463
Patent 7,934,041 B2

> allow access from devices connected to the first transport
> medium to the remote storage devices using native low
> level block protocol.

*Id.* at 9:35–56.

*B. Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Tech., LLC*, 793 F.3d 1268, 1278–79 (Fed. Cir. 2015), *cert. granted sub nom. Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 890 (2016). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definition for a claim term must be set forth with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only those terms which are in controversy need be construed, and only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

In our Decision to Institute, we construed "native low level block protocol" and "remote." Dec. Inst. 8–9. Neither party contests our construction for "native low-level block protocol" and "remote." We adopt our previous constructions and analysis for those terms based on the full record after trial. *See id.* at 8–9. Thus, we construe "native low-level block protocol" as "a protocol in which storage space is accessed at the block level, such as the SCSI protocol." *Id.* at 8. We also construe "remote" as "indirectly connected through a storage router to enable connections to

6

IPR2014-01463
Patent 7,934,041 B2

storage devices at a distance greater than allowed by a conventional parallel network interconnect." *Id.* at 8–9.

> In the Patent Owner Response, Patent Owner asserts that

>> Each of the independent claims includes a "map: limitation: "a [storage router] . . . configured to[] maintain a map to allocate storage space on the remote storage devices to devices connected to the first transport medium, by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices . . . " (Claims 1 and 20); "maintaining a map at the storage router to allocate storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices . . ." (Claim 37).

PO Resp. 5. Patent Owner proposes a construction for the "map" limitations. *Id.* at 5–10.

Patent Owner also identifies certain limitations of independent claims 1, 20, and 37 as "control[ing] access" limitations, stating that "[e]ach of the independent claims also recites 'control[ling] access from the devices connected to the first transport medium to the storage space . . . in accordance with the map.'" *Id.* at 10. Patent Owner proposes a construction of the "control[ling] access" limitations. *Id.* at 10–12.

### *"map" limitations*

Patent Owner submits that in the "map" limitations, the map "specifically identifies the host and storage so that the storage router can allocate storage to particular hosts." PO Resp. 10. Patent Owner argues that this understanding is consistent with the testimony of Petitioners' expert, and the intrinsic evidence. *Id.* at 6–8. Patent Owner asserts that "'allocate

7

IPR2014-01463
Patent 7,934,041 B2

storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices' as claimed means the 'map' must identify within the map the **precise** host to which storage has been allocated within the map." *Id.* at 7 (citing Ex. 2027 ¶¶ 36–38).  According to Patent Owner, it is not enough to map between a storage device and an intermediate identifier associated with a particular device because the identifier is not directly and immutably associated with the device itself—in other words, mapping to an identifier is insufficient unless the identifier is associated with a particular device and *cannot* be associated with any other device.  *See id.* at 16–21 (arguing that mapping to a channel identifier does not suffice, even if the channel is connected to only one host device, because the channel identifier *could* be associated with another device if another device were connected to that channel).

Petitioners object that, for two reasons, Patent Owner's proposed construction is not the broadest reasonable construction.  First, Petitioners argue that the claims recite a "map" with "representations" of no specific type and that the specification of the '041 patent simply teaches associating hosts and storage.  Pet. Reply 3.  Petitioners argue that the specification contains no implementation details and is silent as to the specific manner in which such associations are created.  *Id.*  Thus, Petitioners contend that Patent Owner's requirement of a particular map with specific characteristics cannot be the broadest reasonable construction.  *Id.*  Second, Petitioners assert that Patent Owner seeks a construction that not only must the mapping

IPR2014-01463
Patent 7,934,041 B2

include precise identifiers, but that those identifiers must be intrinsically tied to a host. *Id.* at 3–4.

The construction proposed by Patent Owner is overly narrow. Although Patent Owner emphasizes that the map must identify specific host devices, it does not explain persuasively why the claim language should be construed to exclude doing so via intermediate identifiers. *See* PO Resp. 5–10. Patent Owner does not identify any disclosure in the '041 patent's specification that clearly disavows mapping to a device indirectly, or mapping to a device via an intermediate identifier that could identify a different host if the system were configured differently. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (holding that "words of manifest exclusion or explicit disclaimers in the specification are necessary to disavow claim scope" (internal quotations omitted)). Patent Owner's discussion of Figure 3, for example, is insufficient to compel a narrow construction of the term because Patent Owner analyzes only a preferred embodiment of the invention. *See* PO Resp. 8–10; *see, e.g., In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004) (holding that limitations should not be imported from preferred embodiments into the claims absent a clear disclaimer of claim scope in the specification).

Moreover, the '041 patent specifically discusses mapping with identifiers that are not immutable. For example, the specification discusses addressing devices on an FC loop using an AL_PA (arbitrated loop physical address) identifier, and the possibility of "FC devices changing their AL-PA due to device insertion or other loop initialization." Ex. 1001, 8:51–56; *see* Tr. 54:5–55:15 (counsel for Patent Owner acknowledging an AL_PA is a "temporarily assigned ID" that can point to different devices); Pet. Reply 4–

9

IPR2014-01463
Patent 7,934,041 B2

8 (discussing evidence supporting the use of intermediate identifiers, including testimony by Patent Owner's proffered expert).

For the reasons above, we are not persuaded that the broadest reasonable interpretation of the "map" limitations mandates mapping directly or immutably to a host device itself, or excludes mapping to devices using intermediate identifiers.

The '041 patent is related to a number of other patents, including U.S. Patent No. 6,425,035 B2 ("the '35 patent") and U.S. Patent No. 7,051,147 ("the '147 patent"). The '041 patent, the '035 patent, and the '147 patent are related to one another because each is a continuation of one or more patent applications that are continuations of application No. 09/001,799, filed on December 31, 1997, now U.S. Patent No. 5,941,972. We note that a district court in a related case construed the claim terms "map" and "mapping" in the '035 patent as follows:

> To create a path from a device on one side of the storage router to a device on the other side of the router. A "map" contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices.

Ex. 1010, 12. In IPR2014-01226 and IPR2014-01544 we concluded that the district court's construction reproduced above is the broadest reasonable interpretation of certain claim limitations in the '035 patent and the '147 patent similar to the "map" limitations in the '041 patent. *Cisco Sys., Inc. v. Crossroads Sys., Inc.,* Case IPR2014-01266, slip op. at 10 (PTAB Jan. 29, 2016) (Paper 51); *Cisco Sys., Inc. v. Crossroads Sys., Inc.*, Case IPR2014-01544, slip op. at 8–9 (PTAB Jan. 29, 2016) (Paper 50). After considering the evidence of record, we determine the above claim construction from the

10

IPR2014-01463
Patent 7,934,041 B2

district court also corresponds to the broadest reasonable interpretation of the "map" limitations of claims 1, 20, and 37 of the '041 patent and adopt it for purposes of this Decision.

### *"control access"/"controlling access" limitations*

Patent Owner also seeks to have us construe the various limitations that include the language "control access" or "controlling access." PO Resp. 10–12. Patent Owner contends that "'[c]ontrol[ling] access' refers to the use of 'access controls' that limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map." *Id.* at 10. In other words, Patent Owner asserts that "controlling access is device specific in that it involves controlling a particular device's access to specified storage according to the map." *Id.* at 12 (citing Ex. 2027 ¶ 43). Patent Owner argues that, as described in the specification of the '041 patent, the storage router implements access controls according to the map so that the allocated storage can only be accessed by the host(s) associated with that storage in the map. *Id.*

Petitioners disagree with Patent Owner's understanding of the meaning of these limitations. Pet. Reply 8–10. In particular, Petitioners argue that Patent Owner seeks to impermissibly narrow the "control access" limitations by arguing that to meet these limitations the prior art must additionally provide different storage access to different hosts. *Id.* at 8. Petitioners also submit that "Patent Owner seeks to read into the 'control access' limitation a requirement that access to storage by particular hosts must be maintained between physical reconfigurations of the hosts." *Id.* at 9. Thus, Petitioners argue that the "control access" limitations "should be at least as broad as the District Court's construction of 'limit a device's

11

IPR2014-01463
Patent 7,934,041 B2

access to a specific subset of storage devices or sections of a single storage device according to a map." *Id.* at 10.

We agree with Petitioners that the "control access"/"controlling access" limitations are not as limited as Patent Owner contends. Patent Owner fails to point us to any express or implicit disclaimer in the specification of the '041 patent that would limit "control access"/"controlling access" to using only device-specific access controls that can only limit a particular device's access to specified storage. For example, the discussion of Figure 3 of the '041 patent is insufficient to compel a narrow construction of the term because it analyzes only a preferred embodiment of the invention. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012) ("To constitute disclaimer, there must be a clear and unmistakable disclaimer . . . It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation.").

Thus, we agree with Petitioners that the broadest reasonable interpretation of the terms "control access"/"controlling access" is "limit a device's access to a specific subset of storage devices or sections of a single storage device according to a map." Ex. 1026, 14, 40; Ex. 2027 ¶ 34.

> *C. Obviousness of Claims 1–14, 16–33, 35–50, and 53 over CRD-5500 Manual and HP Journal*
>
> <u>*CRD-5500 Manual (Ex. 1004)*</u>

The CRD-5500 Manual describes the features and operation of the CRD-5500 SCSI RAID Controller. Ex. 1004, 9. In general, the CRD-5500 RAID controller routes commands and data between hosts (i.e., initiators) and storage devices (i.e., targets) coupled to the controller. *Id.* at 9, 12.

12

IPR2014-01463
Patent 7,934,041 B2

Figure 1-2, as annotated by Petitioners, illustrates the architecture of the

storage network in which the CRD-5500 RAID controller operates:



CQ-1004, Figure 1-2 (annotated)

Figure 1-2 shows the architecture of a network using the CRD-5500 with

hosts attached to SCSI buses on one side of the controller and storage

devices also attached to SCSI buses on the other side.  *Id.* at 10–13.

The CRD-5500 Manual describes a Host LUN (Logical Unit Number)

Mapping feature that allows a user to assign redundancy groups to a

particular host.  *Id.* at 10.  The logical unit number is the number that the

host uses to address the drive.  *Id.* at 18.  A redundancy group is defined as

each RAID (Redundant Array of Independent Disks) set or partition of a

RAID set (i.e., storage space).  *Id.* at 19.  The CRD-5500 Manual describes

that the Host LUN Mapping feature is part of the Monitor Utility included in

the firmware of the controller.  *Id.* at 40, 44.  The CRD-5500 Manual

includes a screen shot of the Monitor Utility's Host LUN Mapping feature:

13

IPR2014-01463
Patent 7,934,041 B2

```
                          Monitor Utility                    02-09-96
                        HOST LUN MAPPING                      13:14:00
                           Channel 0

    +--------+-----------------+    +----------+-----------------+
    | Host LUN | Redundancy Group |    | Host LUN | Redundancy Group |
    +--------+-----------------+    +----------+-----------------+
    | 0      | 0               |    | 16       | 16              |
    | 1      | 1               |    | 17       | 17              |
    | 2      | -               |    | 18       | 18              |
    | 3      | -               |    | 19       | 19              |
    | 4      | 5               |    | 20       | 20              |
    | 5      | -               |    | 21       | 21              |
    | 6      | 6               |    | 22       | 22              |
    | 7      | 7               |    | 23       | 23              |
    | 8      | 8               |    | 24       | 24              |
    | 9      | 9               |    | 25       | 25              |
    | 10     | 10              |    | 26       | 26              |
    | 11     | 11              |    | 27       | 27              |
    | 12     | 12              |    | 28       | 28              |
    | 13     | 13              |    | 29       | 29              |
    | 14     | 14              |    | 30       | 30              |
    | 15     | 15              |    | 31       | 31              |
    +--------+-----------------+    +----------+-----------------+

  ARROW KEYS: MOVE CURSOR | N: NEXT CH | P: PREV CH | ENTER: SELECT | CTRL-Z: EXIT
```

*Id.* at 44. This screen shot shows a table matching the various Host LUNs to different redundancy groups for the host on Channel 0 of a CRD-5500. *Id.* Each "host channel" corresponds to an I/O module that provides an external interface port for the CRD-5500. *Id.* at 21; Ex. 2027 ¶ 68.

### *HP Journal*

Volume 47, issue 5 of the Hewlett-Packard Journal includes a number of articles that address the growing problem in 1997 of "I/O channels becom[ing] bottlenecks to system performance." Ex. 1006, 5. Specifically, one article in the issue provides an introduction to the Fibre Channel I/O interface and describes it as "a flexible, scalable, high-speed data transfer interface that can operate over a variety of both copper wire and optical fiber at data rates up to 250 times faster than existing communications interfaces." *Id.* at 94. The article additionally provides many reasons a Fibre Channel communication link is superior to a SCSI bus (e.g., longer distances and higher bandwidth, smaller connectors). *Id.* It further notes that SCSI commands may be "encapsulated and transported within Fibre Channel frames" to support existing storage hardware. *Id.* at 94–95.

IPR2014-01463
Patent 7,934,041 B2

The HP Journal describes a Fibre Channel protocol chip made by HP called "Tachyon." *Id.* at 99–112. The article states that the Tachyon chip implements the Fibre Channel standard and "enables low-cost gigabit host adapters on industry-standard buses." *Id.* at 101.

*Analysis*

1. *Reason to Combine the CRD Manual and the HP Journal*

Applicable to all of the challenged claims, the Petition provides a detailed analysis of why a person of ordinary skill in the art would have been motivated to combine the CRD Manual and the HP Journal[6] in the manner asserted by Petitioners. Pet. 17–21 (citing Ex. 1003 ¶¶ 48–57). Specifically, Petitioners contend: (1) the CRD Manual explains that the disclosed CRD-5500 controller has a modular design capable of accepting various I/O modules; (2) the HP Journal describes the benefits of FC technology over SCSI technology; (3) the HP Journal discloses the replacement of SCSI with FC, including the use of SCSI commands with FC frames. *Id.* For example, the HP Journal discusses various advantages of FC over SCSI as a transport medium technology, including advantages in bandwidth and addressability, and explains how some FC controllers are compatible with SCSI devices. *Id.*; *see, e.g.*, Ex. 1006, 94–95, 99–101. Patent Owner does not dispute in its

---

[6] These portions of the *HP Journal* relied on by Petitioners share a common author (Meryem Primmer), and similar subject matter (FC technology and its implementation), as well as the same apparent publication date in the same issue of the journal. Patent Owner did not dispute that one of ordinary skill would have combined the teachings of the different articles in the *HP Journal*. Based on the full record after trial, we agree and consider the articles collectively, as the parties have done throughout the proceeding.

IPR2014-01463
Patent 7,934,041 B2

Patent Owner Response that a person of ordinary skill[7] would have had reason to combine the teachings of these references.

Based on the full record after trial, Petitioners have articulated a sufficient reason to combine the CRD Manual and the HP Journal with rational underpinnings supported by the evidence. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

> 2.    *Claims 1–14, 16–33, 35–50, and 53*
>
> a.    *Claim 1*

Petitioners explain how the CRD Manual and the HP Journal, in combination, render obvious each of the limitations of independent claim 1. Pet. 21–29; Pet. Reply 10–20. Petitioners contend the CRD Manual teaches a storage router, the CRD-5500 controller, which routes data between host computers ("a device") and SCSI disk drives ("remote storage devices"). Pet. 22–23; Ex. 1004, 9–11. With respect to the "first controller operable to interface with a first transport medium, wherein the first transport medium is a serial transport medium," Petitioners rely on teachings from the combination of the CRD Manual and the HP Journal, as follows. Pet. 23–24. First, the CRD Manual discloses multiple "I/O modules," which interface with SCSI buses that connect to the hosts and the disk drives. Ex. 1004, 9, 21, 24, 32. Second, the HP Journal discusses the Tachyon FC controller chip, which enables interfacing with a high-speed FC connection. Ex. 1006, 101, 111. The HP Journal further discloses that the Tachyon controller is designed to be compatible with SCSI commands as well. *Id.*

---

[7] The level of ordinary skill in the art is reflected by the prior art of record. *See Okajima v. Boudreau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

IPR2014-01463
Patent 7,934,041 B2

at 101.  Based on these disclosures and the testimony of their proffered expert, Dr. Andrew Hospodor, Petitioners argue:

> [T]he CRD-5500 Controller's ability to accept different I/O modules that interface with different transport media to communicate with hosts, as taught by the CRD Manual, in view of the Fibre Channel I/O module and Fibre Channel transport medium (which is a serial transport medium), as taught by the HP Journal, render obvious 'a first controller operable to interface with a first transport medium, wherein the first medium is a serial transport media' as recited in the claim.

Pet. 23–24 (citing Ex. 1003, 40–46).[8]  Dr. Hospodor explains that "one of ordinary skill in the art would have been motivated to replace the SCSI I/O host modules in the CRD-5500 RAID controller with a Fibre Channel I/O module based on the Tachyon chip."  Ex. 1004, 33.

Next, the Petition identifies the central processor, system circuitry, and firmware disclosed in the CRD Manual as teaching the recited "processing device."  Pet. 24 (citing Ex. 1004, 9, 11, 21; Ex. 1003, 46–48). As to the requirements that the "processing device is configured to: maintain a map to allocate storage space . . . [and] control access . . . in accordance with the map," Petitioners rely on the CRD Manual's discussion of the Host LUN Mapping feature.  *Id.* at 24–27.  Specifically, the CRD Manual describes a feature of its Monitor Utility used to "map LUNs on

---

[8] Patent Owner argues that Dr. Hospodor's testimony should be accorded "diminished" weight due to his alleged bias and certain deposition testimony that Patent Owner believes undermines his credibility.  PO Resp. 55–59.  All of these considerations were taken into account, and Dr. Hospodor's testimony was accorded the weight appropriate in light of the full record. Further, we determine that Dr. Hospodor was a credible witness overall, despite the issues identified by Patent Owner, because his testimony generally was supported by the record as explained in this Decision.

IPR2014-01463
Patent 7,934,041 B2

each host channel to a particular redundancy group." Ex. 1004, 44. A host channel corresponds to an I/O module, which is assigned to a host. *Id.* Each host channel has multiple LUNs, each of which can be mapped to a specific redundancy group. *Id.* Redundancy groups may be one or more disk drives, or partitions thereof. *Id.* at 19. Thus, Petitioners assert the CRD Manual teaches maintaining Host LUN Mapping settings that map hosts (the recited "devices") and redundancy groups (the recited "remote storage devices"). Pet. 25 (citing Ex. 1003, 48–53). With respect to the processing device controlling access, Petitioners identify the CRD Manual's discussion of using host LUN mapping settings to make certain redundancy groups available to certain host channels while blocking access to other host channels. *Id.* at 27 (citing Ex. 1004, 9, 44 Ex. 1003, 54–55).

With respect to the limitation that "the processing device is configured to . . . allow access from devices connected to the first transport medium to the remote storage devices using native low level block protocol," Petitioners cite the CRD Manual's disclosure of using SCSI messages on host and drive channels, as well as the HP Journal's disclosure of transmitting SCSI commands "encapsulated and transported within Fibre Channel frames." *Id.* at 27–28 (citing Ex. 1004, 57; Ex. 1006, 94–95; Ex. 1003, 55–57; Ex. 1001, 5:59–63). Specifically, Petitioners assert that

> Thus, the CRD-5500 Controller allowing access from hosts to disk drives on a SCSI bus using SCSI I/O commands, as taught by the CRD Manual, in view of the encapsulation of SCSI I/O commands within Fibre Channel communications, as taught by the HP Journal, renders obvious "allow access from devices connected to the first transport medium to the remote storage devices using native low level, block protocol" as recited in the claim.

18

IPR2014-01463
Patent 7,934,041 B2

*Id.* at 28 (citing Ex. 1003, 55–57).

Based on the full record after trial, we find that the combination of the CRD Manual and the HP Journal, as described above with Petitioners' citations and arguments, which we adopt, teach or suggest each limitation of claim 1 of the '041 patent. Patent Owner's counterarguments are unpersuasive.

First, Patent Owner argues the asserted combination does not teach the "map" limitation of claim 1. PO Resp. 23–33; *see also id.* at 12–21 (arguing the CRD Manual fails to teach mapping). According to Patent Owner, the CRD Manual fails to teach the recited mapping because the Host LUN Mapping feature only maps storage devices to host channels, not to the specific hosts themselves. *Id.* at 13–14, 23–27 (citing Ex. 2027 ¶¶ 53, 55, 68, 75–76, 82, 84–86). This argument, however, relies on the overly narrow claim construction rejected above, and is unpersuasive as a result. For example, Patent Owner addresses Figure 1-2 of the CRD Manual, which is reproduced below:



19

IPR2014-01463
Patent 7,934,041 B2

Figure 1-2 of the CRD Manual depicts a configuration of the CRD-5500 controller where each of four different hosts is assigned to a different channel, i.e., channel 0 through channel 3. Ex. 1004, 10. These hosts may then access redundancy groups via the CRD-5500 controller. *Id.*

The specific configuration depicted in Figure 1-2 meets the mapping limitation because each host channel is dedicated to a single host—thus, in effect, mapping to a host channel is tantamount to mapping to a particular host. *See* Pet. Reply 12–13 (citing Ex. 1004, 44; Ex. 1025, 129:16–17). The CRD Manual explicitly refers to mapping to hosts and host channels interchangeably, which Patent Owner acknowledges at least with respect to Figure 1-2. *See* Ex. 1004, 9; PO Resp. 30–31; Pet. Reply 11. The analysis presented by Patent Owner regarding other configurations different from that in Figure 1-2—i.e., configurations where two hosts are connected to the same host channel (PO Resp. 19–21, 31)—does not cancel or negate the configuration disclosed by Figure 1-2. Similarly, whether the Figure 1-2 configuration would teach the mapping limitation if it were hypothetically altered by switching cables is irrelevant. *See* PO Resp. 18–19. As discussed above, the broadest reasonable interpretation of the mapping limitation is not limited only to mapping directly and immutably to a specific host device, and does not exclude categorically the use of intermediate identifiers. Consequently, Patent Owner has not shown persuasively why the configuration disclosed in the CRD Manual falls outside the scope of the claim language.

Patent Owner additionally contends that the CRD Manual fails to teach the "control access" limitation of claim 1. *Id.* at 33–39. Making arguments similar to its arguments relating to the mapping limitation, Patent

IPR2014-01463
Patent 7,934,041 B2

Owner purports to show how the redundancy group access controls of the CRD Manual can be defeated by changing the disclosed configuration in Figure 1-2, i.e., by rewiring the hosts such that multiple hosts are connected to the same host channel. *Id.* at 37–38. Patent Owner has not persuasively demonstrated, however, that the purported inadequacy of the access control method disclosed for the Figure 1-2 configuration when directly applied to a different configuration, shows that the CRD Manual fails to teach implementing access controls at least for the configuration of Figure 1-2.

Although Patent Owner argues that Petitioners rely on such a configuration because they propose combining the CRD Manual with the HP Journal, Patent Owner inaccurately characterizes Petitioners' contentions as bodily incorporating only one aspect of the HP Journal's teachings—placing all hosts on a single FC arbitrated loop—while ignoring the HP Journal's other teachings regarding implementing such FC loops. *See* PO Resp. 34–38; *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."). As noted in the Petition (Pet. 17), the HP Journal provides detailed disclosures on the implementation of FC arbitrated loops, including configurations with multiple host devices. *See* Pet. Reply 13–20; Ex. 1006, 100–111. The record as a whole supports Petitioners' contention that a person of ordinary skill would have found it obvious to combine the teachings of the CRD Manual and the HP Journal to arrive at a system utilizing FC loops, which

21

IPR2014-01463
Patent 7,934,041 B2

maps redundancy groups to particular hosts and implements access controls as taught by the CRD Manual, but applying FC addressing capabilities taught by the HP Journal in lieu of the host channel-based implementation of the CRD Manual. *See* Pet. Reply 13–20; Ex. 1003 ¶¶ 48–57.

In sum, based on the full record after trial, we find that a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of claim 1 of the '041 patent.

> b.    *Claims 20 and 37*

Petitioners presented evidence and argument to support their contention that the combination of the CRD Manual and the HP Journal teaches each limitation of independent claims 20 and 37. Pet. 17–21, 42–47, 50–53. Claims 20 and 37 each contain a "map" limitation and a "control access" or "controlling access" limitation similar to those of claim 1 discussed above. The disputes regarding claims 20 and 37 are substantially the same as those regarding claim 1 discussed above. *See id.*; PO Resp. 5–39; Pet. Reply 2–20. For the reasons explained above in connection with claim 1, we find Petitioners' evidence and arguments regarding claims 20 and 37 more persuasive than Patent Owner's. Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of claims 20 and 37 of the '041 patent, as set forth in the Petition. We are persuaded by Petitioners' contentions with respect to claims 20 and 37, and we adopt them as the basis for our decision.

22

IPR2014-01463
Patent 7,934,041 B2

     *c.*    *Claims 6, 25, and 42*

        Claims 6, 25, and 42 depend from claims 1, 20, and 37, respectively.  Claims 6 and 25 each recite

> wherein the native low level block protocol is received at the storage router via the first transport medium and the processing device uses the received native low level block protocol to allow the devices connected to the first transport medium access to storage space specifically allocated to them in the map.

Ex. 1001, 10:3–8, 11:27–32.  Claim 42 recites similar limitations.  *Id.* at 12:39–45.  Petitioners present evidence and argument to support their contention that the combination of the CRD Manual and the HP Journal teaches each limitation of claims 6, 25, and 42.  Pet. 31–33, 48, 54.  For example, regarding allowing devices connected to the first transport medium to access specifically allocated storage space, Petitioner notes the CRD Manual discloses using a map to allocate specific redundancy groups to hosts.  *Id.* at 32–33.  The Petition identifies portions of both the CRD Manual and the HP Journal as teaching devices, including workstations in an FC loop, connected to a first transport medium.  *Id.* at 43–44; Pet. Reply 13–16 (discussing use of AL_PA in the combination).  We find this explanation of the combination using AL_PA in mapping persuasive to show that the combination teaches the limitations of claims 6, 25, and 42.

      Patent Owner argues that the asserted prior art does not teach the limitations of claims 6, 25, and 42 because it contends, as it did for claim 1, that the CRD Manual teaches associating storage devices (or subsets thereof) with host channels, and not host devices directly.  *See* PO Resp. 39–41.  For the same reasons as discussed above for claims 1, 20, and 37, this argument is unpersuasive.

23

IPR2014-01463
Patent 7,934,041 B2

Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggest each limitation of claims 6, 25, and 42 of the '041 patent. We are persuaded by Petitioners' contentions with respect to claims 6, 25, and 42, and we adopt them as the basis for our decision.

### d.    *Claims 13, 32, and 49*

Claims 13, 32, and 49 depend indirectly from claims 1, 20, and 37, respectively. Each of claims 13, 32, and 49 recites "wherein the storage router is operable to route requests to the same logical unit number from different devices connected to the first transport medium to different subsets of storage space on the remote storage devices." Ex. 1001, 10:31–35. Petitioners present evidence and argument to support their contention that the combination of the CRD Manual and the HP Journal teaches these limitations. Pet. 38–39, 49, 55–56. Petitioners explain, for example, that the CRD Manual discloses examples that would allow a person of ordinary skill in the art to set up routing such that different hosts referencing the same LUN result in the requests being routed to different subsets of storage space on remote storage devices. *Id.* at 38–39. The Petition identifies portions of both the CRD Manual and the HP Journal as teaching devices, including workstations in an FC loop, connected to a first transport medium. *Id.* at 43–44; Pet. Reply 13–16 (discussing use of AL_PA in the combination). In combination with the HP Journal's disclosure of using workstations in an FC AL_PA, Petitioners' explanation that the CRD Manual allows using the same LUN to route requests from different hosts to different storage

IPR2014-01463
Patent 7,934,041 B2

persuades us that the limitations of claims 13, 32, and 49 would have been obvious.

Patent Owner argues that, in the examples provided by the CRD Manual, using the same LUN to route requests from different hosts to different storage "requires that the host devices be connected to different channels as shown in Figure 1-2." PO Resp. 42. Patent Owner further argues that

> [O]ne of ordinary skill in the art would not consider a request by Host 1 to LUN 4 and a request by Host 2 to LUN 4 in the configuration of Figure 1-2 to be 'requests to the same logical unit number from different devices connected to the first transport medium' because the requests are directed to logical unit numbers on different busses, not the same logical unit number on the same bus.

*Id.* at 43. Patent Owner also argues that "as discussed above, the Host LUN Mapping lacks any information about the hosts and, lacking such, cannot distinguish between specific hosts." *Id.*

We find these arguments unpersuasive because they attack the CRD Manual individually, rather than addressing the CRD Manual in combination with the HP Journal. Petitioners explain that in the system resulting from the combination of the CRD Manual and the HP Journal, "a Tachyon chip in a CRD-5500 would *distinguish between requests from different hosts on an arbitrated loop*." Pet. Reply 20–21. This vitiates Patent Owner's arguments that the CRD Manual does not, by itself, teach differentiating between specific hosts.

Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the limitations of claims 13, 32, and 49 would have been obvious over the combination of the CRD Manual and the

25

IPR2014-01463
Patent 7,934,041 B2

HP Journal.  We are persuaded by Petitioners' contentions with respect to claims 13, 32, and 49, and we adopt them as the basis for our decision.

> e.    Claims 14, 33, and 50

Claims 14, 33, and 50 depend from claims 1, 20, and 37, respectively. Each of claims 14, 33, and 50 recites "wherein the representations of devices connected to the first transport medium are unique identifiers."  Ex. 1001, 10:36–38, 11:61–63, 13:6–8.  Petitioners present evidence and arguments that the combination of the CRD Manual and the HP Journal teaches this limitation.  Pet. 39–40, 49–50, 56.  We agree that cited evidence teaches or suggests this claim limitation.  For example, Petitioners assert that the CRD Manual teaches four different channel numbers, specifically channels 0, 1, 2, and 3, that can be unique identifiers for hosts.  *Id.* at 39–40.  The Petition identifies portions of both the CRD Manual and the HP Journal as teaching devices, including workstations in an FC loop, connected to a first transport medium.  *Id.* at 43–44; Pet. Reply 13–16 (discussing use of AL_PA in the combination).  We are persuaded that the disclosures of channel numbers in the CRD Manual and the use of a FC AL_PA in the HP Journal teach unique identifiers, as recited in claims 14, 33, and 50.

Patent Owner argues that the CRD Manual does not teach unique identifiers, asserting that it teaches channel numbers that "do not uniquely identify the host devices connected to the Channel."  PO Resp. 45–46.  We find this argument unpersuasive for multiple reasons.  First, contrary to Patent Owner's argument, in the system shown in Figure 1-2 of the CRD Manual, the channel numbers do uniquely identify the hosts, as each channel contains one host.  Patent Owner does not provide evidence or reasoning persuading us that the "map" limitations of claims 1, 20, and 37, or the

26

IPR2014-01463
Patent 7,934,041 B2

limitations of claims 14, 33, and 50, require directly mapping to or identifying hosts. Additionally, Patent Owner's argument improperly attacks the CRD Manual individually, overlooking the disclosure in the HP Journal of using an AL_PA on a FC. Petitioner explains that the Fibre Channel system disclosed by the HP Journal uses unique identifiers. Pet. Reply 22.

Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the limitations of claims 14, 33, and 50 would have been obvious over the combination of the CRD Manual and the HP Journal. We are persuaded by Petitioners' contentions with respect to claims 14, 33, and 50, and we adopt them as the basis for our decision.

> *f.  Claims 2–5, 7–12, 16–19, 21–24, 26–31, 35, 36, 38–41, 43–48, and 53*

Each of claims 2–5, 7–12, 16–19, 21–24, 26–31, 35, 36, 38–41, 43–48, and 53 depends directly or indirectly from one of claims 1, 20, and 37. Petitioners present evidence and arguments that claims 2–5, 7–12, 16–19, 21–24, 26–31, 35, 36, 38–41, 43–48, and 53 would have been obvious in view of the CRD Manual and the HP Journal. Pet. 29–31, 33–38, 40–42, 47–50, 53–56. We have reviewed the evidence and arguments presented and determine that Petitioners have demonstrated, by a preponderance of the evidence, that all of the limitations of each of claims 2–5, 7–12, 16–19, 21–24, 26–31, 35, 36, 38–41, 43–48, and 53, considered as a whole, would have been obvious in view of the CRD Manual and the HP Journal, on the basis set forth in the Petition. We are persuaded by Petitioners' contentions with respect to claims 2–5, 7–12, 16–19, 21–24, 26–31, 35, 36, 38–41, 43–48, and 53, and we adopt them as the basis for our decision.

27

IPR2014-01463
Patent 7,934,041 B2

Patent Owner argues that Petitioners have not demonstrated unpatentability of claims 2–5, 7–12, 16–19, 21–24, 26–31, 35, 36, 38–41, 43–48, and 53 because Petitioners have not demonstrated unpatentability of independent claims 1, 20, and 37.  PO Resp. 47–48.  We find this argument unpersuasive because, as explained above, we are persuaded that Petitioners have demonstrated unpatentability of independent claims 1, 20, and 37.

> D.    *Obviousness of Claim 15, 34, 51, and 52 over CRD-5500 Manual, HP Journal, and Fibre Channel Standard*

*Fibre Channel Standard*

The Fibre Channel Standard "describes the point-to-point physical interface, transmission protocol, and signaling protocol of a high-performance serial link for support of the higher level protocols associated with HIPPI, IPI, SCSI, and others."  Ex. 1007, 1.  The Fibre Channel Standard explains that "[t]he Fibre Channel (FC) is logically a bidirectional point-to-point serial data channel, structured for high performance capability.  Physically, the Fibre Channel can be an interconnection of multiple communication points, called N_Ports, interconnected by a switching network, called a Fabric, or a point-to-point link."  *Id.* at 49.  The Fibre Channel Standard discloses that "[e]ach N_Port shall have a native N_Port Identifier which is unique within the address domain of a Fabric."  *Id.* at 132.  Regarding naming, the Fibre Channel Standard discloses that "[t]he application of Name_Identifiers in Network_Header for heterogeneous (FC to Non-FC) networks and homogeneous (FC to FC) networks is summarized in table 42."  *Id.* at 148.  Table 42 of the Fibre Channel Standard is reproduced below.

28

IPR2014-01463
Patent 7,934,041 B2

| Table 42 - Network addresses | | |
|---|---|---|
| NAA | Name_Identifier | Network |
| IEEE | WWN | Heterogeneous |
| CCITT - individual address | WWN | Heterogeneous |
| CCITT - group address | WWN | Heterogeneous |
| IP | WWN | Heterogeneous |
| IEEE extended | FCN | FC Networks |
| Local | FCN | FC Networks |
| Note:<br>    WWN - Worldwide Name (worldwide unique address)<br>    FCN - Fibre Channel Name (Fibre Channel unique address) | | |

  Table 42 of the Fibre Channel Standard provides information
regarding network addresses.

  *Analysis*

   *1. Claims 15, 34, and 51*

  Claims 15, 34, and 51 depend from claims 14, 33, and 50,
respectively. Each of claims 15, 34, and 51 recites "wherein the unique
identifiers are world wide names." Ex. 1001, 10:39–40, 11:64–65, 13:9–10.
Petitioners present evidence and arguments that claims 15, 34, and 51 would
have been obvious in view of the CRD Manual, the HP Journal, and the
Fibre Channel Standard. Pet. 56–59; Pet. Reply 22. Petitioners assert that
the CRD Manual discloses uniquely identifying hosts. *Id.* at 58. Petitioners
reiterate their assertion that, as discussed in connection with independent
claims 1, 20, and 37, it would have been obvious to "replace the SCSI I/O
host modules in the CRD-5500 Controller with a Fibre Channel I/O host
module, so as to communicate with the hosts via a Fibre Channel link." *Id.*
Petitioners assert that this would have created a heterogeneous network, and
that "the Fibre Channel Standard teaches that in a 'heterogeneous network'
(Fibre Channel to Non-Fibre Channel) nodes (*e.g.*, hosts) are represented by
unique identifiers that are 'worldwide names.'" *Id.* at 58–59. In view of

29

IPR2014-01463
Patent 7,934,041 B2

this, Petitioners assert that "wherein the unique identifiers are world wide names" would have been obvious in view of the CRD Manual, the HP Journal, and the Fibre Channel Standard. *Id.* at 59. We have reviewed the evidence and arguments presented by Petitioners, and we are persuaded that Petitioners have demonstrated, by a preponderance of the evidence, that claims 15, 34, and 51 would have been obvious in view of the CRD Manual, the HP Journal, and the Fibre Channel Standard, on the basis set forth in the Petition.

Patent Owner argues that Petitioners' position regarding claim 15 is inconsistent with its position regarding claim 14. PO Resp. 48. Patent Owner notes that, when addressing claim 14, Petitioners identify the channel numbers of the CRD Manual as being unique identifiers. *Id.* Patent Owner argues that the channel numbers of the CRD Manual are not world wide names. *Id.* Patent Owner further argues that "the fact that a Fibre Channel device can be identified by world wide name according to the Fibre Channel standard is irrelevant to the CRD-5500" because "the CRD-5500 Manual does not teach specifying the attached hosts on a channel." *Id.* at 48–49.

Patent Owner's arguments are unpersuasive because they attack the references individually. The argument that the channel numbers disclosed by the CRD Manual are not world wide names is unpersuasive because Petitioners rely on the Fibre Channel Standard as teaching use of world wide names in systems like the one that results from combining the CRD Manual with the teachings of the HP Journal. The argument that the CRD Manual does not teach specifying the attached hosts on a channel is also unpersuasive. First, contrary to Patent Owner's arguments, we are persuaded that in the system shown in Figure 1-2 of the CRD Manual, the

IPR2014-01463
Patent 7,934,041 B2

channel numbers uniquely identify hosts attached to the channels. Second, Petitioners' observation that the Fibre Channel Standard discloses using world wide names in heterogeneous systems like the combination of the CRD Manual and the HP Journal provides reason to combine the references' disclosures by using world wide names as unique identifiers.

Additionally, we do not agree with Patent Owner's argument that Petitioners take inconsistent positions with respect to claims 14 and 15. In addressing claims 14 and 15, Petitioners identify one combination of prior art as rendering claim 14 obvious and another combination of prior art as rendering claim 15 obvious. *See* Pet. 13, 56–59. We do not find inconsistent Petitioners' assertions that one obvious combination of prior art would have one unique identifier (*e.g.*, channel numbers) and another obvious combination of prior art would have a different unique identifier (*e.g.*, world wide names).

Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the limitations of claims 15, 34, and 51 would have been obvious over the combination of the CRD Manual, the HP Journal, and the Fibre Channel Standard. We are persuaded by Petitioners' contentions with respect to claims 15, 34, and 51, and we adopt them as the basis for our decision.

### 2. *Claim 52*

Claim 52 depends indirectly from independent claim 37. Petitioners present evidence and arguments that claim 52 would have been obvious over the CRD Manual, the HP Journal, and the Fibre Channel Standard. Pet. 56–58, 59. We have reviewed the evidence and arguments presented and determine that Petitioners have demonstrated, by a preponderance of the

31

IPR2014-01463
Patent 7,934,041 B2

evidence, that claim 52 would have been obvious over the CRD Manual, the HP Journal, and the Fibre Channel Standard, on the basis set forth in the Petition. We are persuaded by Petitioners' contentions with respect to claim 52, and we adopt them as the basis for our decision.

Patent Owner argues that Petitioners have not demonstrated unpatentability of claim 52 because Petitioners have not demonstrated unpatentability of claim 37. PO Resp. 47–48. We find this argument unpersuasive because, as explained above, we are persuaded that Petitioners have demonstrated unpatentability of independent claim 37.

### E. Objective Indicia of Non-Obviousness

Factual inquiries for an obviousness determination include secondary considerations based on objective evidence of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).

Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise. *See Graham*, 383 U.S. at 17; *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

To be relevant, evidence of non-obviousness must be commensurate in scope with the claimed invention. *In re Kao*, 639 F.3d 1057, 1068 (Fed.

32

IPR2014-01463
Patent 7,934,041 B2

Cir. 2011) (citing *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971)); *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). In that regard, in order to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining non-obviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). The burden of producing evidence showing a nexus lies with the patent owner. *Id.*; *Prometheus Labs, Inc. v. Roxane Labs, Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

### 1. *Long-Felt Need*

Patent Owner presents arguments regarding long-felt need in its Response. PO Resp. 50–51. Patent Owner's evidence of long-felt need includes selected quotes from an article by an expert used by Petitioners in a co-pending lawsuit, and citations to testimony by the same expert to the effect that "before [Patent Owner's] invention, there was no such thing as a storage router and that the term 'storage router' did not exist." *Id.* at 51 (citing Ex. 2038, 14; Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14).

"Establishing long-felt need requires objective evidence that an art-recognized problem existed in the art for a long period of time without solution." *Ex parte Jellá*, 90 USPQ2d 1009, 1019 (BPAI 2008) (precedential).

We have reviewed the cited testimony (Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14), and find it insufficient to establish a long-felt need. The

IPR2014-01463
Patent 7,934,041 B2

testimony is directed to whether the term "storage router" was used in the art in the late 1990s. *See, e.g.*, *id.* at 104:24–105:1. It does not address what the needs or problems of the art were at that time. Thus, we do not find that the testimony supports sufficiently Patent Owner's contention of long-felt need.

The article cited by Patent Owner (Ex. 2038), which suggests that a problem might have existed in file system performance generally, also does not establish that there was long-felt need for the claimed invention. Patent Owner presented no evidence as to how long this problem had been recognized, the extent of the problem, whether it remained unresolved at the time of the invention, or whether the invention resolved this need. *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332–33 (Fed. Cir. 2009). As such, we find that Patent Owner has not shown adequately that there was any long-felt need for the claimed invention.

2. *Commercial Success*

Patent Owner submits evidence of the number of products it has sold, revenue from those sales, and the relative sales of its various products as allegedly demonstrating the commercial success of the claimed invention. PO Resp. 51–53 (citing Ex. 2043; Ex. 2044). In particular, it identifies the relative sales of certain products where two versions were sold, one with "access controls" and one without them, as allegedly establishing a nexus between their commercial success and the claimed invention of the '147 patent. *Id.* (citing Ex. 2043 ¶¶ 2–6; Ex. 2044).

Evidence of commercial success "is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). As a threshold matter, a sufficient nexus between Patent Owner's commercial

34

IPR2014-01463
Patent 7,934,041 B2

product and the features of its claimed invention has not been established. The evidence does not show sufficiently that the items listed in Exhibit 2044 embody the claimed invention, or that sales of the listed products resulted from novel, non-obvious features of the claimed invention rather than other features. *See Ormco Corp.*, 463 F.3d at 1312–13 (evidence did not show that commercial success was due to claimed and novel features).

Even if Patent Owner had established a nexus between its marketed technology and the invention claimed in the patent, its commercial success argument would not be persuasive. Patent Owner's declarant's statements that certain products include "mapping" or "access controls" (Ex. 2043 ¶¶ 5–6) are insufficient to show commercial success of the claimed invention. An important component of the commercial success inquiry is determining market share associated with the alleged success, relative to all competing products. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012). Even sales volume, if provided without market share information, is only weak evidence, if any, of commercial success. *Id.* at 1299. Here, the fact that Patent Owner sold a certain number of these devices and that they made up a certain share of its own sales is insufficient to establish commercial success without some context about the larger market. *See In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

3. *Licensing*

Patent Owner argues that "[a]s shown in Exhibit 2050, a large number of licensees have taken licenses directed specifically to Crossroads' '972 patent family." PO Resp. 53 (citing Ex. 2050). Patent Owner submits that "[t]he total license payments through FY2014 are over $60 million" and that "[p]rominent members of the industry have paid millions of dollars to

35

IPR2014-01463
Patent 7,934,041 B2

Crossroads in exchange for a license." *Id.* Patent Owner concludes that because these companies were willing to pay millions of dollars to license the invention claimed in the '972 patent family, the claims are not obvious. *Id.* at 54.

"While licenses can sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without showing a clear nexus to the claimed invention." *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015); *see also Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'"); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) ("[T]he mere existence of these licenses is insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art that would have motivated one of ordinary skill to modify [other prior art].").

Indeed, the mere existence of several licenses, without more specific information about the circumstances surrounding the licensing, is often not a good indicator of nonobviousness. In *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985), the Court of Appeals for the Federal Circuit stated that such licensing programs "are not infallible guides to patentability. They sometimes succeed because they are mutually beneficial to the licensed group or because of business judgments that it is cheaper to take licenses than to defend infringement suits, or for other reasons unrelated to the unobviousness of the licensed subject matter."

36

IPR2014-01463
Patent 7,934,041 B2

Here, we lack sufficient information about the circumstances surrounding these licenses to be able to assess whether they truly weigh in favor of non-obviousness. Patent Owner directs us to no testimony from any licensee regarding why the licensee took a license from Patent Owner. It is unknown how much of the decision to take a license stems from a business cost-benefit analysis with regard to defending an infringement suit or from another business reason, rather than from acknowledged merits of the claimed invention. Patent Owner does not provide any information about how many entities refused to take a license, or why they refused.

In addition, as Patent Owner admits, these licenses are directed to an entire family of patents. Without more evidence, we are unable to determine whether the claimed subject matter of the '041 patent was the motivator for taking the license. Given these circumstances, we determine that Patent Owner has failed to establish an adequate nexus between the claimed invention of the '041 patent and the licenses. Thus, we find Patent Owner's evidence of licensing does not weigh in favor of non-obviousness.

> F.    *Conclusion as to Asserted Grounds of Unpatentability*

Having considered all of the evidence and contentions of the parties regarding the obviousness of claims 1–53, including secondary evidence and indicia of non-obviousness presented by Patent Owner, we determine that Petitioner has established by a preponderance of evidence that claims 1–53 are unpatentable under the asserted grounds. The relatively weak secondary evidence of non-obviousness, diminished further by Patent Owner's failure to show an adequate nexus to the claimed invention, is insufficient to overcome the relatively strong evidence of obviousness presented by Petitioner. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333,

1344 (Fed. Cir. 2013) (requisite nexus between secondary indicia and invention must be shown for evidence to be accorded substantial weight, and where a claimed invention represents no more than the predictable use of prior art elements according to established functions, evidence of secondary indicia is often inadequate to establish non-obviousness).

## III.    PATENT OWNER'S MOTION TO EXCLUDE

We have reviewed Patent Owner's Motion to Exclude ("PO Mot. to Exclude," Paper 37), Petitioners' Opposition to the Motion ("Pet. Opp. Mot. to Exclude," Paper 41), and Patent Owner's Reply in Support of the Motion (Paper 43).  We *deny* the motion to exclude.

Patent Owner seeks to exclude certain cross examination testimony of Dr. Levy because "it was obtained pursuant to objectionable questioning and, further, mischaracterizes his testimony."  PO Mot. to Exclude 1.  In the alternative, Patent Owner requests that we consider additional portions of Dr. Levy's testimony pursuant to the Rule of Completeness (Fed. R. Evid. 106).  *Id.*  Petitioners respond that these objections were not preserved, that the Rule of Completeness is inapplicable to these proceedings because the entirety of the transcript of Dr. Levy's deposition is part of the record, that these objections go to the weight that should be given the evidence not its admissibility, and that Patent Owner's allegations of mischaracterizations are baseless.  Pet. Opp. Mot. to Exclude 1–12.  We agree with Petitioners that Patent Owner's objections go to the weight that should be given the evidence, not its admissibility.  Moreover, as the entirety of Dr. Levy's deposition is in the record of this proceeding, we have considered the additional passages of Dr. Levy's testimony that Patent Owner identifies as

38

IPR2014-01463
Patent 7,934,041 B2

well as the rest of his testimony.  Accordingly, Patent Owner's Motion to Exclude is *denied*.

## IV.    PATENT OWNER'S MOTION TO SEAL

Patent Owner filed several exhibits (Exhibits 2040, 2042, 2044, and 2045) under seal, along with a Motion to Seal (Paper 17) and a protective order (Paper 18).  We previously granted Patent Owner's Motion for Entry of the Default Protective Order.  Paper 38.  Petitioners oppose Patent Owner's Motion to Seal.  Paper 22.  Patent Owner filed a reply.  Paper 25. For the reasons discussed below, Patent Owner's Motion to Seal is *granted*.

Petitioners argue that there is a strong public interest in unsealing these exhibits because Patent Owner relies on these exhibits in support of its arguments of patentability.  Pet. Opp. Mot. Exclude 2.  However, we did not see any need to rely on any of these exhibits in this Decision.  We have reviewed the exhibits at issue and agree with Patent Owner that they contain confidential sales and licensing information.  Given the sensitive nature of this information and the fact that we did not rely on it in rendering our Decision, we agree with Patent Owner that good cause has been shown to seal the information.

However, we note that confidential information subject to a protective order ordinarily becomes public 45 days after final judgment in a trial, unless a motion to expunge is granted.  37 C.F.R. § 42.56; Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14, 2012).  In view of the foregoing, the confidential documents filed in the instant proceeding will remain under seal, at least until the time period for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has

IPR2014-01463
Patent 7,934,041 B2

concluded.  The record for the instant proceeding will be preserved in its
entirety, and the confidential documents will not be expunged or made
public, pending appeal.  Notwithstanding 37 C.F.R. § 42.56 and the Office
Patent Trial Practice Guide, neither a motion to expunge confidential
documents nor a motion to maintain these documents under seal is necessary
or authorized at this time.  *See* 37 C.F.R. § 42.5(b).

## V.    CONCLUSION

For the reasons expressed above, we determine that Petitioners have
shown by a preponderance of the evidence that:

(1) CRD-5500 Manual and HP Journal renders claims 1–14, 16–33,
35–50, and 53 of the '041 patent unpatentable as obvious; and

(2) CRD-5500 Manual, HP Journal, and Fibre Channel Standard
renders claims 15, 34, 51, and 52 of the '041 patent unpatentable as obvious.

## VI.    ORDER

For the reasons given, it is:

ORDERED that claims 1–53 of the '041 patent have been shown to be
*unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is
*denied*;

FURTHER ORDERED that Patent Owner's Motion to Seal is
*granted*;

FURTHER ORDERED that the information sealed during this *inter
partes* review remain under seal, and the record preserved, until the time

IPR2014-01463
Patent 7,934,041 B2

period for filing a notice of appeal of this Decision has expired or, if an appeal is taken, the appeal process has concluded; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

41

IPR2014-01463
Patent 7,934,041 B2

PETITIONERS:

David McCombs
Andrew S. Emhke
Scott Jarratt
Philip Philbin
Gregory P. Huh
HAYNES AND BOONE, LLP
David.mccombs.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
scott.jarratt.ipr@haynesboone.com
phillip.philbin.ipr@haynesboone.com
gregory.huh.ipr@haynesboone.com


PATENT OWNER:

Steven R. Sprinkle
Russell Wong
John L. Adair
James Hall
SPRINKLE IP LAW GROUP
crossroadsip@sprinklelaw.com
CrossroadsIPR@counselip.com

42

Trials@uspto.gov                                                    Paper 50
571.272.7822                                          Entered: January 29, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

CISCO SYSTEMS, INC., QUANTUM CORPORATION,
and ORACLE CORPORATION,
Petitioners,

v.

CROSSROADS SYSTEMS, INC.,
Patent Owner.

————————

Case IPR2014-01544[1]
Patent 7,051,147 B2

————————

Before NEIL T. POWELL, KRISTINA M. KALAN, J. JOHN LEE, and
KEVIN W. CHERRY, *Administrative Patent Judges*.

LEE, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

————————

[1] Case IPR2015-00852 has been joined with this proceeding.

INTRODUCTION

On September 25, 2014, Cisco Systems, Inc. and Quantum Corporation filed a Petition (Paper 3, "Pet.") requesting *inter partes* review of claims 1–39 of U.S. Patent No. 7,051,147 B2 (Ex. 1001, "the '147 patent"). Crossroads Systems, Inc. timely filed a Preliminary Response (Paper 7). An *inter partes* review of all challenged claims was instituted on April 3, 2015. Paper 9 ("Inst. Dec."). Crossroads then filed a Patent Owner Response (Paper 20, "PO Resp."), and Cisco and Quantum filed a Petitioner Reply (Paper 33, "Pet. Reply").

Oracle Corporation filed a separate petition challenging the same claims of the '147 patent on March 6, 2015, in *Oracle Corporation v. Crossroads Systems, Inc.*, Case IPR2015-00852 ("852 IPR"). 852 IPR, Paper 1. The 852 IPR petition asserted the identical ground of unpatentability, and relied on the same evidence and arguments, as presented in this proceeding. *See id.* Concurrently with that petition, Oracle filed a Motion for Joinder requesting that the 852 IPR be joined with this proceeding. 852 IPR, Paper 3. Crossroads timely filed a preliminary response to Oracle's petition (852 IPR, Paper 12), but it did not oppose joinder. An *inter partes* review of all challenged claims was instituted on August 14, 2015, and Oracle's Motion for Joinder was granted. Paper 34 ("Joinder Inst. Dec."). Because Oracle requested in its Motion for Joinder, the schedule in this proceeding was unchanged by the joinder of the 852 IPR, and Oracle indicated it would not require briefing separate from that filed by Cisco and Quantum in this proceeding. *Id.* at 8–9.

2

An oral hearing was held on October 30, 2015.  Paper 49 ("Tr.").[2]

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  As discussed below, Petitioners have shown by a preponderance of the evidence that claims 1–39 of the '147 patent are unpatentable.

### A.     Related Proceedings

The parties identify several of district court cases related to this proceeding, including the following in which Petitioners are named parties: (1) *Crossroads Systems, Inc. v. Oracle Corporation*, Case No. 1-13-cv-00895-SS (W.D. Tex.); (2) *Crossroads Systems, Inc. v. Cisco Systems, Inc.*, Case No. 1-14-cv-00148-SS (W.D. Tex.); and (3) *Crossroads Systems, Inc. v. Quantum Corporation*, Case No. 1-14-cv-00150-SS (W.D. Tex.).  Pet. 1; Paper 15, 3–4.

In addition, the '147 patent is the subject of two other pending *inter partes* reviews:  (1) *Oracle Corporation v. Crossroads Systems, Inc.*, Case IPR2014-01207 (PTAB); and (2) *Oracle Corporation v. Crossroads Systems, Inc.*, Case IPR2014-01209 (PTAB).  Pet. 1; Paper 15, 4.

### B.     The '147 Patent

The '147 patent relates to a storage router and network where devices (e.g., workstations) connected to a Fibre Channel ("FC") transport medium are provided access to storage devices on a second FC transport medium. Ex. 1001, Abstract.  The storage router interfaces with both FC media, mapping workstations on the first FC transport medium, for example, to the storage devices on the second FC transport medium.  *Id*.  The storage router

---

[2] A combined oral hearing was held for this case as well as related *inter partes* reviews IPR2014-01226 (to which IPR2015-00825 was joined) and IPR2014-01463 (to which IPR2015-00854 was joined).

of the '147 patent allows access from the workstations to the storage devices using "native low level, block protocol." *Id.* One advantage of using such native low level block protocols is greater access speed when compared to network protocols that must first be translated to low level requests, and vice versa, which reduces access speed. *Id.* at 1:58–67.

<div align="center">

*C.    Challenged Claims*

</div>

Petitioners challenge the patentability of claims 1–39 of the '147 patent, of which claims 1, 6, 10, 14, 21, 28, and 34 are independent. Claim 1 is illustrative of the challenged claims, and recites:

> 1.    A storage router for providing virtual local storage on remote storage devices to a device, comprising:
>
> a buffer providing memory work space for the storage router;
>
> a first Fibre Channel controller operable to connect to and interface with a first Fibre Channel transport medium;
>
> a second Fibre Channel controller operable to connect to and interface with a second Fibre Channel transport medium; and
>
> a supervisor unit coupled to the first and second Fibre Channel controllers and the buffer, the supervisor unit operable:
>
>> to maintain a configuration for remote storage devices connected to the second Fibre Channel transport medium that maps between the device and the remote storage devices and that implements access controls for storage space on the remote storage devices; and
>>
>> to process data in the buffer to interface between the first Fibre Channel controller and the second Fibre Channel controller to allow access from Fibre Channel initiator devices to the remote storage devices using native low level, block protocol in accordance with the configuration.

<div align="center">

4

**Appx00085**

</div>

IPR2015-01544
Patent 7,051,147 B2

### D.    *Instituted Ground of Unpatentability*

This *inter partes* review was instituted on the alleged ground of unpatentability of all challenged claims in view of the combination of the CRD Manual[3] and the HP Journal[4] under 35 U.S.C. § 103.  Inst. Dec. 16; Joinder Inst. Dec. 9.

### ANALYSIS

### A.    *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are construed according to their broadest reasonable interpretation in light of the specification.  37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1278–79 (Fed. Cir. 2015).  Only those terms in controversy need to be construed, and only to the extent necessary to resolve the controversy.  *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

During trial, the parties disputed the claim construction of the term "maps between the device and the remote storage devices," which we address below.  No other claim terms require express construction to resolve the issues raised in this *inter partes* review.

Claim 1 recites "a configuration for remote storage devices . . . that *maps between the device and the remote storage devices*" (emphasis added).  Each independent claim recites a similar limitation.  This term was not construed expressly in the Decision on Institution.  Petitioners argue this

---

[3] CMD TECHNOLOGY, INC., CRD-5500 SCSI RAID CONTROLLER USER'S MANUAL (Rev. 1.3, 1996) (Ex. 1004, "CRD Manual").
[4] HEWLETT-PACKARD JOURNAL, Oct. 1996 (Ex. 1006, "HP Journal").

IPR2015-01544
Patent 7,051,147 B2

term should be construed as "allocate[s] storage on the storage devices to devices to facilitate routing and access controls." Pet. 11.[5]

Patent Owner argues that the term "requires that the map specifically identify the host and storage so that the storage router can allocate storage to particular hosts." PO Resp. 10.  Further, Patent Owner makes clear its position that the recited mapping requires the storage devices to be mapped directly to a particular device, such as a host computer.  *Id.* at 6–10.  According to Patent Owner, it is not enough to map between a storage device and an intermediate identifier associated with a particular device because the identifier is not directly and immutably associated with the device itself—in other words, mapping to an identifier is insufficient unless the identifier is associated with a particular device and *cannot* be associated with any other device.  *See id.* at 19–22 (arguing that mapping to a channel identifier does not suffice, even if the channel is connected to only one host device, because the channel identifier *could* be associated with another device if another device were connected to that channel).

We are not persuaded Petitioners' proposed construction is the broadest reasonable interpretation of the "maps between" term.  Petitioners do not explain sufficiently what it means to "facilitate" routing and access controls.  Moreover, other claim terms expressly address access controls and allocating storage.  For example, dependent claim 7 recites "access controls" including "an allocation of subsets of storage space."  Petitioners do not provide a persuasive justification for including these concepts in the construction of the "maps between" term.

---

[5] The 852 IPR petition presented the same challenges "verbatim" as the Petition in this proceeding.  852 IPR, Paper 1, 1.  Thus, in general, we cite only to the Petition filed in this proceeding for brevity.

IPR2015-01544
Patent 7,051,147 B2

The construction proposed by Patent Owner, however, is overly narrow. Although Patent Owner emphasizes that the map must identify specific host devices, it does not explain persuasively why the claim language should be construed to exclude doing so via intermediate identifiers. *See* PO Resp. 5–10. Patent Owner does not identify any disclosure in the '147 patent's specification that clearly disavows mapping to a device indirectly, or mapping to a device via an intermediate identifier that could identify a different host if the system were configured differently. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) (holding that "words of manifest exclusion or explicit disclaimers in the specification are necessary to disavow claim scope" (internal quotations omitted)). Patent Owner's discussion of Figure 3, for example, is insufficient to compel a narrow construction of the term because it analyzes only a preferred embodiment of the invention. *See* PO Resp. 8–9; *see also In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1369 (Fed. Cir. 2004) (holding that limitations should not be imported from embodiments into the claims absent a clear disclaimer of claim scope in the specification).

Moreover, the '147 patent specifically discusses mapping with identifiers that are not immutable. For example, the specification discusses addressing devices on an FC loop using an AL_PA (arbitrated loop physical address) identifier, and the possibility of "FC devices changing their AL-PA due to device insertion or other loop initialization." Ex. 1001, 8:40–46; *see* Tr. 54:5–55:15 (counsel for Patent Owner acknowledging an AL_PA is a "temporarily assigned ID" that can point to different devices); Pet. Reply 4–7 (discussing evidence supporting the use of intermediate identifiers, including testimony by Patent Owner's proffered expert).

IPR2015-01544
Patent 7,051,147 B2

Further, the claims of the '147 patent indicate the mapping may use mere representations of a device rather than requiring direct mapping to the device itself. Claim 15, for example, recites mapping including "virtual LUNs that provide a representation of the storage device," and claim 17 recites "mapping from a host device ID to a virtual LUN representation of the remote storage device." Although these claims refer to "virtual representations of storage devices rather than host devices, the "maps between" term of the independent claims uses the same language when referring to both the devices and storage devices—for example, claim 14 merely recites a "map between the device and the remote storage device." The claim language does not indicate that the mapping may address storage devices one way, but that devices must be addressed in a different, more specific or direct way.

For the reasons above, we are not persuaded that the broadest reasonable interpretation of "maps between the device and the remote storage devices" mandates mapping directly or immutably to a host device itself, or excludes mapping to devices using intermediate identifiers.

The parties note that a district court in a related case construed the term as follows:

> To create a path from a device on one side of the storage router to a device on the other side of the router. A "map" contains a representation of devices on each side of the storage router, so that when a device on one side of the storage router wants to communicate with a device on the other side of the storage router, the storage router can connect the devices.

Ex. 1009, 12. Although we are not bound by the construction or reasoning of the district court, we do not disregard the analysis and conclusions of a court construing the same claim term in a concurrent proceeding concerning

8

IPR2015-01544
Patent 7,051,147 B2

the same patent. *See Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–27 (Fed. Cir. 2015). After considering the construction of the district court, we determine this construction corresponds to the broadest reasonable interpretation and adopt it for purposes of this Decision.

### B.    *Asserted Grounds of Unpatentability*

Petitioners assert that claims 1–39 are unpatentable under § 103 in view of the combination of the CRD Manual and the HP Journal. Pet. 14–60. As discussed below, Petitioners have demonstrated by a preponderance of the evidence that all challenged claims are unpatentable on this ground.

### 1.    *CRD Manual*

The CRD Manual describes the CRD-5500 RAID controller, a device that enables access to an array of disk drives on SCSI buses. Ex. 1004, 9.[6] This controller has a modular design that permits customization of its I/O channels using different I/O hardware modules, which allow support of multiple hosts and multiple drives. *Id*. at 9–11.

### 2.    *HP Journal*

The HP Journal is a collection of articles dated October 1996. Ex. 1006, 1–3. For example, the HP Journal includes an article titled "An Introduction to Fibre Channel" by Meryem Primmer ("Primmer Article"). *Id*. at 94. The Primmer Article discusses FC technology, describing it as "a flexible, scalable, high-speed data transfer interface" where "[n]etworking and I/O protocols, such as SCSI commands, are mapped to [FC] constructs and encapsulated and transported within [FC] frames." *Id*.

Additionally, an article titled "Tachyon: A Gigabit Fibre Channel Protocol Chip," by Judith A. Smith and Meryem Primmer ("Smith Article"),

---

[6] For clarity, we refer to the pagination of Exhibit 1004 provided by Petitioners and not its native pagination.

9

is also included in the HP Journal. *Id*. at 99. The Smith article discusses the Tachyon chip, an FC interface controller (*id*. at 111) that "enables a seamless interface to the physical FC-0 layer and low-cost [FC] attachments for hosts, systems, and peripherals on both industry-standard and proprietary buses." *Id*. at 99.

These portions of the HP Journal relied on by Petitioners share a common author (Meryem Primmer), and similar subject matter (FC technology and its implementation), as well as the same apparent publication date in the same issue of the journal. Patent Owner did not dispute that one of ordinary skill[7] would have combined the teachings of the different articles in the HP Journal. Based on the full record after trial, we agree and consider them collectively, as the parties have done throughout the proceeding, for simplicity and to avoid confusion.

3.     *Reason to Combine the CRD Manual and the HP Journal*

Applicable to all of the challenged claims, the Petition provides a detailed analysis of why a person of ordinary skill in the art would have been motivated to combine the CRD Manual and the HP Journal in the manner asserted by Petitioners. Pet. 18–22 (citing Ex. 1003 ¶¶ 53–62). Specifically, Petitioners contend: (1) the CRD Manual explains that the disclosed CRD-5500 controller has a modular design capable of accepting various I/O modules; (2) the HP Journal describes the benefits of FC technology over SCSI technology; (3) the HP Journal discloses the replacement of SCSI with FC, including the use of SCSI commands with FC frames. *Id*. For example, the HP Journal discusses various advantages of FC over SCSI as a transport medium technology, including advantages in bandwidth and addressability,

---

[7] The level of ordinary skill in the art is reflected by the prior art of record. *See Okajima v. Boudreau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

IPR2015-01544
Patent 7,051,147 B2

and explains how some FC controllers are compatible with SCSI devices. *Id.*; *see, e.g.*, Ex. 1006, 94–95, 99–101. Patent Owner does not dispute in its Patent Owner Response[8] that a person of ordinary skill would have had reason to combine the teachings of these references. Based on the full record after trial, Petitioners have articulated a sufficient reason to combine the CRD Manual and the HP Journal with rational underpinnings supported by the evidence. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

    *4.    Claim 1*

    Petitioners contend the CRD Manual teaches a storage router, the CRD-5500 controller, which routes data between host computers ("a device") and SCSI disk drives ("remote storage devices"). Pet. 23; Ex. 1004, 9–11. According to Petitioners, the CRD Manual teaches the buffer limitation of claim 1 through its disclosure of an "onboard cache" that temporarily stores data from the hosts before eventually writing that data to the storage devices. Pet. 24; Ex. 1004, 12.

    With respect to the first and second FC controllers, Petitioners rely on teachings from the combination of the CRD Manual and the HP Journal, as follows. Pet. 24–26. First, the CRD Manual discloses multiple "I/O modules," which interface with SCSI buses that connect to the hosts and the disk drives. Ex. 1004, 9, 21, 24, 32. Second, the HP Journal discusses the Tachyon FC controller chip, which enables interfacing with a high-speed FC connection. Ex. 1006, 101, 111. The HP Journal further discloses that the Tachyon controller is designed to be compatible with SCSI commands as

---

[8] Although Crossroads disputed whether Petitioners articulated a sufficient reason to combine the references in its Preliminary Response, it waived this argument by not including it in its Patent Owner Response.

IPR2015-01544
Patent 7,051,147 B2

well. *Id.* at 101. Based on these disclosures and the testimony of their proffered expert, Dr. Andrew Hospodor (Ex. 1003), Petitioners argue a person of ordinary skill would have been taught to replace the SCSI technology of the CRD Manual I/O modules with the FC controller chip and FC interconnects of the HP Journal to arrive at the recited FC controllers and FC transport media of claim 1. Pet. 24–26 (citing Ex. 1003 ¶¶ 53–62).[9]

Next, the Petition identifies the central processor, system circuitry, and firmware disclosed in the CRD Manual as teaching the recited "supervisor unit." Pet. 26 (citing Ex. 1004, 9, 11, 40, 53, Fig. 2-1). Further, according to Petitioners, the combination of the CRD Manual and the HP Journal teaches "process[ing] data in the buffer to interface between the first Fibre Channel controller and the second Fibre Channel controller to allow access from Fibre Channel initiator devices to the remote storage devices using native low level, block protocol in accordance with the configuration," as recited in claim 1. Pet. 28–29 (citing Ex. 1003, 56–59). Specifically, Petitioners note that the CRD Manual discloses host computers (initiator devices) writing data to disk drives (remote storage devices) via an onboard cache (buffer) using a SCSI interface. *Id.*; Ex. 1004, 9, 12, 24–25. As the '147 patent discloses, SCSI is an example of a "native low level, block protocol" within the meaning of the claims. *See* Ex. 1001, 5:13–17, 5:46–50. In addition, Petitioners rely on the HP Journal's discussion of using

---

[9] Crossroads argues that Dr. Hospodor's testimony should be accorded "diminished" weight due to his alleged bias and certain deposition testimony that Crossroads believes undermines his credibility. PO Resp. 55–58. All of these considerations were taken into account, and Dr. Hospodor's testimony was accorded the weight appropriate in light of the full record. Further, we determine that Dr. Hospodor was a credible witness overall, despite the issues identified by Crossroads, because his testimony generally was supported by the record as explained in this Decision.

12

IPR2015-01544
Patent 7,051,147 B2

encapsulated SCSI commands over an FC link through the Tachyon FC
controller (Ex. 1006, 101), arguing these disclosures would have taught a
person of ordinary skill to process data from host computers via an onboard
cache to access (e.g., write data to) storage drives using encapsulated SCSI
commands over an FC network.  Pet. 28–29.

As to the requirement that the supervisor unit be operable to "maintain
a configuration . . . that maps between the device and the remote storage
devices," Petitioners rely on the CRD Manual's discussion of a host LUN
(Logical Unit Number) mapping feature.  *Id.* at 26–27.  Specifically, the
CRD Manual describes a feature of its Monitor Utility used to "map LUNs
on each host channel to a particular redundancy group."  Ex. 1004, 44.  A
host channel corresponds to an I/O module, which is assigned to a host.  *Id.*
Each host channel has multiple LUNs, each of which can be mapped to a
specific redundancy group.  *Id.*  Redundancy groups may be one or more
disk drives, or partitions thereof.  *Id.* at 19.  Thus, Petitioners assert the CRD
Manual teaches that the Monitor Utility maintains host LUN mapping
settings that map a host on a host channel (the recited "device") and
redundancy groups (the recited "remote storage devices").  Pet. 26–27
(citing Ex. 1003 ¶¶ 51–55).

Finally, Petitioners contend the CRD Manual teaches the "access
controls" limitation as well.  *Id.* at 27–28.  Specifically, Petitioners identify
the CRD Manual's discussion of using host LUN mapping settings to make
certain redundancy groups available to certain host channels while blocking
access to other host channels.  *Id.* (citing Ex. 1004, 44).

Based on the full record after trial, we find that the record supports the
conclusion that the combination of the CRD Manual and the HP Journal
teaches or suggests each limitation of claim 1 of the '147 patent, as set forth

13

IPR2015-01544
Patent 7,051,147 B2

in Petitioners' analysis explained above.  Patent Owner's counterarguments are unpersuasive.

First, Patent Owner argues the asserted combination does not teach the "maps between" limitation of claim 1.  PO Resp. 24–33; *see also id.* at 14–23 (arguing the CRD Manual fails to teach mapping).  According to Patent Owner, the CRD Manual fails to teach the recited mapping because the host LUN mapping feature only maps storage devices to host *channels*, not the specific hosts themselves.  *Id.* at 14–16, 25–28 (citing Ex. 2027 ¶¶ 51–54, 61– 66, 73, 81, 82).  This argument, however, relies on the overly narrow claim construction rejected above, and is unpersuasive as a result. For example, Patent Owner addresses Figure 1-2 of the CRD Manual, which is reproduced below:



Figure 1-2 of the CRD Manual depicts a configuration of the CRD-5500 controller where each of four different hosts is assigned to a different

14

channel, i.e., channel 0 through channel 3. Ex. 1004, 10. These hosts may then access redundancy groups via the CRD-5500 controller. *Id*.

Although the host LUN mapping feature disclosed in the CRD Manual maps redundancy groups to host channels, the specific configuration depicted in Figure 1-2 meets the mapping limitation because each host channel is dedicated to a single host—thus, in effect, mapping to a host channel is tantamount to mapping to a particular host. *See* Pet. Reply 12–13. In recognition of this fact, the CRD Manual explicitly refers to mapping to hosts and host channels interchangeably, which Patent Owner acknowledges at least with respect to Figure 1-2. *See* Ex. 1004, 9; PO Resp. 30–31; Pet. Reply 11. The analysis presented by Patent Owner regarding other configurations *different* from that in Figure 1-2—i.e., configurations where two hosts are connected to the same host channel (PO Resp. 21–22, 31)— does not cancel or negate the configuration disclosed by Figure 1-2. Similarly, whether the Figure 1-2 configuration would teach the mapping limitation *if it were hypothetically altered* is irrelevant. *See* PO Resp. 20–21. As discussed above, the broadest reasonable interpretation of the mapping limitation is not limited only to mapping directly and immutably to a specific host device, and does not exclude categorically the use of intermediate identifiers. Consequently, Patent Owner has not shown persuasively why the configuration disclosed in the CRD Manual falls outside the scope of the claim language.

Patent Owner additionally contends that the CRD Manual fails to teach the access controls limitation of claim 1. *Id.* at 33–38. Similar to its arguments relating to the mapping limitation, Patent Owner purports to show how the redundancy group access controls of the CRD Manual can be defeated by changing the disclosed configuration in Figure 1-2, i.e., by

rewiring the hosts such that multiple hosts are connected to the same host channel. *Id.* at 36–38. Patent Owner has not persuasively demonstrated, however, that the purported inadequacy of the access control method disclosed for the Figure 1-2 configuration, when directly applied to a *different* configuration, shows that the CRD Manual fails to teach implementing access controls at least for the configuration of Figure 1-2.

Although Patent Owner argues that Petitioners rely on such a configuration because they propose combining the CRD Manual with the HP Journal, Patent Owner inaccurately characterizes Petitioners' contentions as bodily incorporating only one aspect of the HP Journal's teachings—placing all hosts on a single FC arbitrated loop—while ignoring the HP Journal's other teachings regarding implementing such FC loops. *See* PO Resp. 34–36; *see also In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference; nor is it that the claimed invention must be expressly suggested in any one or all of the references. Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."). As noted in the Petition (Pet. 20), the HP Journal provides detailed disclosures on the implementation of FC arbitrated loops, including configurations with multiple host devices. *See* Ex. 1006, 100–111. The record as a whole supports Petitioners' contention that a person of ordinary skill would have been able to combine the teachings of the CRD Manual and the HP Journal to arrive at a system utilizing FC loops, which maps redundancy groups to particular hosts and implements access controls as taught by the CRD Manual, but applying FC addressing capabilities taught by the HP Journal in

IPR2015-01544
Patent 7,051,147 B2

lieu of the host channel-based implementation of the CRD Manual. *See* Ex. 1003 ¶¶ 55–61.

Lastly, Patent Owner argues the asserted prior art fails to teach that the data in the CRD Manual's onboard cache is processed "to allow access from Fibre Channel initiator devices to the remote storage devices," as recited in claim 1, because the host already has access when that data is processed. PO Resp. 39. Thus, Patent Owner appears to argue that the data in the cache must be processed as part of determining whether access can be granted in the first place. Patent Owner does not, however, explain why the claim should be construed in that manner. The data in the CRD Manual's onboard cache is written to the target storage device once it is processed, which Patent Owner does not dispute. *See* Ex. 1004, 12. As discussed above, Petitioners' contention that writing to a storage device teaches allowing access to those devices is persuasive based on the record, and we are not persuaded that Patent Owner's position is commensurate with the full scope of the claim language.

In sum, based on the full record after trial, we find that a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of claim 1 of the '147 patent.

     *5.    Claims 2–5*

Claims 2–5 depend, directly or indirectly, from claim 1. Petitioners presented evidence and argument to support their contention that the combination of the CRD Manual and the HP Journal teaches each limitation of these dependent claims. Pet. 30–34. We agree that the cited evidence teaches or suggests the limitations of these claims. For example, Petitioners rely on the redundancy groups of the CRD Manual as teaching the "subsets

IPR2015-01544
Patent 7,051,147 B2

of storage space" recited in claim 2, and identify the host LUN mapping and access control features in the CRD Manual as teaching allocating those subsets to associated devices such that each subset is only accessible by the associated device. *Id.* at 30–31. The Petition identifies portions of both the CRD Manual and the HP Journal that describe workstations, including workstations in an FC loop, as teaching FC devices comprising workstations, as recited in claim 3. *Id.* at 31. With respect to claim 4, Petitioners rely on the CRD Manual as disclosing disk drives as storage devices. *Id.* at 32. Further, Petitioners rely on the HP Journal's discussion of an FC frame manager, FIFO queues, and inbound/outbound block movers, as teaching the FC protocol unit, first-in-first-out queue, and DMA interface limitations of claim 5. *Id.* at 32–34. We find Petitioners' contentions persuasive and supported by the record.

In response, Patent Owner argues that the asserted prior art does not teach the limitations of claim 2 because it contends, as it did for claim 1, that the CRD Manual teaches associating storage devices (or subsets thereof) with host channels and not host devices directly. *See* PO Resp. 39–40. Patent Owner did not present other arguments specifically directed to claims 2–5. *See id.* For the same reasons as discussed above for claim 1, this argument is unpersuasive.

Based on the full record after trial, a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches or suggests each limitation of claims 2–5 of the '147 patent.

6.    *Claims 6–39*

The limitations recited in independent claim 6 are very similar to those of claims 1 and 3, and both parties rely on essentially the same

arguments[10] with respect to those limitations as for claims 1 and 3. *See* Pet. 34–38; PO Resp. 40–43. Claim 6 requires explicitly that the storage router map between a "plurality of workstations" and a "plurality of storage devices." As discussed above for claims 1 and 3, Petitioners established sufficiently that the combination of the CRD Manual and the HP Journal teach multiple workstations and multiple storage devices (e.g., multiple disk drives), as well as mapping between them, and Petitioners advance the same arguments and evidence for claim 6 (Pet. 35–37). For reasons similar to those discussed above with respect to claims 1 and 3, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claim 6.

Claims 7–9 depend, directly or indirectly, from claim 6 and recite limitations similar to those recited in claim 1 and its dependent claims. For example, claims 7 and 8 recite the same limitations as claims 2 and 4, respectively. Both parties rely on essentially the same arguments as those discussed above for the previous claims. *See* Pet. 38–41; PO Resp. 43–44. For reasons similar to those discussed above for the previous claims, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claims 7–9.

---

[10] Crossroads also argues in a footnote that it "strenuously disagrees that the [CRD Manual] discloses a storage network." PO Resp. 40 n.8. This contention is not explained, nor is any evidentiary support cited except three paragraphs of Dr. Levy's Declaration. *Id.* This conclusory statement is insufficient and, to the extent it seeks to incorporate by reference the explanations provided in the Levy Declaration, is contrary to 37 C.F.R. § 42.6(a)(3). Thus, the argument was not considered. Further, even were it considered, it is unpersuasive, and we find Dr. Hospodor's testimony more credible on this issue. *See* Ex. 1003, 73–74.

IPR2015-01544
Patent 7,051,147 B2

Each of the remaining independent claims (claims 10, 14, 21, 28, and 34), as well as most of their dependent claims (claims 11–13, 18–20, 25–27, 32, 33, and 37–39) recite limitations similar to those recited in previous claims discussed above.  For example, claims 11–13 recite limitations substantially the same as those of claims 2–4, and the limitations of claim 28 are substantially the same as limitations recited in claim 1.  The parties advance similar arguments and evidence with respect to these claims as for those previous claims.  *See* Pet. 41–46, 49–60; PO Resp. 44–47, 49–50.  For similar reasons as discussed above, we find the full record after trial supports Petitioners' contention that the asserted prior art teaches each limitation of claims 10–14, 18–21, 25–28, 32, 33, and 37–39.

Claims 15–17 recite additional limitations relating to "virtual LUNs that provide a representation of the storage device," "mapping from a host device ID to a virtual LUN representation of the remote storage device to a physical LUN of the remote storage device," and exposing the (host) device to only "LUNs that the device may access."  The remaining claims (claims 22–24, 29–31, 35, and 36) recite essentially the same limitations.

Petitioners contend the CRD Manual's description of its host LUN mapping feature teaches these limitations.  Pet. 46–49.  Specifically, Petitioners focus on the table depicted on page 44 of the CRD Manual, which is reproduced below:

IPR2015-01544
Patent 7,051,147 B2

```
                    Monitor Utility              02-09-96
                  HOST LUN MAPPING               13:14:00
                     Channel 0

+---------+-----------------+   +---------+-----------------+
| Host LUN | Redundancy Group|   | Host LUN | Redundancy Group|
+---------+-----------------+   +---------+-----------------+
| 0       | 0               |   | 16      | 16              |
| 1       | 1               |   | 17      | 17              |
| 2       | -               |   | 18      | 18              |
| 3       | -               |   | 19      | 19              |
| 4       | 5               |   | 20      | 20              |
| 5       | -               |   | 21      | 21              |
| 6       | 6               |   | 22      | 22              |
| 7       | 7               |   | 23      | 23              |
| 8       | 8               |   | 24      | 24              |
| 9       | 9               |   | 25      | 25              |
| 10      | 10              |   | 26      | 26              |
| 11      | 11              |   | 27      | 27              |
| 12      | 12              |   | 28      | 28              |
| 13      | 13              |   | 29      | 29              |
| 14      | 14              |   | 30      | 30              |
| 15      | 15              |   | 31      | 31              |
+---------+-----------------+   +---------+-----------------+

ARROW KEYS: MOVE CURSOR | N: NEXT CH | P: PREV CH | ENTER: SELECT | CTRL-Z: EXIT
```

This table shows the host LUN mapping settings for host channel 0.
Ex. 1004, 44. Host LUNs 0 through 31 for channel 0 are shown, some of
which are assigned to particular redundancy groups (e.g., LUN 4 is assigned
to redundancy group 5). *Id*.

According to Petitioners, the host channel number corresponds to the
recited "host device ID," the host LUNs correspond to the recited "virtual
LUNs," and each redundancy group number corresponds to the recited
"physical LUN." Pet. 47–49. Thus, Petitioners assert the above table from
the CRD Manual teaches mapping from the host channel number ("host
device ID") to a LUN ("virtual LUN representation of the remote storage
device") to a particular redundancy group number ("physical LUN of the
remote storage device"). *Id*. at 48–49. Further, Petitioners contend the CRD
Manual teaches exposing a host device (via a specific host channel assigned
to a particular host) to only the LUNs it may access by describing that
particular redundancy groups can be hidden from particular host channels.
*Id*. at 48 (citing Ex. 1004, 44). We find Petitioners' arguments regarding
these claims to be persuasive and supported by the record.

The counterarguments advanced by Patent Owner essentially are the same as its arguments for claim 1. Patent Owner maintains that the CRD Manual fails to disclose a host device ID because the host channel is the ID of a slot where a host may be connected, not an ID of the host itself. PO Resp. 48. Thus, according to Patent Owner, the CRD Manual fails to disclose mapping from a host device ID as well. *Id.* Similar to Patent Owner's position regarding the "maps between" limitation of claim 1, Patent Owner does not provide a persuasive justification for construing the claims narrowly to exclude mapping to host channel numbers that are dedicated to individual host devices, as shown in Figure 1-2 of the CRD Manual.

In sum, based on the full record after trial, we find that a preponderance of the evidence supports Petitioners' contention that the combination of the CRD Manual and the HP Journal teaches each limitation of claims 6–39 of the '147 patent.

### 7.    *Secondary Considerations of Non-Obviousness*

Secondary considerations based on objective evidence of non-obviousness, if present, must be considered in an obvious determination. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Notwithstanding what the teachings of the prior art would have suggested to one of ordinary skill in the art at the time of the invention, the totality of the evidence submitted, including objective evidence of non-obviousness, may lead to a conclusion that the challenged claims would not have been obvious to one of ordinary skill. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).

To be relevant, evidence of non-obviousness must be commensurate in scope with the claimed invention. *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (citing *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971)); *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). In that regard,

IPR2015-01544
Patent 7,051,147 B2

there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations for that evidence to be accorded substantial weight. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "Nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in determining non-obviousness. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). The burden of producing evidence showing a nexus lies with the patent owner. *Id.*; *Prometheus Labs, Inc. v. Roxane Labs, Inc.*, 805 F.3d 1092, 1101–02 (Fed. Cir. 2015).

Here, Patent Owner alleges that such secondary considerations include long-felt but unmet need, commercial success, and licensing. PO Resp. 51–55. As explained below, Patent Owner has not established sufficiently that the record supports its allegations.

### a.    *Long-Felt Need*

Patent Owner's evidence of alleged long-felt need includes selected quotes from an article by an expert purportedly used by Petitioners in a co-pending lawsuit, and citations to testimony by the same expert to the effect that "before Crossroads' invention, there was no such thing as a storage router and that the term 'storage router' did not exist." PO Resp. 51–52 (citing Ex. 2038, 14; Ex. 2029, 103:18–24, 104:15–105:1, 136:6–14).

"Establishing long-felt need requires objective evidence that an art-recognized problem existed in the art for a long period of time without solution." *Ex parte Jellá*, 90 USPQ2d 1009, 1019 (BPAI 2008) (precedential). The evidence presented is insufficient to establish such a long-felt need. The cited testimony is directed to whether the term "storage router" was used in the art in the late 1990s. *See*, *e.g.*, Ex. 2029, 104:24–

23

IPR2015-01544
Patent 7,051,147 B2

105:1.  It does not address what the needs or problems of the art were at that time.  The article cited by Patent Owner (Ex. 2038), which suggests that a problem might have existed in file system performance generally, nevertheless also does not establish that there was long-felt need for the claimed invention.  As Petitioners note (Pet. Reply 25), Patent Owner has presented no evidence as to how long this problem had been recognized, the extent of the problem, whether it remained unresolved at the time of the invention, or whether the invention resolved this need.  *See Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1332–33 (Fed. Cir. 2009).  As a result, Patent Owner has not established adequately a long-felt but unmet need for its claimed invention.

> b.    *Commercial Success*

Patent Owner submits evidence of the number of products it has sold, revenue from those sales, and the relative sales of its various products, as allegedly demonstrating the commercial success of the claimed invention.  PO Resp. 48–52 (citing Ex. 2043; Ex. 2044).  In particular, it identifies the relative sales of certain products where two versions were sold, one with "access controls" and one without them, as allegedly establishing a nexus between their commercial success and the claimed invention of the '147 patent.  *Id.* (citing Ex. 2043 ¶¶ 2–6; Ex. 2044).

Evidence of commercial success "is only significant if there is a nexus between the claimed invention and the commercial success."  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006).  To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer "proof that the sales [of the allegedly successful product] were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors

24

IPR2015-01544
Patent 7,051,147 B2

unrelated to the quality of the patented subject matter." *In re Huang*, 100
F.3d 135, 140 (Fed. Cir. 1996).

As a threshold matter, Patent Owner has not established a sufficient
nexus between its commercial product and the features of its claimed
invention. Patent Owner has not shown that the items listed in Exhibit 2044
embody the claimed invention, or that sales of the listed products resulted
from novel, non-obvious features of the claimed invention rather than other
features. *See Ormco Corp.*, 463 F.3d at 1312–13 (evidence did not show
that commercial success was due to claimed and novel features). The
statements by Patent Owner's declarant that certain products include
"mapping" or "access controls" (Ex. 2043 ¶¶ 5–6) are insufficient to show
commercial success of the claimed invention. Petitioners also identify
evidence indicating that factors other than the claimed features contributed
to the commercial performance of Patent Owner's products. Pet. Reply 23–
24 (citing, e.g., Ex. 1102, 4–6; Ex. 1105, 89:4–17, 91:7–12, 96:5–102:24,
127:9–20, 136:20–138:24).

Even if Patent Owner had established a nexus between its marketed
technology and the invention claimed in the '147 patent, its commercial
success argument would not be persuasive. An important component of the
commercial success inquiry is determining market share associated with the
alleged success, relative to all competing products. *In re Applied Materials,
Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012). Even sales volume, if provided
without market share information, is only weak evidence, if any, of
commercial success. *Id.* at 1299. As Petitioners assert (Pet. Reply 23), the
fact that Patent Owner sold a certain number of these devices and that they
made up a certain share of its own sales is insufficient to establish

IPR2015-01544
Patent 7,051,147 B2

commercial success without some context about the larger market.  *See In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

    *c.*    *Licensing*

Patent Owner also presents evidence relating to licensing of its patents, including the '147 patent.  PO Resp. 54–55.  Specifically, Patent Owner argues that "a large number of licensees have taken licenses directed specifically to Crossroads' '972 patent family."  PO Resp. 54.  Patent Owner submits that "[t]he total license payments through FY2014 are over $60 million" and that "[p]rominent members of the industry have paid millions of dollars to Crossroads in exchange for a license."  *Id.*  Patent Owner concludes that because these companies were willing to pay millions of dollars to license the invention claimed in the '972 patent family, the claims are not obvious.  *Id.*

"While licenses can sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without showing a clear nexus to the claimed invention."  *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361–62 (Fed. Cir. 2015); *see also Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases specifically require affirmative evidence of nexus where the evidence of commercial success presented is a license, because it is often 'cheaper to take licenses than to defend infringement suits.'"); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) ("[T]he mere existence of these licenses is insufficient to overcome the conclusion of obviousness, as based on the express teachings in the prior art that would have motivated one of ordinary skill to modify [other prior art].").  In *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907–08 (Fed. Cir. 1985), the Federal Circuit stated that such licensing programs "are not infallible guides

26

IPR2015-01544
Patent 7,051,147 B2

to patentability," noting that their success may be due to mutual benefits, "business judgments that it is cheaper to take licenses than to defend infringement suits," or "for other reasons unrelated to the unobviousness of the licensed subject matter."

Here, we lack sufficient information about the circumstances surrounding these licenses to be able to assess whether they truly weigh in favor of non-obviousness. Patent Owner directs us to no testimony from any licensee regarding why the licensee took a license from Patent Owner. It is unknown how much of the decision to take a license stems from a business cost-benefit analysis with regard to defending an infringement suit or from another business reason, rather than from acknowledged merits of the claimed invention. Patent Owner does not provide any information about how many entities refused to take a license, or why they refused.

In addition, as Patent Owner admits, these licenses are directed to an entire family of patents. PO Resp. 54; Pet. Reply 24. Without more evidence, we are unable to determine whether the claimed subject matter of the '147 patent was the motivator for these licensees to take their licenses. *See* Pet. Reply 24. Given these circumstances, Patent Owner has failed to establish an adequate nexus between the claimed invention of the '147 patent and the licenses. Thus, we find Patent Owner's evidence of licensing does not weigh in favor of non-obviousness.

### 8.  *Conclusion as to Asserted Ground of Unpatentability*

For the reasons discussed above and based on the full record after trial, we conclude Petitioners have established by a preponderance of the evidence that claims 1–39 are unpatentable under § 103 in view of the combination of the CRD Manual and the HP Journal. The relatively weak secondary evidence of non-obviousness, diminished further by Patent

Owner's failure to show an adequate nexus to the claimed invention, is insufficient to overcome the relatively strong evidence of obviousness presented by Petitioner. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (requisite nexus between secondary indicia and invention must be shown for evidence to be accorded substantial weight, and where a claimed invention represents no more than the predictable use of prior art elements according to established functions, evidence of secondary indicia is often inadequate to establish non-obviousness).

### C.    *Patent Owner's Motion to Exclude*

Patent Owner moves to exclude certain portions of Exhibit 1025, the deposition testimony of its expert, Dr. Levy, under Federal Rule of Evidence 403. Paper 38, 1–8. According to Patent Owner, the testimony in question "was obtained pursuant to objectionable questioning and/or mischaracterizes his testimony." *Id*. at 1. In the alternative, Patent Owner requests that we consider additional portions of Dr. Levy's testimony pursuant to the Rule of Completeness (Fed. R. Evid. 106). *Id.* at 6, 8.

Petitioners respond that these objections were not preserved, that the Rule of Completeness is inapplicable to these proceedings because the entirety of the transcript of Dr. Levy's deposition is part of the record, that these objections go to the weight that should be given the evidence not its admissibility, and that Patent Owner's allegations of mischaracterizations are baseless. Paper 42, 1–12.

We agree with Petitioners that Patent Owner's objections go to the weight that should be given the evidence, not its admissibility. Moreover, as the entirety of Dr. Levy's deposition is in the record of this proceeding, we have considered the additional passages of Dr. Levy's testimony that Patent

IPR2015-01544
Patent 7,051,147 B2

Owner identifies, as well as the rest of his testimony.  Accordingly, Patent Owner's Motion to Exclude is *denied*.

D.    *Patent Owner's Motion to Seal*

Patent Owner filed several exhibits (Exhibits 2040, 2042, 2044, and 2045) under seal, along with a Motion to Seal (Paper 18) and a proposed protective order (Paper 19).  We previously granted Patent Owner's motion for entry of the protective order.  Paper 39.  Petitioners oppose Patent Owner's Motion to Seal.  Paper 23.  Patent Owner filed a reply.  Paper 27. For the reasons discussed below, Patent Owner's Motion to Seal is *granted*.

Petitioners argue that there is a strong public interest in unsealing these exhibits because they are a critical part of the substantive basis of Patent Owner's patentability arguments.  Paper 23, 2–5.  However, we did not see any need to rely on any of these exhibits in this Decision.  We have reviewed the exhibits at issue and agree with Patent Owner that they contain confidential sales and licensing information.  Given the sensitive nature of this information and the fact that we did not rely on it in rendering our Decision, we agree with Patent Owner that good cause has been shown to seal the information.

However, we note that confidential information subject to a protective order ordinarily becomes public 45 days after final judgment in a trial, unless a motion to expunge is granted.  37 C.F.R. § 42.56; Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14, 2012).  In view of the foregoing, the confidential documents filed in the instant proceeding will remain under seal, at least until the time period for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has concluded.  The record for the instant proceeding will be preserved in its entirety, and the confidential documents will not be expunged or made

IPR2015-01544
Patent 7,051,147 B2

public, pending appeal.  Notwithstanding 37 C.F.R. § 42.56 and the Office

Patent Trial Practice Guide, neither a motion to expunge confidential

documents nor a motion to maintain these documents under seal is necessary

or authorized at this time.  *See* 37 C.F.R. § 42.5(b).


CONCLUSION

For the foregoing reasons, Petitioners have shown by a preponderance

of the evidence that claims 1–39 of the '147 patent are unpatentable under

35 U.S.C. § 103(a).


ORDER

It is

ORDERED that claims 1–39 of the '147 patent are held unpatentable

under 35 U.S.C. § 103(a);

FURTHER ORDERED that Patent Owner's Motion to Exclude

Evidence (Paper 38) is denied;

FURTHER ORDERED that Patent Owner's Motion to Seal (Paper

18) is granted;

FURTHER ORDERED that the information sealed during this *inter

partes* review remain under seal, and the record preserved, until the time

period for filing a notice of appeal of this Decision has expired or, if an

appeal is taken, the appeal process has concluded; and

FURTHER ORDERED that, because this is a final written decision,

parties to the proceeding seeking judicial review of this Decision must

comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2015-01544
Patent 7,051,147 B2

PETITIONER:

David McCombs
David.mccombs.ipr@haynesboone.com

Andrew S. Ehmke
andy.ehmke.ipr@haynesboone.com

Scott T. Jarratt
scott.jarratt.ipr@haynesboone.com

Philip Philbin
phillip.philbin.ipr@haynesboone.com

Gregory P. Huh
gregory.huh.ipr@haynesboone.com


PATENT OWNER:

Steven Sprinkle
crossroadsipr@sprinklelaw.com

Russell Wong
CrossroadsIPR@blankrome.com

James Hall
CrossroadsIPR@blankrome.com

John Adair
crossroadsipr@sprinklelaw.com

Keith Rutherford
CrossroadsIPR@blankrome.com

**Appx00112**



US006425035B2

(12) **United States Patent**
Hoese et al.

(10) Patent No.: **US 6,425,035 B2**
(45) Date of Patent: *Jul. 23, 2002

(54) **STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE**

(75) Inventors: **Geoffrey B. Hoese**, Austin; **Jeffry T. Russell**, Cibolo, both of TX (US)

(73) Assignee: **Crossroads Systems, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/965,335**

(22) Filed: **Sep. 27, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/354,682, filed on Jul. 15, 1999, which is a continuation of application No. 09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972.

(51) Int. Cl.[7] ................................................ **G06F 13/00**
(52) U.S. Cl. ......................... **710/129**; 710/128; 710/8; 710/36; 710/105
(58) Field of Search ............................. 710/1–5, 8–13, 710/36–38, 105, 100–101, 126–131; 711/100, 112, 113; 714/42

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,748,924 A | * | 5/1998 | Llorens et al. | 710/129 |
| 5,768,623 A | * | 6/1998 | Judd et al. | 710/37 |
| 5,809,328 A | * | 9/1998 | Nogales et al. | 710/5 |
| 5,812,754 A | * | 9/1998 | Lui et al. | 714/6 |
| 5,835,496 A | * | 11/1998 | Yeung et al. | 370/514 |
| 5,848,251 A | * | 12/1998 | Lomelino et al. | 710/129 |
| 5,935,260 A | * | 8/1999 | Ofer | 714/42 |
| 5,941,972 A | * | 8/1999 | Hoese et al. | 710/129 |
| 5,959,994 A | * | 9/1999 | Boggs et al. | 370/399 |
| 6,041,381 A | * | 3/2000 | Hoese | 710/129 |
| 6,055,603 A | * | 4/2000 | Ofer et al. | 711/113 |
| 6,065,087 A | * | 5/2000 | Keaveny et al. | 710/129 |
| 6,075,863 A | * | 6/2000 | Krishnan et al. | 380/49 |
| 6,098,149 A | * | 8/2000 | Ofer et al. | 711/112 |
| 6,118,766 A | * | 9/2000 | Akers | 370/249 |
| 6,148,004 A | * | 11/2000 | Nelson et al. | 370/463 |
| 6,185,203 B1 | * | 2/2001 | Berman | 370/351 |
| 6,209,023 B1 | * | 3/2001 | Dimitroff et al. | 709/211 |
| 6,230,218 B1 | * | 5/2001 | Caspers et al. | 710/20 |
| 6,341,315 B1 | * | 1/2002 | Arroyo et al. | 709/230 |
| 6,343,324 B1 | * | 1/2002 | Hubis et al. | 709/229 |

* cited by examiner

*Primary Examiner*—Christopher B. Shin
(74) *Attorney, Agent, or Firm*—Gray Cary Ware & Friedrich LLP

(57) **ABSTRACT**

A storage router (**56**) and storage network (**50**) provide virtual local storage on remote SCSI storage devices (**60, 62, 64**) to Fiber Channel devices. A plurality of Fiber Channel devices, such as workstations (**58**), are connected to a Fiber Channel transport medium (**52**), and a plurality of SCSI storage devices (**60, 62, 64**) are connected to a SCSI bus transport medium (**54**). The storage router (**56**) interfaces between the Fibre Channel transport medium (**52**) and the SCSI bus transport medium (**54**). The storage router (**56**) maps between the workstations (**58**) and the SCSI storage devices (**60, 62, 64**) and implements access controls for storage space on the SCSI storage devices (**60, 62, 64**). The storage router (**56**) then allows access from the workstations (**58**) to the SCSI storage devices (**60, 62, 64**) using native low level, block protocol in accordance with the mapping and the access controls.

**14 Claims, 2 Drawing Sheets**



Cisco Systems, Inc. and Quantum Corporation v. Crossroads Systems, Inc.
CQ-1001 / Page 1 of 14



**U.S. Patent** Jul. 23, 2002 Sheet 1 of 2 US 6,425,035 B2

FIG. 1

FIG. 2

FIG. 3

U.S. Patent

Jul. 23, 2002

Sheet 2 of 2

US 6,425,035 B2



FIG. 4



FIG. 5

CQ-1001 / Page 3 of 14

US 6,425,035 B2

**1**

# STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE

## RELATED APPLICATIONS

This application claims the benefit of the filing date of U.S. patent application Ser. No. 09/354,682 by inventors Geoffrey B. Hoese and Jeffry T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Jul. 15, 1999, which is a continuation of U.S. patent application Ser. No. 091001,799, filed on Dec. 31, 1997, now U.S. Pat. No. 5.941,972, and hereby incorporates these applications by reference in their entireties as if they had been fully set forth herein.

## TECHNICAL FIELD OF THE INVENTION

This invention relates in general to network storage devices, and more particularly to a storage router and method for providing virtual local storage on remote SCSI storage devices to Fiber Channel devices.

## BACKGROUND OF THE INVENTION

Typical storage transport mediums provide for a relatively small number of devices to be attached over relatively short distances. One such transport medium is a Small Computer System Interface (SCSI) protocol, the structure and operation of which is generally well known as is described, for example, in the SCSI-1, SCSI-2 and SCSI-3 specifications. High speed serial interconnects provide enhanced capability to attach a large number of high speed devices to a common storage transport medium over large distances. One such serial interconnect is Fibre Channel, the structure and operation of which is described, for example, in Fiber Channel Physical and Signaling Interface (FC-PH), ANSI X3.230 Fiber Channel Arbitrated Loop (FC-AL), and ANSI X3.272 Fiber Channel Private Loop Direct Attach (FC-PLDA).

Conventional computing devices, such as computer workstations, generally access storage locally or through network interconnects. Local storage typically consists of a disk drive, tape drive, CD-ROM drive or other storage device contained within, or locally connected to the workstation. The workstation provides a file system structure, that includes security controls, with access to the local storage device through native low level, block protocols. These protocols map directly to the mechanisms used by the storage device and consist of data requests without security controls. Network interconnects typically provide access for a large number of computing devices to data storage on a remote network server. The remote network server provides file system structure, access control, and other miscellaneous capabilities that include the network interface. Access to data through the network server is through network protocols that the server must translate into low level requests to the storage device. A workstation with access to the server storage must translate its file system protocols into network protocols that are used to communicate with the server. Consequently, from the perspective of a workstation, or other computing device, seeking to access such server data, the access is much slower than access to data on a local storage device.

## SUMMARY OF THE INVENTION

In accordance with the present invention, a storage router and method for providing virtual local storage on remote SCSI storage devices to Fiber Channel devices are disclosed that provide advantages over conventional network storage devices and methods.

**2**

According to one aspect of the present invention, a storage router and storage network provide virtual local storage on remote SCSI storage devices to Fiber Channel devices. A plurality of Fiber Channel devices, such as workstations, are connected to a Fiber Channel transport medium, and a plurality of SCSI storage devices are connected to a SCSI bus transport medium. The storage router interfaces between the Fiber Channel transport medium and the SCSI bus transport medium. The storage router maps between the workstations and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. The storage router then allows access from the workstations to the SCSI storage devices using native low level, block protocol in accordance with the mapping and the access controls.

According to another aspect of the present invention, virtual local storage on remote SCSI storage devices is provided to Fiber Channel devices. A Fibre Channel transport medium and a SCSI bus transport medium are interfaced with. A configuration is maintained for SCSI storage devices connected to the SCSI bus transport medium. The configuration maps between Fiber Channel devices and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. Access is then allowed from Fiber Channel initiator devices to SCSI storage devices using native low level, block protocol in accordance with the configuration.

A technical advantage of the present invention is the ability to centralize local storage for networked workstations without any cost of speed or overhead. Each workstation access its virtual local storage as if it work locally connected. Further, the centralized storage devices can be located in a significantly remote position even in excess of ten kilometers as defined by Fibre Channel standards.

Another technical advantage of the present invention is the ability to centrally control and administer storage space for connected users without limiting the speed with which the users can access local data. In addition, global access to data, backups, virus scanning and redundancy can be more easily accomplished by centrally located storage devices.

A further technical advantage of the present invention is providing support for SCSI storage devices as local storage for Fiber Channel hosts. In addition, the present invention helps to provide extended capabilities for Fiber Channel and for management of storage subsystems.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. 1 is a block diagram of a conventional network that provides storage through a network server;

FIG. 2 is a block diagram of one embodiment of a storage network with a storage router that provides global access and routing;

FIG. 3 is a block diagram of one embodiment of a storage network with a storage router that provides virtual local storage;

FIG. 4 is a block diagram of one embodiment of the storage router of FIG. 3; and

FIG. 5 is a block diagram of one embodiment of data flow within the storage router of FIG. 4.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 is a block diagram of a conventional network, indicated generally at 10, that provides access to storage

US 6,425,035 B2

**3**

through a network server. As shown, network 10 includes a plurality of workstations 12 interconnected with a network server 14 via a network transport medium 16. Each workstation 12 can generally comprise a processor, memory, input/output devices, storage devices and a network adapter as well as other common computer components. Network server 14 uses a SCSI bus 18 as a storage transport medium to interconnect with a plurality of storage devices 20 (tape drives, disk drives, etc.). In the embodiment of FIG. 1, network transport medium 16 is an network connection and storage devices 20 comprise hard disk drives, although there are numerous alternate transport mediums and storage devices.

In network 10, each workstation 12 has access to its local storage device as well as network access to data on storage devices 20. The access to a local storage device is typically through native low level, block protocols. On the other hand, access by a workstation 12 to storage devices 20 requires the participation of network server 14 which implements a file system and transfers data to workstations 12 only through high level file system protocols. Only network server 14 communicates with storage devices 20 via native low level, block protocols. Consequently, the network access by workstations 12 through network server 14 is slow with respect to their access to local storage. In network 10, it can Also be a logistical problem to centrally manage and administer local data distributed across an organization, including accomplishing tasks such as backups, virus scanning and redundancy.

FIG. 2 is a block diagram of one embodiment of a storage network, indicated generally at 30, with a storage router that provides global access and routing. This environment is significantly different from that of FIG. 1 in that there is no network server involved. In FIG. 2, a Fiber Channel high speed serial transport 32 interconnects a plurality of workstations 36 and storage devices 38. A SCSI bus storage transport medium interconnects workstations 40 and storage devices 42. A storage router 44 then serves to interconnect these mediums and provide devices on either medium global, transparent access to devices on the other medium. Storage router 44 routes requests from initiator devices on one medium to target devices on the other medium and routes data between the target and the initiator. Storage router 44 can allow initiators and targets to be on either side. In this manner, storage router 44 enhances the functionality of Fiber Channel 32 by providing access, for example, to legacy SCSI storage devices on SCSI bus 34. In the embodiment of FIG. 2, the operation of storage router 44 can be managed by a management station 46 connected to the storage router via a direct serial connection.

In storage network 30, any workstation 36 or workstation 40 can access any storage device 38 or storage device 42 through native low level, block protocols, and vice versa. This functionality is enabled by storage router 44 which routes requests and data as a generic transport between Fiber Channel 32 and SCSI bus 34. Storage router 44 uses tables to map devices from one medium to the other and distributes requests and data across Fiber Channel 32 and SCSI bus 34 without any security access controls. Although this extension of the high speed serial interconnect provided by Fiber Channel 32 is beneficial, it is desirable to provide security controls in addition to extended access to storage devices through a native low level, block protocol.

FIG. 3 is a block diagram of one embodiment of a storage network, indicated generally at 50, with a storage router that provides virtual local storage. Similar to that of FIG. 2, storage network 50 includes a Fiber Channel high speed

**4**

serial interconnect 52 and a SCSI bus 54 bridged by a storage router 56. Storage router 56 of FIG. 3 provides for a large number of workstations 58 to be interconnected on a common storage transport and to access common storage devices 60, 62 and 64 through native low level, block protocols.

According to the present invention, storage router 56 has enhanced functionality to implement security controls and routing such that each workstation 58 can have access to a specific subset of the overall data stored in storage devices 60, 62 and 64. This specific subset of data has the appearance and characteristics of local storage and is referred to herein as virtual local storage. Storage router 56 allows the configuration and modification of the storage allocated to each attached workstation 58 through the use of mapping tables or other mapping techniques.

As shown in FIG. 3, for example, storage device 60 can be configured to provide global data 65 which can be accessed by all workstations 58. Storage device 62 can be configured to provide partitioned subsets 66, 68, 70 and 72, where each partition is allocated to one of the workstations 58 (workstations A, B, C and D). These subsets 66, 68, 70 and 72 can only be accessed by the associated workstation 58 and appear to the associated workstation 58 as local storage accessed using native low level, block protocols. Similarly, storage device 64 can be allocated as storage for the remaining workstation 58 (workstation E).

Storage router 56 combines access control with routing such that each workstation 58 has controlled access to only the specified partition of storage device 62 which forms virtual local storage for the workstation 58. This access control allows security control for the specified data partitions. Storage router 56 allows this allocation of storage devices 60, 62 and 64 to be managed by a management station 76. Management station 76 can connect directly to storage router 56 via a direct connection or, alternately, can interface with storage router 56 through either Fiber Channel 52 or SCSI bus 54. In the latter case, management station 76 can be a workstation or other computing device with special rights such that storage router 56 allows access to mapping tables and shows storage devices 60, 62 and 64 as they exist physically rather than as they have been allocated.

The environment of FIG. 3 extends the concept of a single workstation having locally connected storage devices to a storage network 50 in which workstations 58 are provided virtual local storage in a manner transparent to workstations 58. Storage router 56 provides centralized control of what each workstation 58 sees as its local drive, as well as what data it sees as global data accessible by other workstations 58. Consequently, the storage space considered by the workstation 58 to be its local storage is actually a partition (i.e., logical storage definition) of a physically remote storage device 60, 62 or 64 connected through storage router 56. This means that similar requests from workstations 58 for access to their local storage devices produce different accesses to the storage space on storage devices 60, 62 and 64. Further, no access from a workstation 58 is allowed to the virtual local storage of another workstation 58.

The collective storage provided by storage devices 60, 62 and 64 can have blocks allocated by programming means within storage router 56. To accomplish this function, storage router 56 can include routing tables and security controls that define storage allocation for each workstation 58. The advantages provided by implementing virtual local storage in centralized storage devices include the ability to do collective backups and other collective administrative func-

CQ-1001 / Page 5 of 14

US 6,425,035 B2

5

tions more easily. This is accomplished without limiting the performance of workstations 58 because storage access involves native low level, block protocols and does not involve the overhead of high level protocols and file systems required by network servers.

FIG. 4 is a block diagram of one embodiment of storage router 56 of FIG. 3. Storage router 56 can comprise a Fiber Channel controller 80 that interfaces with Fiber Channel 52 and a SCSI controller 82 that interfaces with SCSI bus 54. A buffer 84 provides memory work space and is connected to both Fiber Channel controller 80 and to SCSI controller 82. A supervisor unit 86 is connected to Fiber Channel controller 80, SCSI controller 82 and buffer 84. Supervisor unit 86 comprises a microprocessor for controlling operation of storage router 56 and to handle mapping and security access for requests between Fiber Channel 52 and SCSI bus 54.

FIG. 5 is a block diagram of one embodiment of data flow within storage router 56 of FIG. 4. As shown, data from Fiber Channel 52 is processed by a Fibre Channel (FC) protocol unit 88 and placed in a FIFO queue 90. A direct memory access (DMA) interface 92 then takes data out of FIFO queue 90 and places it in buffer 84. Supervisor unit 86 processes the data in buffer 84 as represented by supervisor processing 93. This processing involves mapping between Fiber Channel 52 and SCSI bus 54 and applying access controls and routing functions. A DMA interface 94 then pulls data from buffer 84 and places it into a buffer 96. A SCSI protocol unit 98 pulls data from buffer 96 and communicates the data on SCSI bus 54. Data flow in the reverse direction, from SCSI bus 54 to Fiber Channel 52, is accomplished in a reverse manner.

The storage router of the present invention is a bridge device that connects a Fiber Channel link directly to a SCSI bus and enables the exchange of SCSI command set information between application clients on SCSI bus devices and the Fiber Channel links. Further, the storage router applies access controls such that virtual local storage can be established in remote SCSI storage devices for workstations on the Fiber Channel link. In one embodiment, the storage router provides a connection for Fiber Channel links running the SCSI Fiber Channel Protocol (FCP) to legacy SCSI devices attached to a SCSI bus. The Fiber Channel topology is typically an Arbitrated Loop (FC_AL).

In part, the storage router enables a migration path to Fiber Channel based, serial SCSI networks by providing connectivity for legacy SCSI bus devices. The storage router can be attached to a Fiber Channel Arbitrated Loop and a SCSI bus to support a number of SCSI devices. Using configuration settings, the storage router can make the SCSI bus devices available on the Fiber Channel network as FCP logical units. Once the configuration is defined, operation of the storage router is transparent to application clients. In this manner, the storage router can form an integral part of the migration to new Fibre Channel based networks while providing a means to continue using legacy SCSI devices.

In one implementation (not shown), the storage router can be a rack mount or free standing device with an internal power supply. The storage router can have a Fibre Channel and SCSI port, and a standard, detachable power cord can be used, the FC connector can be a copper DB9 connector, and the SCSI connector can be a 68-pin type. Additional modular jacks can be provided for a serial port and a 802.3 10BaseT port, i.e. twisted pair Ethernet, for management access. The SCSI port of the storage router an support SCSI direct and sequential access target devices and can support SCSI

6

initiators, as well. The Fiber Channel port can interface to SCSI-3 FCP enabled devices and initiators.

To accomplish its functionality, one implementation of the storage router uses: a Fiber Channel interface based on the HEWLETT-PACKARD TACHYON HPFC-5000 controller and a GLM media interface; an Intel 80960RP processor, incorporating independent data and program memory spaces, and associated logic required to implement a stand alone processing system; and a serial port for debug and system configuration. Further, this implementation includes a SCSI interface supporting Fast-20 based on the SYMBIOS 53C8xx series SCSI controllers, and an operating system based upon the WIND RIVERS SYSTEMS VXWORKS or IXWORKS kernel, as determined. by design. In addition, the storage router includes software as required to control basic functions of the various elements, and to provide appropriate translations between the FC and SCSI protocols.

The storage router has various modes of operation that are possible between FC and SCSI target and initiator combinations. These modes are: FC Initiator to SCSI Target; SCSI Initiator to FC Target; SCSI Initiator to SCSI Target; and FC Initiator to FC Target. The first two modes can be supported concurrently in a single storage router device are discussed briefly below. The third mode can involve two storage router devices back to back and can serve primarily as a device to extend the physical distance beyond that possible via a direct SCSI connection. The last mode can be used to carry FC protocols encapsulated on other transmission technologies (e.g. ATM, SONET), or to act as a bridge between two FC loops (e.g. as a two port fabric).

The FC Initiator to SCSI Target mode provides for the basic configuration of a server using Fiber Channel to communicate with SCSI targets. This mode requires that a host system have an FC attached device and associated device drivers and software to generate SCSI-3 FCP requests. This system acts as an initiator using the storage router to communicate with SCSI target devices. The SCSI devices supported can include SCSI-2 compliant direct or sequential access (disk or tape) devices. The storage router serves to translate command and status information and transfer data between SCSI-3 FCP and SCSI-2, allowing the use of standard SCSI-2 devices in a Fibre Channel environment.

The SCSI Initiator to FC Target mode provides for the configuration of a server using SCSI-2 to communicate with Fiber Channel targets. This mode requires that a host system has a SCSI-2 interface and driver software to control SCSI-2 target devices. The storage router will connect to the SCSI-2 bus and respond as a target to multiple target IDs. Configuration information is required to identify the target IDs to which the bridge will respond on the SCSI-2 bus. The storage router then translates the SCSI-2 requests to SCSI-3 FCP requests, allowing the use of FC devices with a SCSI host system. This will also allow features such as a tape device acting as an initiator on the SCSI bus to provide full support for this type of SCSI device.

In general, user configuration of the storage router will be needed to support various functional modes of operation. Configuration can be modified, for example, through a serial port or through an Ethernet port via SNMP (simple network management protocol) or a Telnet session. Specifically, SNMP manageability can be provided via an 802.3 Ethernet interface. This can provide for configuration changes as well as providing statistics and error information. Configuration can also be performed via TELNET or RS-232 interfaces

US 6,425,035 B2

7

with menu driven command interfaces. Configuration information can be stored in a segment of flash memory and can be retained across resets and power off cycles. Password protection can also be provided.

In the first two modes of operation, addressing information is needed to map from FC addressing to SCSI addressing and vice versa. This can be 'hard' configuration data, due to the need for address information to be maintained across initialization and partial reconfigurations of the Fiber Channel address space. In an arbitrated loop configuration, user configured addresses will be needed for AL__PAs in order to insure that known addresses are provided between loop reconfigurations.

With respect to addressing, FCP and SCSI 2 systems employ different methods of addressing target devices. Additionally, the inclusion of a storage router means that a method of translating device IDs needs to be implemented. In addition, the storage router can respond to commands without passing the commands through to the opposite interface. This can be implemented to allow all generic FCP and SCSI commands to pass through the storage router to address attached devices, but allow for configuration and diagnostics to be performed directly on the storage router through the FC and SCSI interfaces.

Management commands are those intended to be processed by the storage router controller directly. This may include diagnostic, mode, and log commands as well as other vendor-specific commands. These commands can be received and processed by both the FCP and SCSI interfaces, but are not typically bridged to the opposite interface. These commands may also have side effects on the operation of the storage router, and cause other storage router operations to change or terminate.

A primary method of addressing management commands though the FCP and SCSI interfaces can be through peripheral device type addressing. For example, the storage router can respond to all operations addressed to logical unit (LUN) zero as a controller device. Commands that the storage router will support can include INQUIRY as well as vendor-specific management commands. These are to be generally consistent with SCC standard commands.

The SCSI bus is capable of establishing bus connections between targets. These targets may internally address logical units. Thus, the prioritized addressing scheme used by SCSI subsystems can be represented as follows: BUS:TARGET:LOGICAL UNIT. The BUS identification is intrinsic in the configuration, as a SCSI initiator is attached to only one-bus. Target addressing is handled by bus arbitration from information provided to the arbitrating device. Target addresses are assigned to SCSI devices directly, though some means of configuration, such as a hardware jumper, switch setting, or device specific software configuration. As such, the SCSI protocol provides only logical unit addressing within the Identify message. Bus and target information is implied by the established connection.

Fiber Channel devices within a fabric are addressed by a unique port identifier. This identifier is assigned to a port during certain well-defined states of the FC protocol. Individual ports are allowed to arbitrate for a known, user defined address. If such an address is not provided, or if arbitration for a particular user address fails, the port is assigned a unique address by the FC protocol. This address is generally not guaranteed to be unique between instances. Various scenarios exist where the AL-PA of a device will change, either after power cycle or loop reconfiguration.

The FC protocol also provides a logical unit address field within command structures to provide addressing to devices

8

internal to a port. The FCP__CMD payload specifies an eight byte LUN field. Subsequent identification of the exchange between devices is provided by the FQXID (Fully Qualified Exchange ID).

FC ports can be required to have specific addresses assigned. Although basic functionality is not dependent on this, changes in the loop configuration could result in disk targets changing identifiers with the potential risk of data corruption or loss. This configuration can be straightforward, and can consist of providing the device a loop-unique ID (AL__PA) in the range of "01h" to "EFh." Storage routers could be shipped with a default value with the assumption that most configurations will be using single storage routers and no other devices requesting the present ID. This would provide a minimum amount of initial configuration to the system administrator. Alternately, storage routers could be defaulted to assume any address so that configurations requiring multiple storage routers on a loop would not require that the administrator assign a unique ID to the additional storage routers.

Address translation is needed where commands are issued in the cases FC Initiator to SCSI Target and SCSI Initiator to FC Target. Target responses are qualified by the FQXID and will retain the translation acquired at the beginning of the exchange. This prevents configuration changes occurring during the course of execution of a command from causing data or state information to be inadvertently misdirected. Configuration can be required in cases of SCSI Initiator to FC Target, as discovery may not effectively allow for FCP targets to consistently be found. This is due to an FC arbitrated loop supporting addressing of a larger number of devices than a SCSI bus and the possibility of FC devices changing their AL-PA due to device insertion or other loop initialization.

In the direct method, the translation to BUS:TARGET:LUN of the SCSI address information will be direct. That is, the values represented in the FCP LUN field will directly map to the values in effect on the SCSI bus. This provides a clean translation and does not require SCSI bus discovery. It also allows devices to be dynamically added to the SCSI bus without modifying the address map. It may not allow for complete discovery by FCP initiator devices, as gaps between device addresses may halt the discovery process. Legacy SCSI device drivers typically halt discovery on a target device at the first unoccupied LUN, and proceed to the next target. This would lead to some devices not being discovered. However, this allows for hot plugged devices and other changes to the loop addressing.

In the ordered method, ordered translation requires that the storage router perform discovery on reset, and collapses the addresses on the SCSI bus to sequential FCP LUN values. Thus, the FCP LUN values 0-N can represent N+1 SCSI devices, regardless of SCSI address values, in the order in which they are isolated during the SCSI discovery process. This would allow the FCP initiator discovery process to identify all mapped SCSI devices without further configuration. This has the limitation that hot-plugged devices will not be identified until the next reset cycle. In this case, the address may also be altered as well.

In addition to addressing, according to the present invention, the storage router provides configuration and access controls that cause certain requests from FC Initiators to be directed to assigned virtual local storage partitioned on SCSI storage devices. For example, the same request for LUN 0 (local storage) by two different FC Initiators can be directed to two separate subsets of storage. The storage

US 6,425,035 B2

9 | 10

router can use tables to map, for each initiator, what storage access is available and what partition is being addressed by a particular request. In this manner, the storage space provided by SCSI storage devices can be allocated to FC initiators to provide virtual local storage as well as to create any other desired configuration for secured access.

Although the present invention has been described in detail, it should be understood that various changes, substitutions, and alterations can be made hereto without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

**1**. A storage router for providing virtual local storage on remote storage devices to devices, comprising:

a buffer providing memory work space for the storage router;

a first controller operable to connect to and interface with a first transport medium;

a second controller operable to connect to and interface with a second transport medium; and

a supervisor unit coupled to the first controller, the second controller and the buffer, the supervisor unit operable to map between devices connected to the first transport medium and the storage devices, to implement access controls for storage space on the storage devices and to process data in the buffer to interface between the first controller and the second controller to allow access from devices connected to the first transport medium to the storage devices using native low level, block protocols.

**2**. The storage router of claim **1**, wherein the supervisor unit maintains an allocation of subsets of storage space to associated devices connected to the first transport medium, wherein each subset is only accessible by the associated device connected to the first transport medium.

**3**. The storage router of claim **2**, wherein the devices connected to the first transport medium comprise workstations.

**4**. The storage router of claim **2**, wherein the storage devices comprise hard disk drives.

**5**. The storage router of claim **1**, wherein the first controller comprises:

a first protocol unit operable to connect to the first transport medium;

a first-in-first-out queue coupled to the first protocol unit; and

a direct memory access (DMA) interface coupled to the first-in-first-out queue and to the buffer.

**6**. The storage router of claim **1**, wherein the second controller comprises:

a second protocol unit operable to connect to the second transport medium;

an internal buffer coupled to the second protocol unit; and

a direct memory access (DMA) interface coupled to the internal buffer and to the buffer of the storage router.

**7**. A storage network, comprising:

a first transport medium;

a second transport medium;

a plurality of workstations connected to the first transport medium;

a plurality of storage devices connected to the second transport medium; and

a storage router interfacing between the first transport medium and the second transport medium, the storage router providing virtual local storage on the storage devices to the workstations and operable:

to map between the workstations and the storage devices;

to implement access controls for storage space on the storage devices; and

to allow access from the workstations to the storage devices using native low level, block protocol in accordance with the mapping and access controls.

**8**. The storage network of claim **7**, wherein the access controls include an allocation of subsets of storage space to associated workstations, wherein each subset is only accessible by the associated workstation.

**9**. The storage network of claim **7**, wherein the storage devices comprise hard disk drives.

**10**. The storage network of claim **7**, wherein the storage router comprises:

a buffer providing memory work space for the storage router;

a first controller operable to connect to and interface with the first transport medium, the first controller further operable to pull outgoing data from the buffer and to place incoming data into the buffer;

a second controller operable to connect to and interface with the second transport medium, the second controller further operable to pull outgoing data from the buffer and to place incoming data into the buffer; and

a supervisor unit coupled to the first controller, the second controller and the buffer, the supervisor unit operable:

to map between devices connected to the first transport medium and the storage devices, to implement the access controls for storage space on the storage devices and to process data in the buffer to interface between the first controller and the second controller to allow access from workstations to storage devices.

**11**. A method for providing virtual local storage on remote storage devices connected to one transport medium to devices connected to another transport medium, comprising:

interfacing with a first transport medium;

interfacing with a second transport medium;

mapping between devices connected to the first transport medium and the storage devices and that implements access controls for storage space on the storage devices; and

allowing access from devices connected to the first transport medium to the storage devices using native low level, block protocols.

**12**. The method of claim **11**, wherein mapping between devices connected to the first transport medium and the storage devices includes allocating subsets of storage space to associated devices connected to the first transport medium, wherein each subset is only accessible by the associated device connected to the first transport medium.

**13**. The method of claim **12**, wherein the devices connected to the first transport medium comprise workstations.

**14**. The method of claim **12**, wherein the storage devices comprise hard disk drives.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,425,035 B2                                      Page 1 of  1
DATED         : July 23, 2002
INVENTOR(S)   : Geoffry B. Hoese et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Column 10,</u>
Line 47, delete "that implements" and insert -- implementing --

Signed and Sealed this

Twenty-sixth Day of August, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*



US006425035C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (5472nd)

# United States Patent
Hoese et al.

(10) **Number:** US 6,425,035 C1
(45) **Certificate Issued:** *Aug. 8, 2006

(54) **STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE**

(75) Inventors: **Geoffrey H. Hoese**, Austin, TX (US); **Jeffry T. Russell**, Cibolo, TX (US)

(73) Assignee: **Crossworlds Software**, Burlingame, CA (US)

**Reexamination Request:**
No. 90/007,125, Jul. 19, 2004
No. 90/007,317, Nov. 23, 2004

**Reexamination Certificate for:**
Patent No.: **6,425,035**
Issued: **Jul. 23, 2002**
Appl. No.: **09/965,335**
Filed: **Sep. 27, 2001**

( * ) Notice: This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 09/354,682, filed on Jul. 15, 1999, now Pat. No. 6,421,753, which is a continuation of application No. 09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972.

(51) **Int. Cl.**
*G06F 13/00*    (2006.01)

(52) **U.S. Cl.** .............................. **710/315**; 710/2; 710/8; 710/36; 710/105; 710/305; 710/308; 711/112

(58) **Field of Classification Search** ................. 710/1–5, 710/8–13, 36–38, 105, 100, 101, 305–316; 711/100, 112, 113; 714/42
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,082,406 A | 3/1963 | Stevens | |
| 4,092,732 A | 5/1978 | Ouchi | |
| 4,695,948 A | 9/1987 | Blevins et al. | |
| 4,751,635 A | 6/1988 | Kret | |

| | | | |
|---|---|---|---|
| 4,864,532 A | 9/1989 | Reeve et al. | |
| 4,947,367 A | 8/1990 | Chang et al. | |
| 5,072,378 A | 12/1991 | Manka | |
| 5,163,131 A | 11/1992 | Row et al. | |
| 5,239,632 A | 8/1993 | Larner | |
| 5,239,643 A | 8/1993 | Blount et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0810530 A2 | 12/1997 |
| EP | 0827059 A2 | 3/1998 |
| GB | 2296798 A | 7/1996 |
| GB | 2297636 A | 8/1996 |
| GB | 2341715 | 3/2000 |
| JP | 6301607 | 10/1994 |
| JP | 8-230895 | 9/1996 |
| WO | WO 98/36357 | 8/1998 |
| WO | WO 99/34297 A1 | 7/1999 |

OTHER PUBLICATIONS

Systems Architectures Using Fibre Channel, Roger Cummings, Twelfth IEE Symposium on Mass Storage Systems, copyright 1993 IEEE. pp. 251–256.*

(Continued)

*Primary Examiner*—Dov Popovici

(57) **ABSTRACT**

A storage router (**56**) and storage network (**50**) provide virtual local storage on remote SCSI storage devices (**60, 62, 64**) to Fiber Channel devices. A plurality of Fiber Channel devices, such as workstations (**58**), are connected to a Fiber Channel transport medium (**52**), and a plurality of SCSI storage devices (**60, 62, 64**) are connected to a SCSI bus transport medium (**54**). The storage router (**56**) interfaces between the Fibre Channel transport medium (**52**) and the SCSI bus transport medium (**54**). The storage router (**56**) maps between the workstations (**58**) and the SCSI storage devices (**60, 62, 64**) and implements access, controls for storage space on the SCSI storage devices (**60, 62, 64**). The storage router (**56**) then allows access from the workstations (**58**) to the SCSI storage devices (**60, 62, 64**) using native low level, block protocol in accordance with the mapping and the access controls.



US 6,425,035 C1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,257,386 | A | 10/1993 | Saito |
| 5,345,565 | A  * | 9/1994 | Jibbe et al. .................. 710/316 |
| 5,347,384 | A | 9/1994 | McReynolds et al. |
| 5,394,526 | A  * | 2/1995 | Crouse et al. ............. 709/219 |
| 5,414,820 | A | 5/1995 | McFarland et al. |
| 5,423,044 | A | 6/1995 | Sutton et al. |
| 5,465,382 | A | 11/1995 | Day, III et al. |
| 5,530,845 | A | 6/1996 | Hiatt et al. |
| 5,535,352 | A | 7/1996 | Bridges et al. |
| 5,581,714 | A | 12/1996 | Amini et al. |
| 5,596,562 | A | 1/1997 | Chen |
| 5,596,736 | A | 1/1997 | Kerns |
| 5,598,541 | A | 1/1997 | Malladi |
| 5,634,111 | A  * | 5/1997 | Oeda et al. .................. 711/153 |
| 5,680,556 | A | 10/1997 | Begun et al. |
| 5,701,491 | A | 12/1997 | Dunn et al. |
| 5,712,976 | A | 1/1998 | Falcon et al. |
| 5,729,705 | A | 3/1998 | Weber |
| 5,743,847 | A | 4/1998 | Nakamura et al. |
| 5,751,975 | A | 5/1998 | Gillespie et al. |
| 5,774,683 | A | 6/1998 | Gulick |
| 5,845,107 | A | 12/1998 | Fisch et al. |
| 5,857,080 | A | 1/1999 | Jander et al. |
| 5,864,653 | A | 1/1999 | Tavallaei et al. |
| 5,867,648 | A | 2/1999 | Foth et al. |
| 5,884,027 | A | 3/1999 | Garbus et al. |
| 5,913,045 | A | 6/1999 | Gillespie et al. |
| 5,923,557 | A | 7/1999 | Eidson |
| 5,941,969 | A | 8/1999 | Ram et al. |
| 5,953,511 | A | 9/1999 | Sescilia et al. |
| 5,959,994 | A | 9/1999 | Boggs et al. |
| 5,974,530 | A | 10/1999 | Young |
| 5,978,379 | A | 11/1999 | Chan et al. |
| 5,991,797 | A | 11/1999 | Futral et al. |
| 6,000,020 | A | 12/1999 | Chin et al. |
| 6,021,451 | A | 2/2000 | Bell et al. |
| 6,070,253 | A | 5/2000 | Tavallaei et al. |
| 6,131,119 | A | 10/2000 | Fukui |
| 6,134,617 | A | 10/2000 | Weber |
| 6,141,737 | A | 10/2000 | Krantz et al. |
| 6,145,006 | A | 11/2000 | Vishlitsky et al. |
| 6,223,266 | B1 | 4/2001 | Sartore |
| 6,230,218 | B1 | 5/2001 | Casper et al. |
| 6,260,120 | B1 | 7/2001 | Blumenau et al. |
| 6,330,629 | B1 | 12/2001 | Kondo et al. |
| 6,363,462 | B1 | 3/2002 | Bergsten |
| 6,421,753 | B1 | 7/2002 | Hoese et al. |
| 6,425,035 | B1 | 7/2002 | Hoese et al. |
| 6,425,036 | B1 | 7/2002 | Hoese et al. |
| 6,484,245 | B1 | 11/2002 | Sanada et al. |
| 6,529,996 | B1 | 3/2003 | Nguyen et al. |

## OTHER PUBLICATIONS

Fibre Channel and ATM: The Physical Layers, Jerry Quam, WESCON/94, published Sep. 27–29, 1994. pp. 648–652.*

Petal: Distributed Virtual Disks, Edward K. Lee and Chandramohan A. Thekkath, ACM SIGPLAN Notices, vol. 31, Issue 9, Sep. 1996, pp. 84–92.*

Black Box, SCSI Fiberoptic Extender, Single–Ended, Product Insert, 2 pages, 1996.

Burskey, Dave "New Serial I/Os Speed Storage Subsystems" Feb. 6, 1996.

CRD–5500, Raid Disk Array Controller Product Insert, pp. 1–5.

CRD–5500, SCSI Raid Controller OEM Manual, Rev. 1.3, Feb. 26, 1996, pp. 1–54.

Raidtec FibreArray and Raidtec FlexArray UltraRaid Systems, Windows IT PRO Article, Oct. 1997.

DIGITAL Storage Works, HSZ70 Array Controller, HSOF Version 7.0 EK–HSZ70–CG. A01, Digital Equipment Corporation, Maynard, Massachusetts.

DIGITAL StorageWorks, Using Your HSZ70 Array Controller in a SCSI Controller Shelf (DS–BA356–M Series), User's Guide, pp. 1–1 through A–5 with index, Jan. 1998.

DIGITAL StorageWorks HSZ270 Array Controller HSOF Version 7.0 EK–HSZ270–RM. A01. CLI Reference Manual.

DIGITAL Storageworks HSG80 Array Controller ACS Version 8.0 (User's Guide) Jan. 1998.

DIGITAL StorageWorks HSZ70 Array Controller HSOF Version 7.0 EK–HSZ70–SV. A01.

Emerson, "Ancor Communications: Performance evaluation of switched fibre channel I/O system using—FCP for SCSI" Feb. 1995, IEEE, pp. 479–484.

IBM Technical Publication: Magstar and IBM 3590 High Performance Tape Subsystem Technical Guide, Nov. 1996, pp. 1–269.

Guide to Sharing and Partitioning IBM Tape Library Dataservers, Nov. 1996, IBM, International Technical Support Organization, San Jose Center.

Misc. Reference Manual Pages, SunOS 5.09.

Block–Based Distributed File Systems, Anthony J. McGregor, Jul. 1997.

InfoServer 150VXT Photograph.

Pictures of internal components of the InfoServer 150, taken from   http://bindarydinosaurs.couk/Museum/Digital/Infoserver/infoserver.php in Nov. 2004.

Simplest Migration to Fibre Channel Technology.

Compaq Storageworks HSG80 Array Controller ACS Version 8.3 (Maintenance and Service Guide) Nov. 1998.

Compaq Storageworks HSG80 Array Controller ACS Version 8.3 (Configuration and CLI Reference Guide) Nov. 1998.

Office Action dated Jan. 21, 2003 for 10/174,720.

Office Action dated Feb. 27, 2001 for 09/354,682.

Office Action dated Aug. 11, 2000 for 09/354,682.

Office Action dated Dec. 16, 1999 for 09/354,682.

Office Action dated Nov. 6, 2002, for 10/023,786.

Office Action dated Jan. 21, 2003 for 10/081,110.

Office Action dated Jan. 27, 2005 in 10/658,163.

Office Action in Ex Parte Reexamination 90/007,127, mailed Feb. 7, 2005.

Office Action in Ex Parte Reexamination 90/007,126, mailed Feb. 7, 2005.

Office Action in Ex Parte Reexamination 90/007,124, mailed Feb. 7, 2005.

Office Action in Ex Parte Reexamination 90/007,123, mailed Feb. 7, 2005.

European Office Action issued Apr. 1, 2004 in Application No. 98966104.6–2413.

Defendant's First Supplemental Trial Exhibit List, Crossroads Systems, Inc., v. Chaparral Network Storage, Inc., C.A. No. A–00CA–217–SS (W.D. Tex. 2001), (CD–Rom).

Defendant's Third Supplemental Trial Exhibit List, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A–00CA–248–SS (W.D. Tex. 2001) (CD–Rom).

Defendant's Trial Exhibits, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A–00CA–248–SS (W.D. Tex. 2001). (CD–Rom).

US 6,425,035 C1

Page 3

Defendants' Trial Exhibits, *Crossroads Systems, Inc.*, v. *Chaparral Network Storage, Inc.*, C.A. No. A–00CA–217–SS (W.D. Tex. 2001) (CD–Rom).

Defendant Chaparral Network Storage, Inc.'s First Supplemental Trial Exhibit List (D1 through D271) (CD–ROM Chaparral Exhibits ExList_Def), Sep. 2, 2001.

Defendant Pathlight Technology Inc.'s Third Supplemental Trial Exhibit List (CD–ROM Pathlight Exhibits ExList_ Def).

Plaintiff's Fourth Amended Trail Exhibit List, *Crossroads Systems, Inc.* v. *Chaparral Network Storage, Inc,* C.A. No. A–00CA–217–SS (W.D. Tex. 2001) (CD–Rom), Sep. 11, 2001.

Plaintiff's Revised Trial Exhibit List, *Crossroads Systems, Inc.* v. *Pathlight Technology, Inc.*, C.A. No. A–00CA–248–SS (W.D. Tex. 2001). (CD–Rom).

Plaintiff's Trial Exhibits, *Crossroads Systems, Inc.* v. *Chaparral Networks Storage, Inc.*, C.A. No. A–00CA–217–SS (W.D. Tex. 2001). (CD–Rom).

Plaintiff's Fourth Amended Trail Exhibit List (CD–ROM Chaparral Exhibits ExList_Plaintiff), Sep. 11, 2001.

Plaintiff's Revised Trail Exhibit List (CD–ROM Pathlight Exhibits ExList_Plaintitf).

Trail Transcripts, *Crossroads Systems, Inc.* v. *Chaparral Network Storage, Inc.*, C.A. No. A–00CA–217–SS (W.D. Tex. 2001) (CD–Rom).

Trail Transcripts, *Crossroads Systems, Inc.* v. *Pathlight Technology, Inc.*, C.A. No. A–00CA–248–SS (W.D. Tex. 2001). (CD–Rom).

Trial Exhibits and Transcripts, *Crossroads* v. *Chaparral,* Civil Action No. A–00CA–21755, W.D. Tex. 2000 (CD–Rom and hard copy printouts).

Snively, "Sun Microsystem Computer Corporation: Implementing a fibre optic channel SCSI transport" 1994 IEEE, Feb. 28, 1994, pp. 78–82.

Datasheet for CrossPoint 4100 Fibre Channel to SCSI Router (Dedek Ex 41 (ANCT 117–120)) (CD–ROM Chaparral Exhibits D012).

Symbios Logic—Software Interface Specification Series 3 SCSI RAID Controller Software Release 02.xx (Engelbrechet Ex 2 (LSI 1421–1658)) (CD–ROM Chaparral Exhibits D013), Dec. 3, 1997.

Press Release—Symbios Logic to Demonstrate Strong Support for Fibre Channel at Fall Comdex (Engelbrecht 12 (LSI 2785–86)) (CD–ROM Chaparral Exhibits D016), Nov. 13, 1996.

OEM Datasheet on the 3701 Controller (Engelbrecht 13 (LSI 01837–38)) (CD–ROM Chaparral Exhibits D017), Jun. 17, 1905.

Nondisclosure Agreement Between Adaptec and Crossroads Dated Oct. 17, 1996 (Quisenberry Ex 25 (CRDS 8196)) (CD–ROM Chaparral Exhibits D020).

Organizational Presentation on the External Storage Group (Lavan Ex 1 (CNS 182242–255)) (CD–ROM Chaparral Exhibits D021), Apr. 11, 1996.

Bridge. C, Bridge Between SCSI–2 and SCSI–3 FCP (Fibre Channel Protocol) (CD–ROM Chaparrral Exhibits P214).

Bridge Phase ll Architecture Presentation (Lavan Ex 2 (CNS 182287–295)) (CD–ROM Chaparral Exhibits D022), Apr. 12, 1996.

Attendees/Action Items from Apr. 12, 1996 Meeting at BTC (Lavan Ex 3 (CNS 182241)) (CD–ROM Chaparral Exhibits D023), Apr. 12, 1996.

Brooklyn Hardware Engineering Requirements Documents, Revision 1.4 (Lavan Ex 4 (CNS 178188–211)) (CD–ROM Chaparral Exhibits D024) by Pecone, May 26, 1996.

Brooklyn Single–Ended SCSI RAID Bridge Controller Hardware OEM Manual, Revision 2.1 (Lavan EX 5 (CNS 177169–191)) (CD–ROM Chaparral Exhibits D025), Mar. 2, 1996.

Coronado Hardware Engineering Requirements Document, Revision 0.0 (Lavan Ex 7 (CNS 176917–932)). (CD–ROM Chaparral Exhibits D027) by O'Dell, Sep. 30, 1996.

ESS/FPG Organization (Lavan Ex 8 (CNS 178639–652)) (CD–ROM Chaparral Exhibits D028), Dec. 6, 1996.

Adaptec MCS ESS Presents: Intelligent External I/O Raid Controllers "Bridge" Strategy (Lavan Ex 9 (CNS 178606–638)). (CD–ROM Chaparral Exhibits D029), Feb. 6, 1996.

AEC–7313 Fibre Channel Daughter Board (for Brooklyn) Engineering Specification, Revision 1.0 (Lavan Ex 10 (CNS 176830–850)) (CD–ROM Chaparral Exhibits D030), Feb. 27, 1997.

Bill of Material (Lavan Ex 14 (CNS 177211–214)) (CD–ROM Chaparral Exhibits D034), Jul. 24, 1997.

AEC–. 4412B, AEC–7412/B2 External RAID Controller Hardware 0EM Manual, Revision 2.0 (Lavan Ex 15 (CNS 177082–123)) (CD–ROM Chaparral Exhibits D035), Jun. 27, 1997.

Coronado ll, AEC–7312A Fibre Channel Daughter (for Brooklyn) Hardware Specification, Revision 1.2 (Lavan Ex 16 (CNS 177192–210)) (CD–ROM Chaparral Exhibits D037) by Tom Yang, Jul. 18, 1997.

AEC–4412B, AEC7412/3B External RAID Controller Hardware OEM Manual, Revision 3.0. (Lavan Ex 17 (CNS 177124–165)) (CD–ROM Chaparral Exhibits D036), Aug. 25, 1997.

Memo Dated Aug. 15, 1997 to AEC–7312A Evaluation Unit Customers re: B001 Release Notes (Lavan Ex 18 (CNS 182878–879)) (CD–ROM Chaparral Exhibits D038), Aug. 15, 1997.

Brooklyn Main Board (AES–0302) MES Schedule (Lavan Ex 19 (CNS 177759–763)) (CD–ROM Chaparral Exhibits D039), Feb. 11, 1997.

News Release–Adaptec Adds Fibre Channel Option to its External RAID Controller Family (Lavan Ex 20 (CNS 182932–934)) (CD–ROM Chaparral Exhibits D040), May 6, 1997.

AEC–4412B/7412B User's Guide, Rev. A (Lavan Ex 21) (CD–ROM Chaparral Exhibits D041), Jun. 19, 1905.

Data Book—AlC–7895 PCI Bus Master Single Chip SCSl Host Adapter (Davies Ex 1 (CNS 182944–64)) (CD–ROM Chaparral Exhibits D046), May 21, 1996.

Data Book—AlC–1160 Fibre Channel Host Adapter ASIC (Davies Ex 2 (CNS 181800–825)) (CD–ROM Chaparral Exhibits D047), Jun. 18, 1905.

Viking RAID Software (Davies Ex 3 (CNS 180969–181026)) (CD–ROM Chaparral Exhibits D048), Jun. 18, 1905.

Header File with Structure Definitions (Davies Ex 4 (CNS 180009–018)) (CD–ROM Chaparral Exhibits D049), Aug. 8, 1996.

C++ SourceCode for the SCSI Command Handler (Davies Ex 5 (CNS 179136–168)) (CD–ROM Chaparral Exhibits D050), Aug. 8, 1996.

Header File Data Structure (Davies Ex 6 (CNS 179997–180008)) (CD–ROM Chaparral Exhibits D051), Jan. 2, 1997.

SCSl Command Handler (Davies Ex 7 (CNS 179676–719)) (CD–ROM Chaparral Exhibits D052), Jan. 2, 1997.

US 6,425,035 C1
Page 4

Coronado: Fibre Channel to SCSl Intelligent RAID Controller Product Brief (Kalwitz Ex 1 (CNS 182804–805)) (CD–ROM Chaparral Exhibits D053).

Bill of Material (Kalwitz Ex 2 (CNS 181632–633)) (CD–ROM Chaparral Exhibits D054), Mar. 17, 1997.

Emails Dated Jan. 13–Mar. 31, 1997 from P. Collins to Mo re: Status Reports (Kalwitz Ex 3 (CNS 182501–511)) (CD–ROM Chaparral Exhibits D055).

Hardware Schematics for the Fibre Channel Daughtercard Coronado (Kalwitz Ex 4 (CNS 181639–648)) (CD–ROM Chaparral Exhibits D056).

Adaptec Schematics re AAC–340 (Kalwitz Ex 14 CNS 177215–251)) (CD–ROM Chaparral Exhibits D057).

Bridge Product Line Review (Manzanares Ex 3 (CNS 177307–336)) (CD–ROM Chaparral Exhibits D058).

AEC Bridge Series Products–Adaptec External Controller RAID Products Pre–Release Draft, v.6 (Manzanares Ex 4 (CNS 174632–653)). (CD–ROM Chaparral Exhibits D059), Oct. 28, 1997.

Hewlett–Packard Roseville Site Property Pass for Brian Smith (Dunning Ex 14 (HP 489) (CD–ROM Chaparral Exhibits D078), Nov. 7, 1996.

Distribution Agreement Between Hewlett–Packard and Crossroads (Dunning Ex 15 (HP 326–33) (CD–ROM Chaparral Exhibits D079).

HPFC–5000 Tachyon User's Manuel, First Edition (PTI 17249–839) (CD–ROM Chaparral Exhibits D084), May 1, 1996.

X3T10 994D—(Draft) Information Technology: SCSl–3 Architecture Model, Rev. 1.8 (PTI 165977) (CD–ROM Chaparral Exhibits D087).

X3T10 Project 1047D: Information Technology—SCSl–3 Controller Commands (SCC), Rev, 6c (PTI 166400–546) (CD–ROM Chaparral Exhibits D088), Sep. 3, 1996.

X3T10 995D—(Draft) SCSl–3 Primary Commands, Rev. 11 (Wanamaker Ex 5 (PTI 166050–229)) (CD–ROM Chaparral Exhibits D089), Nov. 13, 1996.

VBAR Volume Backup and Restore (CRDS 12200–202) (CD–ROM Chaparral Exhibits D099).

Preliminary Product Literature for Infinity Commstor's Fibre Channel to SCSI Protocol Bridge (Smith Ex 11; Quisenberry Ex 31 (SPLO 428–30) (CD–ROM Chaparral Exhibits D143), Aug. 19, 1996.

Letter dated Jul. 12, 1996 from J. Boykin to B. Smith re: Purchase Order for Evaluation Units from Crossroads (Smith Ex 24) CRDS 8556–57) (CD–ROM Chaparral Exhibits D144), Jul. 12, 1996.

CrossPoint 4100 Fibre Channel to SCSl Router Preliminary Datasheet (Hulsey Ex 9 (CRDS 16129–130)) (CD–ROM Chaparral Exhibits D145), Nov. 1, 1996.

CrossPoint 4400 Fibre Channel to SCSl Router Preliminary Datasheet (Bardach Ex. 9, Quisenberry Ex 33 (CRDS 25606–607)) (CD–ROM Chaparral Exhibits D153), Nov. 1, 1996.

Fax Dated Jul. 22, 1996 from L. Petti to B. Smith re: Purchase Order from Data General for FC2S Fibre to Channel SCSl Protocol Bridge Model 11 (Smith Ex 25; Quisenberry Ex 23; Bardach Ex 11 (CRDS 8552–55; 8558) (CD–ROM Chaparral Exhibits D155).

Email Dated Dec. 20, 1996 from J. Boykin to B. Smith re: Purchase Order for Betas in Feb. and Mar. (Hoese Ex 16, Quisenberry Ex 25; Bardach Ex 12 (CRDS 13644–650) (CD–ROM Chaparral Exhibits D156).

Infinity Commstor Fibre Channel Demo for Fall Comdex, 1996 (Hoese Ex 15, Bardach Ex 13 (CRDS 27415) (CD–ROM Chaparral Exhibits D157).

Fax Dated Dec. 19, 1996 from B. Bardach to T. Rarich re: Purchase Order Information (Bardach Ex. 14; Smith Ex 16 (CRDS 4460)) (CD–ROM Chaparral Exhibits D158).

Miscellaneous Documents Regarding Comdex (Quisenberry Ex 2 (CRDS 27415–465)) (CD–ROM Chaparral Exhibits D165).

CrossPoint 4100 Fibre Channel to SCSl Router Preliminary Datasheet (Quisenberry) Ex 3 (CRDS 4933–34) (CD–ROM Chaparral Exhibits D166) (CD–ROM Chaparral Exhibits D166).

CrossPoint 4400 Fibre to Channel to SCSl Router Preliminary Datasheet; Crossroads Company and Product Overview (Quisenberry Ex 4 (CRDS 25606; 16136)) (CD–ROM Chaparral Exhibits D167).

Crossroads Purchase Order Log (Quisenberry Ex 9 (CRDS 14061–062)) (CD–ROM Chaparral Exhibits D172).

RAID Manager 5 with RDAC 5 for UNIX V.4 User's Guide (LSI–01854) (CD–ROM Chaparral Exhibits P062), Sep. 1, 1996.

Letter dated May 12, 1997 from Alan G. Leal to Barbara Bardach enclosing the original OEM License and Purchase Agreement between Hewlett–Package Company and Crossroads Systems, Inc. (CRDS 2057) (CD–ROM Chaparral Exhibits P130).

CR4x00 Product Specification (CRDS 43929) (CD–ROM Chaparral Exhibits P267), Jun. 1, 1998.

Symbios Logic—Hardware Functional Specification for the Symbios Logic Series 3 Fibre Channel Disk Array Controller Model 3701 (Engelbrecht Ex 3 (LSl–1659–1733) (CD–ROM Pathlight Exhibits D074).

Report of the Working Group on Storage I/O for Large Scale Computing; Department of Computer Science Duke University: CS–1996–21 (PTI 173330–347). (CD–ROM Pathlight Exhibits D098).

Brian Allison's 1999 Third Quarter Sales Plan (PDX 38 )CNS 022120–132)) (CD–ROM Pathlight Exhibits D201), Jun. 5, 2001.

Brooklyn SCSI—SCSI Intelligent External RAID Bridge Definition Phase External Documentation (CD–ROM Pathlight Exhibits D129).

"InfoServer 100 System Operations Guide", First Edition, Digital Equipment Corporation, 1990.

S.P. Joshi, "Ethernet controller chip interfaces with variety of 16–bit processors," Electronic Design, Hayden Publishing Co., Inc., Rochelle Park, NJ, Oct. 14, 1982.pp 193–200.

"DP5380 Asynchronous SCSl Interface", National Semiconductor Corporation, Arlington, TX, May 1989, pp. 1–32.

Johnson, D.B., et al., "The Peregrine High Performance RPC System", Software—Practice & Experience, 23(2):201–221, Feb. 1993.

"InfoServer 150—Installation and Owner's Guide", EK–1N-FSV–OM–001, Digital Equipment Corporation, Maynard, Massachusetts 1991, Chapters 1 and 2.

Pictures of internal components of the InfoServer 150, taken from http://www.binarydinosaurs.couk/Museum/Digital/infoserver/infoserver.php in Nov. 2004.

* cited by examiner

**Appx00210**

US 6,425,035 C1

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**–**14** is confirmed.

\*   \*   \*   \*   \*



US007934041B2

(12) **United States Patent** (10) **Patent No.:** US 7,934,041 B2
Hoese et al. (45) **Date of Patent:** Apr. 26, 2011

(54) **STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE**

(75) Inventors: **Geoffrey B. Hoese**, Austin, TX (US); **Jeffry T. Russell**, Cibolo, TX (US)

(73) Assignee: **Crossroads Systems, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/690,592**

(22) Filed: **Jan. 20, 2010**

(65) **Prior Publication Data**

US 2010/0121993 A1    May 13, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 12/552,885, filed on Sep. 2, 2009, which is a continuation of application No. 11/851,724, filed on Sep. 7, 2007, now Pat. No. 7,689,754, which is a continuation of application No. 11/442,878, filed on May 30, 2006, now abandoned, which is a continuation of application No. 11/353,826, filed on Feb. 14, 2006, now Pat. No. 7,340,549, which is a continuation of application No. 10/658,163, filed on Sep. 9, 2003, now Pat. No. 7,051,147, which is a continuation of application No. 10/081,110, filed on Feb. 22, 2002, now Pat. No. 6,789,152, which is a continuation of application No. 09/354,682, filed on Jul. 15, 1999, now Pat. No. 6,421,753, which is a continuation of application No. 09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972.

(51) **Int. Cl.**
*G06F 13/00* (2006.01)
*G06F 3/00* (2006.01)

(52) **U.S. Cl.** ........................... **710/305**; 710/11; 709/258

(58) **Field of Classification Search** ................. 710/1–5, 710/8–13, 36–38, 126–131, 250, 305; 709/258; 714/42; 711/110–113
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,082,406 A    3/1963    Stevens
4,092,732 A    5/1978    Ouchi
(Continued)

FOREIGN PATENT DOCUMENTS

AU        647414    3/1994
(Continued)

OTHER PUBLICATIONS

Black Box, SCSI Fiberoptic Extender, Single-Ended, Product Insert, 2 pages, 1996, Jun. 18, 1905.

(Continued)

*Primary Examiner* — Christopher B Shin
(74) *Attorney, Agent, or Firm* — Sprinkle IP Law Group

(57) **ABSTRACT**

A storage router and storage network provide virtual local storage on remote storage devices. A plurality of devices are connected to a first transport medium. In one embodiment, a storage router maintains a map to allocate storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices. The storage router controls access from the devices connected to the first transport medium to the storage space on the remote storage devices in accordance with the map and allows access from devices connected to the first transport medium to the remote storage devices using native low level block protocol.

**53 Claims, 2 Drawing Sheets**



CISCO et al. v. CROSSROADS
CQ-1001
Page 1 of 15

**US 7,934,041 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,170,415 A | 10/1979 | Lemeshewsky et al. |
| 4,415,970 A | 11/1983 | Swenson et al. |
| 4,455,605 A | 6/1984 | Cormier et al. |
| 4,504,927 A | 3/1985 | Callan |
| 4,533,996 A | 8/1985 | Gartung et al. |
| 4,573,152 A | 2/1986 | Greene et al. |
| 4,603,380 A | 7/1986 | Easton et al. |
| 4,620,295 A | 10/1986 | Aiden, Jr. |
| 4,644,462 A | 2/1987 | Matsubara et al. |
| 4,695,948 A | 9/1987 | Blevins et al. |
| 4,697,232 A | 9/1987 | Brunelle et al. |
| 4,715,030 A | 12/1987 | Koch et al. |
| 4,751,635 A | 6/1988 | Kret |
| 4,787,028 A | 11/1988 | Finfrock et al. |
| 4,807,180 A | 2/1989 | Takeuchi et al. |
| 4,811,278 A | 3/1989 | Bean et al. |
| 4,821,179 A | 4/1989 | Jensen et al. |
| 4,825,406 A | 4/1989 | Bean et al. |
| 4,827,411 A | 5/1989 | Arrowood et al. |
| 4,835,674 A | 5/1989 | Collins et al. |
| 4,845,722 A | 7/1989 | Kent et al. |
| 4,864,532 A | 9/1989 | Reeve et al. |
| 4,897,874 A | 1/1990 | Lidensky et al. |
| 4,947,367 A | 8/1990 | Chang et al. |
| 4,961,224 A | 10/1990 | Yung |
| 5,072,378 A | 12/1991 | Manka |
| 5,077,732 A | 12/1991 | Fischer et al. |
| 5,077,736 A | 12/1991 | Dunphy, Jr. et al. |
| 5,124,987 A | 6/1992 | Milligan et al. |
| 5,155,845 A | 10/1992 | Beal et al. |
| 5,163,131 A | 11/1992 | Row et al. |
| 5,185,876 A | 2/1993 | Nguyen et al. |
| 5,193,168 A | 3/1993 | Corrigan et al. |
| 5,193,184 A | 3/1993 | Belsan et al. |
| 5,202,856 A | 4/1993 | Glider et al. |
| 5,210,866 A | 5/1993 | Milligan et al. |
| 5,212,785 A | 5/1993 | Powers et al. |
| 5,214,778 A | 5/1993 | Glider et al. |
| 5,226,143 A | 7/1993 | Baird et al. |
| 5,239,632 A | 8/1993 | Larner |
| 5,239,643 A | 8/1993 | Blount et al. |
| 5,239,654 A | 8/1993 | Ing-Simmons et al. |
| 5,247,638 A | 9/1993 | O'Brien et al. |
| 5,247,692 A | 9/1993 | Fujimura |
| 5,257,386 A | 10/1993 | Saito |
| 5,297,262 A | 3/1994 | Cox et al. |
| 5,301,290 A | 4/1994 | Tetzlaff et al. |
| 5,315,657 A | 5/1994 | Abadi et al. |
| 5,317,693 A | 5/1994 | Elko et al. |
| 5,331,673 A | 7/1994 | Elko et al. |
| 5,347,384 A | 9/1994 | McReynolds et al. |
| 5,355,453 A | 10/1994 | Glider et al. |
| 5,361,347 A | 11/1994 | Glider et al. |
| 5,367,646 A | 11/1994 | Pardillos et al. |
| 5,379,385 A | 1/1995 | Shomler |
| 5,379,398 A | 1/1995 | Cohn et al. |
| 5,388,243 A | 2/1995 | Glider et al. |
| 5,388,246 A | 2/1995 | Kasi |
| 5,394,402 A | 2/1995 | Ross et al. |
| 5,394,526 A | 2/1995 | Crouse et al. |
| 5,396,596 A | 3/1995 | Hashemi et al. |
| 5,403,639 A | 4/1995 | Belsan et al. |
| 5,410,667 A | 4/1995 | Belsan et al. |
| 5,410,697 A | 4/1995 | Baird et al. |
| 5,414,820 A | 5/1995 | McFarland et al. |
| 5,416,915 A | 5/1995 | Mattson et al. |
| 5,418,909 A | 5/1995 | Jachowski et al. |
| 5,420,988 A | 5/1995 | Elliott |
| 5,423,026 A | 6/1995 | Cook et al. |
| 5,423,044 A | 6/1995 | Sutton et al. |
| 5,426,637 A | 6/1995 | Derby et al. |
| 5,430,855 A | 7/1995 | Wash et al. |
| 5,450,570 A | 9/1995 | Richek et al. |
| 5,452,421 A | 9/1995 | Beardsley et al. |
| 5,459,857 A | 10/1995 | Ludlam et al. |
| 5,463,754 A | 10/1995 | Beausoleil et al. |
| 5,465,382 A | 11/1995 | Day, III et al. |
| 5,469,576 A | 11/1995 | Dauerer et al. |
| 5,471,609 A | 11/1995 | Yudenfriend et al. |
| 5,487,077 A | 1/1996 | Hassner et al. |
| 5,491,812 A | 2/1996 | Pisello et al. |
| 5,495,474 A | 2/1996 | Olnowich et al. |
| 5,496,576 A | 3/1996 | Jeong |
| 5,504,857 A | 4/1996 | Baird et al. |
| 5,507,032 A | 4/1996 | Kimura |
| 5,511,169 A | 4/1996 | Suda |
| 5,519,695 A | 5/1996 | Purohit et al. |
| 5,530,845 A | 6/1996 | Hiatt et al. |
| 5,535,352 A | 7/1996 | Bridges et al. |
| 5,537,585 A | 7/1996 | Blickerstaff et al. |
| 5,544,313 A | 8/1996 | Shachnai et al. |
| 5,548,791 A | 8/1996 | Casper et al. |
| 5,564,019 A | 10/1996 | Beausoleil et al. |
| 5,568,648 A | 10/1996 | Coscarella et al. |
| 5,581,709 A | 12/1996 | Ito et al. |
| 5,581,714 A | 12/1996 | Amini et al. |
| 5,581,724 A | 12/1996 | Belsan et al. |
| 5,596,562 A | 1/1997 | Chen |
| 5,596,736 A | 1/1997 | Kerns |
| 5,598,541 A | 1/1997 | Malladi |
| 5,613,082 A | 3/1997 | Brewer et al. |
| 5,621,902 A | 4/1997 | Cases et al. |
| 5,632,012 A | 5/1997 | Belsan et al. |
| 5,634,111 A | 5/1997 | Oeda et al. |
| 5,638,518 A | 6/1997 | Malladi |
| 5,642,515 A | 6/1997 | Jones et al. |
| 5,659,756 A | 8/1997 | Hefferon et al. |
| 5,664,107 A | 9/1997 | Chatwanni et al. |
| 5,680,556 A | 10/1997 | Begun et al. |
| 5,684,800 A | 11/1997 | Dobbins et al. |
| 5,701,491 A | 12/1997 | Dunn et al. |
| 5,712,976 A | 1/1998 | Falcon et al. |
| 5,727,218 A | 3/1998 | Hotchkin |
| 5,729,705 A | 3/1998 | Weber |
| 5,743,847 A | 4/1998 | Nakamura et al. |
| 5,748,924 A | 5/1998 | Llorens et al. |
| 5,751,971 A | 5/1998 | Dobbins et al. |
| 5,751,975 A | 5/1998 | Gillespie et al. |
| 5,764,931 A | 6/1998 | Schmahl et al. |
| 5,768,623 A | 6/1998 | Judd et al. |
| 5,774,683 A | 6/1998 | Gulick |
| 5,778,411 A | 7/1998 | DeMoss |
| 5,781,715 A | 7/1998 | Sheu |
| 5,802,278 A | 9/1998 | Isfeld et al. |
| 5,805,816 A | 9/1998 | Picazo, Jr. et al. |
| 5,805,920 A | 9/1998 | Sprenkle et al. |
| 5,809,328 A | 9/1998 | Nogales et al. |
| 5,812,754 A | 9/1998 | Lui et al. |
| 5,819,054 A | 10/1998 | Ninomiya et al. |
| 5,825,772 A | 10/1998 | Dobbins et al. |
| 5,835,496 A | 11/1998 | Yeung et al. |
| 5,845,107 A | 12/1998 | Fisch et al. |
| 5,848,251 A | 12/1998 | Lomelino et al. |
| 5,857,080 A | 1/1999 | Jander et al. |
| 5,860,137 A | 1/1999 | Raz et al. |
| 5,864,653 A | 1/1999 | Tavallaei et al. |
| 5,867,648 A | 2/1999 | Foth et al. |
| 5,884,027 A | 3/1999 | Garbus et al. |
| 5,889,952 A | 3/1999 | Hunnicutt et al. |
| 5,913,045 A | 6/1999 | Gillespie et al. |
| 5,923,557 A | 7/1999 | Eidson |
| 5,933,824 A | 8/1999 | DeKoning et al. |
| 5,935,205 A | 8/1999 | Murayama et al. |
| 5,935,260 A | 8/1999 | Ofer |
| 5,941,969 A | 8/1999 | Ram et al. |
| 5,941,972 A | 8/1999 | Hoese et al. |
| 5,946,308 A | 8/1999 | Dobbins et al. |
| 5,953,511 A | 9/1999 | Sescilia et al. |
| 5,959,994 A | 9/1999 | Boggs et al. |
| 5,963,556 A | 10/1999 | Varghese et al. |
| 5,974,530 A | 10/1999 | Young |
| 5,978,379 A | 11/1999 | Chan et al. |
| 5,978,875 A | 11/1999 | Asano et al. |
| 5,991,797 A | 11/1999 | Futral et al. |
| 6,000,020 A | 12/1999 | Chin et al. |
| 6,021,451 A | 2/2000 | Bell et al. |
| 6,029,168 A | 2/2000 | Frey |

**US 7,934,041 B2**

Page 3

| | | |
|---|---|---|
| 6,032,269 A | 2/2000 | Renner, Jr. |
| 6,041,058 A | 3/2000 | Flanders et al. |
| 6,041,381 A | 3/2000 | Hoese |
| 6,055,603 A | 4/2000 | Ofer et al. |
| 6,065,087 A | 5/2000 | Keaveny et al. |
| 6,070,253 A | 5/2000 | Tavallaei et al. |
| 6,073,209 A | 6/2000 | Bergsten |
| 6,073,218 A | 6/2000 | DeKoning et al. |
| 6,075,863 A | 6/2000 | Krishnan et al. |
| 6,081,849 A | 6/2000 | Born et al. |
| 6,098,128 A | 8/2000 | Velez-McCaskey et al. |
| 6,098,149 A | 8/2000 | Ofer et al. |
| 6,108,684 A | 8/2000 | DeKoning et al. |
| 6,118,766 A | 9/2000 | Akers |
| 6,131,119 A | 10/2000 | Fukui |
| 6,134,617 A | 10/2000 | Weber |
| 6,141,737 A | 10/2000 | Krantz et al. |
| 6,145,006 A | 11/2000 | Vishlitsky et al. |
| 6,147,976 A | 11/2000 | Shand et al. |
| 6,147,995 A | 11/2000 | Dobbins et al. |
| 6,148,004 A | 11/2000 | Nelson et al. |
| 6,173,399 B1 | 1/2001 | Gilbrech |
| 6,185,203 B1 | 2/2001 | Berman |
| 6,202,153 B1 | 3/2001 | Diamant et al. |
| 6,209,023 B1 | 3/2001 | Dimitroff et al. |
| 6,219,771 B1 | 4/2001 | Kikuchi et al. |
| 6,223,266 B1 | 4/2001 | Sartore |
| 6,230,218 B1 | 5/2001 | Casper et al. |
| 6,243,827 B1 | 6/2001 | Renner, Jr. |
| 6,260,120 B1 | 7/2001 | Blumenau et al. |
| 6,268,789 B1 | 7/2001 | Diamant et al. |
| 6,308,247 B1 | 10/2001 | Ackerman |
| 6,330,629 B1 | 12/2001 | Kondo et al. |
| 6,330,687 B1 | 12/2001 | Griffith |
| 6,341,315 B1 | 1/2002 | Arroyo et al. |
| 6,343,324 B1 | 1/2002 | Hubis et al. |
| 6,363,462 B1 | 3/2002 | Bergsten |
| 6,401,170 B1 | 6/2002 | Griffith et al. |
| 6,421,753 B1 | 7/2002 | Hoese et al. |
| 6,425,035 B2 | 7/2002 | Hoese et al. |
| 6,425,036 B2 | 7/2002 | Hoese et al. |
| 6,425,052 B1 | 7/2002 | Hashemi |
| 6,453,345 B2 | 9/2002 | Trcka et al. |
| 6,484,245 B1 | 11/2002 | Sanada et al. |
| D470,486 S | 2/2003 | Cheng |
| 6,529,996 B1 | 3/2003 | Nguyen et al. |
| 6,547,576 B2 | 4/2003 | Peng et al. |
| 6,560,750 B2 | 5/2003 | Chien et al. |
| 6,563,701 B1 | 5/2003 | Peng et al. |
| 6,775,693 B1 | 8/2004 | Adams |
| 6,792,602 B2 | 9/2004 | Lin et al. |
| 6,820,212 B2 | 11/2004 | Duchesne et al. |
| 6,854,027 B2 | 2/2005 | Hsu et al. |
| 6,862,637 B1 | 3/2005 | Stupar |
| 6,874,043 B2 | 3/2005 | Treggiden |
| 6,874,100 B2 | 3/2005 | Rauscher |
| 6,910,083 B2 | 6/2005 | Hsu et al. |
| 7,065,076 B1 | 6/2006 | Nemazie |
| 7,127,668 B2 | 10/2006 | McBryde et al. |
| 7,133,965 B2 | 11/2006 | Chien |
| 7,188,111 B2 | 3/2007 | Chen et al. |
| 7,216,225 B2 | 5/2007 | Haviv et al. |
| 7,251,248 B2 | 7/2007 | Trossell et al. |
| 7,281,072 B2 | 10/2007 | Liu et al. |
| 2002/0083221 A1 | 6/2002 | Tsai et al. |
| 2006/0218322 A1 | 9/2006 | Hoese et al. |
| 2006/0277326 A1 | 12/2006 | Tsai et al. |
| 2006/0294416 A1 | 12/2006 | Tsai et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 670376 | 7/1996 |
| CA | 2066443 | 10/2003 |
| EP | 0810530 A2 | 12/1997 |
| EP | 0490973 | 2/1998 |
| EP | 0827059 A2 | 3/1998 |
| GB | 2296798 A | 7/1996 |
| GB | 2297636 A | 8/1996 |
| GB | 2341715 | 3/2000 |
| IL | 095447 | 5/1994 |

| | | |
|---|---|---|
| IL | 107645 | 9/1996 |
| JP | 5502525 | 4/1993 |
| JP | 5181609 | 7/1993 |
| JP | 1993181609 | 7/1993 |
| JP | 6301607 | 10/1994 |
| JP | 720994 | 1/1995 |
| JP | 1995020994 | 1/1995 |
| JP | 8-230895 | 9/1996 |
| JP | 1997185594 | 7/1997 |
| JP | 1997251437 | 9/1997 |
| JP | 10097493 | 4/1998 |
| WO | WO 91/03788 | 3/1991 |
| WO | WO 98/36357 | 8/1998 |
| WO | WO 9733227 | 8/1998 |
| WO | WO 99/34297 A1 | 7/1999 |

OTHER PUBLICATIONS

Block-Based Distributed File Systems, Anthony J. McGregor, Jul. 1997.
Compaq StorageWorks HSG80 Array Controller ACS Version 8.3 (Maintenance and Service Guide) Nov. 1998.
Compaq StorageWorks HSG80 Array Controller ACS Version 8.3 (Configuration and CLI Reference Guide) Nov. 1998.
CRD-5500, Raid Disk Array Controller Product Insert, pp. 1-5.
CRD-5500, SCSI Raid Controller OEM Manual, Rev. 1.3, Feb. 26, 1996, pp. 1-54.
CRD-5500, SCSI Raid Controller Users Manual, Rev. 1.3, Nov. 21, 1996, pp. 10-92.
Digital StorageWorks HSZ70 Array Controller HSOF Version 7.0 EK-SHZ70-RM.A01 CLI Reference Manual, Jul. 1, 1997.
Digital Storage Works, HSZ70 Array Controller, HSOF Version 7.0 EK-HSZ70-CG. A01, Digital Equipment Corporation, Maynard, Massachusetts, Jul. 1, 1997.
Digital StorageWorks, Using Your HSZ70 Array Controller in a SCSI Controller Shelf (DS-BA356-M Series), User's Guide, pp. 1-1 through A-5 with index, Jan. 1, 1998.
Digital StorageWorks HSZ70 Array Controller HSOF Version 7.0 EK-HSZ70-SV.A01, 1997.
Digital StorageWorks HSG80 Array Controller ACS Version 8.0 (User's Guide Jan. 1998.
DP5380 Asynchronous SCSI Interface, National Semiconductor Corporation, Arlington, TX, May 1989, pp. 1-32.
Emerson, "Encor Communications: Performance evaluation of switched fibre channel I/O system using—FCP for SCSI", IEEE, pp. 479-484, Feb. 1, 1995.
Fiber channel (FCS)/ATM internetworking: a design solution.
Fiber Channel storage interface for video-on-demand servers by Anazaloni, et al., Jun. 15, 1995.
Fibre Channel and ATM: The Physical Layers, Jerry Quam WESCON/94, published Sep. 27-29, 1994. pp. 648-652.
Gen5 S-Series XL System Guide Revision 1.01 by Chen, Jun. 18, 1905.
Graphical User Interface for MAXSTRAT Gen5/Gen-S Servers User's guide 1.1, Jun. 11, 1996.
High Performance Data transfers Using Network-Attached Peripherals at the national Storage Laboratory by Hyer, Feb. 26, 1993.
IFT-3000 SCSI to SCSI Disk array Controller Instruction Manual Revision 2.0 by Infotrend Technologies, Inc. 1995.
Implementing a Fibre Channel SCSI transport by Snively, 1994.
"InfoServer 150—Installation and Owner's Guide", EK-INFSV-OM-001, Digital Equipment Corporation, Maynard, Massachusetts 1991, Chapters 1 and 2.
InfoServer 150VXT Photograph.
IBM Technical Publication: Guide to Sharing and Partitioning IBM Tape Library Dataservers, pp. 1-256, Nov. 1, 1996.
IBM Technical Publication: Magstar and IBM 3590 High Performance Tape Subsystem Technical Guide, pp. 1-269, Nov. 1, 1996.
Misc. Reference Manual Pages, SunOS 5.09.
Infoserver 100 System Operations Guide, First Edition Digital Equipment Corporation, 1990.
Johnson, D.B., et al., The Peregrine High Performance RPC System, Software-Practice and Experience, 23(2):201-221, Feb. 1993.
Local-Area networks for the IBM PC by Haugdahl.

CQ-1001 / Page 3 of 15

New serial I/Os speed storage subsystems by Bursky, Feb. 6, 1995.
Petal: Distributed Virtual Disks, Edward K. Lee and Chandramohan A. Thekkath, ACM SIGPLAN Notices, vol. 31, Issue 9, Sep. 1996, pp. 84-92.
Pictures of internal components of the InfoServer 150, taken from http://bindarydinosaurs.couk/Museum/Digital/infoserver/infoserver.php in Nov. 2004.
Raidtec FibreArray and Raidtec FlexArray UltraRAID Systems, Windows IT PRO Article, Oct. 1997.
S.P. Joshi, "Ethernet controller chip interfaces with variety of 16-bit processors," electronic Design, Hayden Publishing Co., Inc., Rochelle Park, NJ, Oct. 14, 1982. pp. 193-200.
Simplest Migration to Fibre Channel Technology Article, Digital Equipment Corporation, Nov. 10, 1997, published on PR Newswire.
Systems Architectures Using Fibre Channel, Roger Cummings, Twelfth IEEE Symposium on Mass Storage Systems, Copyright 1993 IEEE. pp. 251-256.
Office Action dated Jan. 21, 2003 for U.S. Appl. No. 10/174,720.
Office Action dated Feb. 27, 2001 for U.S. Appl. No. 09/354,682.
Office Action dated Aug. 11, 2000 for U.S. Appl. No. 09/354,682.
Office Action dated Dec. 16, 1999 for U.S. Appl. No. 09/354,682.
Office Action dated Nov. 6, 2002 for U.S. Appl. No. 10/023,786.
Office Action dated Jan. 21, 2003 for U.S. Appl. No. 10/081,110.
Office Action in Ex Parte Reexamination 90/007,127, mailed Feb. 7, 2005.
Office Action in Ex Parte Reexamination 90/007,125, mailed Feb. 7, 2005.
Office Action in Ex Parte Reexamination 90/007,126, mailed Feb. 7, 2005.
Office Action in Ex Parte Reexamination 90/007,124, mailed Feb. 7, 2005.
Office Action in Ex Parte Reexamination 90/007,123, mailed Feb. 7, 2005.
European Office Action issued Apr. 1, 2004 in Application No. 98966104.6-2413.
Office Action dated Jan. 27, 2005 in U.S. Appl. No. 10/658,163.
Digital "System Support Addendum", SSA 40.78.01-A, AE-PNZJB-TE, pp. 1-3, Apr. 1, 1993.
Digital "Software Product Description", SSA 40.78.01, AE-PNZJB-TE, pp. 1-3, Apr. 1, 1993.
Digital Equipment Corporation, "InfoServer 100 Installation and Owner's Guide", Order No. EK-DIS1K-IN-001, First Edition, Oct. 1, 1990.
Digital Equipment Corporation, "InfoServer 100 System Operation Guide", Order No. EK-DIS1K-UG-001, First Edition, pp. i-Index 5, Oct. 1, 1990.
Elliott, Working Draft American National Standard, Project T10/1562-D, Revision 5, pp. i-432, Jul. 9, 2003.
Satran, "Standards-Track," May 2001, iSCSI, pp. 9-87, Nov. 1, 2000.
Satran, et al. IPS Internet Draft, iSCSI, pp. 1-8, Nov. 1, 2000.
APT Technologies, Inc., "Serial ATA: High Speed Serialized AT Attachment", Rev. 1.0a, pp. 1-310, Jan. 7, 2003.
Defendant's First Supplemental Trial Exhibit List, Crossroads Systems, Inc., v. Chaparral Network Storage, Inc., C.A. No. A-00CA-217-SS (W.D. Tex. 2001). (CD-Rom).
Defendant's Third Supplemental Trial Exhibit List, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001) (CD-Rom).
Plaintiff's Fourth Amended Trial Exhibit List, Crossroads Systems, Inc. v. Chaparral Network Storage, Inc, C.A. No. A-00CA-217-SS (W.D. Tex. 2001) (CD-Rom).
Plaintiff's Revised Trial Exhibit List, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001). (CD-Rom).
Trial Transcripts, Crossroads Systems, Inc. v. Chaparral Network Storage, Inc., C.A. No. A-00CA-217-SS (W.D. Tex. 2001) Day 1-5 (CD-Rom).
Trial Transcripts, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001). Day 1-4 (CD-Rom).
Datasheet for CrossPoint 4100 Fibre Channel to SCSI Router (Dedek Ex 41 (ANCT 117-120)) (CD-ROM Chaparral Exhibits D012).

Symbios Logic- Software Interface Specification Series 3 SCSI RAID Controller Software Release 02.xx (Engelbrecht Ex 2 (LSI 1421-1658)) (CD-ROM Chaparral Exhibits D013), Dec. 3, 1997.
Press Release- Symbios Logic to Demonstrate Strong Support for Fibre Channel at Fall Comdex (Engelbrecht 12 (LSI 2785-86)) (CD-ROM Chaparral Exhibits D016), Nov. 13, 1996.
OEM Datasheet on the 3701 Controller (Engelbrecht 13 (LSI 01837-38)) (CD-ROM Chaparral Exhibits D017), Jun. 17, 1905.
Nondisclosure Agreement Between Adaptec and Crossroads Dated Oct. 17, 1996 (Quisenberry Ex 25 (CRDS 8196)) (CD-ROM Chaparral Exhibits D020), Oct. 17, 1996.
Organizational Presentation on the External Storage Group (Lavan Ex 1 (CNS 182242-255)) (CD-ROM Chaparral Exhibits D021), Apr. 11, 1996.
Bridge Phase II Architecture Presentation (Lavan Ex 2 (CNS 182287-295)) (CD-ROM Chaparral Exhibits D022), Apr. 12, 1996.
Bridge. C, Bridge Between SCSI-2 and SCSI-3 FCP (Fibre Channel Protocol) (CD-ROM Chaparral Exhibits P214).
Attendees/Action Items from Apr. 12, 1996 Meeting at BTC (Lavan Ex 3 (CNS 182241)) (CD-ROM Chaparral Exhibits D023), Apr. 12, 1996.
Brooklyn Hardware Engineering Requirements Documents, Revision 1.4 (Lavan Ex 4 (CNS 178188-211)) (CD-ROM Chaparral Exhibits D024) by Pecone, May 26, 1996.
Brooklyn Single-Ended SCSI RAID Bridge Controller Hardware OEM Manual, Revision 2.1 (Lavan Ex 5 (CNS 177169-191)) (CD-ROM Chaparral Exhibits D025), Mar. 2, 1996.
Coronado Hardware Engineering Requirements Document, Revision 0.0 (Lavan Ex 7 (CNS 176917-932)) (CD-ROM Chaparral Exhibits D027) by O'Dell, Sep. 30, 1996.
ESS/FPG Organization (Lavan Ex 8 (CNS 178639-652)) (CD-ROM Chaparral Exhibits D028), Dec. 6, 1996.
Adaptec MCS ESS Presents: Intelligent External I/O Raid Controllers "Bridge" Strategy (Lavan Ex 9 (CNS 178606-638)). (CD-ROM Chaparral Exhibits D029), Feb. 6, 1996.
AEC-7313 Fibre Channel Daughter Board (for Brooklyn) Engineering Specification, Revision 1.0 (Lavan Ex 10 (CNS 176830-850)) (CD-ROM Chaparral Exhibits D030), Feb. 27, 1997.
Bill of Material (Lavan Ex 14 (CNS 177211-214)) (CD-ROM Chaparral Exhibits D034), Jul. 24, 1997.
AEC-. 4412B, AEC-7412/B2 External RAID Controller Hardware OEM Manual, Revision 2.0 (Lavan Ex 15 (CNS 177082-123)) (CD-ROM Chaparral Exhibits D035), Jun. 27, 1997.
Coronado II, AEC-7312A Fibre Channel Daughter (for Brooklyn) Hardware Specification, Revision 1.2 (Lavan Ex 16 (CNS 177192-210)) (CD-ROM Chaparral Exhibits D036) by Tom Yang, Jul. 18, 1997.
AEC-4412B, AEC7412/3B External RAID Controller Hardware OEM Manual, Revision 3.0. (Lavan Ex 17 (CNS 177124-165)) (CD-ROM Chaparral Exhibits D038), Aug. 25, 1997.
Memo Dated Aug. 15, 1997 to AEC-7312A Evaluation Unit Customers re: B001 Release Notes (Lavan Ex 18 (CNS 182878-879)) (CD-ROM Chaparral Exhibits D038), Aug. 15, 1997.
Brooklyn Main Board (AES-0302) MES Schedule (Lavan Ex 19 (CNS 177759-763)) (CD-ROM Chaparral Exhibits D039), Feb. 11, 1997.
News Release-Adaptec Adds Fibre Channel Option to its External RAID Controller Family (Lavan Ex 20 (CNS 182932-934)) (CD-ROM Chaparral Exhibits D040), May 6, 1997.
AEC-4412B/7412B User's Guide, Rev. A (Lavan Ex 21) (CD-ROM Chaparral Exhibits D041), Jun. 19, 1905.
Data Book- AIC-7895 PCI Bus Master Single Chip SCSI Host Adapter (Davies Ex 1 (CNS 182944-64)) (CD-ROM Chaparral Exhibits D046), May 21, 1996.
Data Book- AIC-1160 Fibre Channel Host Adapter ASIC (Davies Ex 2 (CNS 181800-825)) (CD-ROM Chaparral Exhibits D047), Jun. 18, 1905.
Viking RAID Software (Davies Ex 3 (CNS 180969-181026)) (CD-ROM Chaparral Exhibits D048), Jun. 18, 1905.
Header File with Structure Definitions (Davies Ex 4 (CNS 180009-018)) (CD-ROM Chaparral Exhibits D049), Aug. 8, 1996.

## US 7,934,041 B2

Page 5

C++ SourceCode for the SCSI Command Handler (Davies Ex 5 (CNS 179136-168)) (CD-ROM Chaparral Exhibits D050), Aug. 8, 1996.

Header File Data Structure (Davies Ex 6 (CNS 179997-180008)) (CD-ROM Chaparral Exhibits D051), Jan. 2, 1997.

SCSI Command Handler (Davies Ex 7 (CNS 179676-719)) (CD-ROM Chaparral Exhibits D052), Jan. 2, 1997.

Coronado: Fibre Channel to SCSI Intelligent RAID Controller Product Brief (Kalwitz Ex I (CNS 182804-805)) (CD-ROM Chaparral Exhibits D053).

Bill of Material (Kalwitz Ex 2 (CNS 181632-633)) (CD-ROM Chaparral Exhibits D054), Mar. 17, 1997.

Emails Dated Jan. 13-Mar. 31, 1997 from P. Collins to Mo re: Status Reports (Kalwitz Ex 3 (CNS 182501-511)) (CD-ROM Chaparral Exhibits D055).

Hardware Schematics for the Fibre Channel Daughtercard Coronado (Kalwitz Ex 4 (CNS 181639-648)) (CD-ROM Chaparral Exhibits D056).

Adaptec Schematics re AAC-340 (Kalwitz Ex 14 CNS 177215-251)) (CD-ROM Chaparral Exhibits D057).

Bridge Product Line Review (Manzanares Ex 3 (CNS 177307-336)) (CD-ROM Chaparral Exhibits D058).

AEC Bridge Series Products-Adaptec External Controller RAID Products Pre-Release Draft, v.6 (Manzanares Ex 4 (CNS 174632-653)). (CD-ROM Chaparral Exhibits D059), Oct. 28, 1997.

Hewlett-Packard Roseville Site Property Pass for Brian Smith (Dunning Ex 14 (HP 489) (CD-ROM Chaparral Exhibits D078), Nov. 7, 1996.

Distribution Agreement Between Hewlett-Packard and Crossroads (Dunning Ex 15 (HP 326-33) (CD-ROM Chaparral Exhibits D079).

HPFC-5000 Tachyon User's Manuel, First Edition (PTI 172419-839) (CD-ROM Chaparral Exhibits D084), May 1, 1996.

X3T10 994D—(Draft) Information Technology: SCSI-3 Architecture Model, Rev. 1.8 (PTI 165977) (CD-ROM Chaparral Exhibits D087).

X3T10 Project 1047D: Information Technology- SCSI-3 Controller Commands (SCC), Rev, 6c (PTI 166400-546) (CD-ROM Chaparral Exhibits D088), Sep. 3, 1996.

X3T10 995D- (Draft) SCSI-3 Primary Commands, Rev. 11 (Wanamaker Ex 5 (PTI 166050-229)) (CD-ROM Chaparral Exhibits D089), Nov. 13, 1996.

VBAR Volume Backup and Restore (CRDS 12200-202) (CD-ROM Chaparral Exhibits D099).

Preliminary Product Literature for Infinity Commstor's Fibre Channel to SCSI Protocol Bridge (Smith Ex 11; Quisenberry Ex 31 (SPLO 428-30) (CD-ROM Chaparral Exhibits D143), Aug. 19, 1996.

Letter dated Jul. 12, 1996 from J. Boykin to B. Smith re: Purchase Order for Evaluation Units from Crossroads (Smith Ex 24) (CRDS 8556-57) (CD-ROM Chaparral Exhibits D144), Jul. 12, 1996.

CrossPoint 4100 Fibre Channel to SCSI Router Preliminary Datasheet (Hulsey Ex 9 (CRDS 16129-130)) (CD-ROM Chaparral Exhibits D145), Nov. 1, 1996.

CrossPoint 4400 Fibre Channel to SCSI Router Preliminary Datasheet (Bardach Ex. 9, Quisenberry Ex 33 (CRDS 25606-607)) (CD-ROM Chaparral Exhibits D153), Nov. 1, 1996.

Fax Dated Jul. 22, 1996 from L. Petti to B. Smith re: Purchase Order from Data General for FC2S Fibre to Channel SCSI Protocol Bridge Model 11 (Smith Ex 25; Quisenberry Ex 23; Bardach Ex 11 (CRDS 8552-55; 8558) (CD-ROM Chaparral Exhibits D155), Jul. 22, 1996.

Email Dated Dec. 20, 1996 from J. Boykin to B. Smith re: Purchase Order for Betas in February and March (Hoese Ex 16, Quisenberry Ex 25; Bardach Ex 12 (CRDS 13644-650) (CD-ROM Chaparral Exhibits D156), Dec. 20, 1996.

Infinity Commstor Fibre Channel Demo for Fall Comdex, 1996 (Hoese Ex 15, Bardach Ex 13 (CRDS 27415) (CD-ROM Chaparral Exhibits D157).

Fax Dated Dec. 19, 1996 from B. Bardach to T. Rarich re: Purchase Order Information (Bardach Ex. 14; Smith Ex 16 (CRDS 4460)) (CD-ROM Chaparral Exhibits D158).

Miscellaneous Documents Regarding Comdex (Quisenberry Ex 2 (CRDS 27415-465)) (CD-ROM Chaparral Exhibits D165).

CrossPoint 4100 Fibre Channel to SCSI Router Preliminary Datasheet (Quisenberry) Ex 3 (CRDS 4933-34) (CD-ROM Chaparral Exhibits D166) (CD-ROM Chaparral Exhibits D166).

CrossPoint 4400 Fibre to Channel to SCSI Router Preliminary Datasheet, Crossroads Company and Product Overview (Quisenberry Ex 4 (CRDS 25606; 16136)) (CD-ROM Chaparral Exhibits D167).

Crossroads Purchase Order Log (Quisenberry Ex 9 (CRDS 14061-062)) (CD-ROM Chaparral Exhibits D172).

RAID Manager 5 with RDAC 5 for UNIX V.4 User's Guide (LSI-01854) (CD-ROM Chaparral Exhibits P062), Sep. 1, 1996.

Letter dated May 12, 1997 from Alan G. Leal to Barbara Bardach enclosing the original OEM License and Purchase Agreement between Hewlett-Package Company and Crossroads Systems, Inc. (CRDS 02057) (CD-ROM Chaparral Exhibits P130).

CR4x00 Product Specification (CRDS 43929) (CD-ROM Chaparral Exhibits P267), Jun. 1, 1998.

Symbios Logic—Hardware Functional Specification for the Symbios Logic Series 3 Fibre Channel Disk Array Controller Model 3701 (Engelbrecht Ex 3 (LSI-1659-1733) (CD-ROM Pathlight Exhibits D074).

Report of the Working Group on Storage I/O for Large Scale Computing; Department of Computer Science Duke University: CS-1996-21 (PTI 173330-347). (CD-ROM Pathlight Exhibits D098).

Brian Allison's 1999 Third Quarter Sales Plan (PDX 38 )CNS 022120-132)) (CD-ROM Pathlight Exhibits D201), Jun. 5, 2001.

Brooklyn SCSI-SCSI Intelligent External RAID Bridge Definition Phase External Documentation ((CD-ROM Pathlight Exhibits D129).

StorageWorks HSx70 System Specification by Steve Sicola dated Jun. 11, 1996 4:57pm, Revision 4.

ANSI TR X3.xxx-199x, Revision 9 of X3-991D. Draft Proposed X3 Technical Report—Small Computer System Interface—3 Generic Packetized Protocol (SCSI-GPP). Computer and Business Equipment Manufacturers Assoc.

Enterprise Systems Connection (ESON) Implementation Guide, Jul. 1996, IBM International Technical Support Organization, Poughkeepsie Center, Jul. 1, 1996.

Digital Delivers Industry-Leading Enterprise-Class Storage Solutions. StorageWorks Family Provides Easiest Path to Fibre Channel. Three pages by Company News Oncall dated Sep. 9, 2004.

American National Standard for Information Technology—Fibre Channel Protocol for SCSI. ANSI X3.269-1996, Jun. 18, 1905.

F1710A File Control Unit and F6493 Array Disk Subsystem by Hitoshi Matsushima, Shojiro Okada and Tetsuro Kudo, Feb. 3, 1995. The Legend of AMDAHL by Jeffrey L. Rodengen (5 pages).

Office Action dated Feb. 6, 2007 from the Japanese Patent Office regarding related application No. 526873/2000.

InfoServer 100 System Operation Guide, Order No. EK-DIS1K-UG-001.

iNFOsERVER 100 Installation and Owner's Guide, Order No. EK-DIS1K-IN-001.

Software Product Description: Product Name: InfoServer 100 Software, Version 1.1 SPD 38.59.00, Nov. 1, 1991.

Software Product Description: Product Name: InfoServer Client for ULTRIX, Version 1.1, SPD 40.78.01, Apr. 1, 1993.

Draft Proposed American National Standard. X3.269-199X, Revision 012. Information System—dpANS Fibre Channel Protocol fo SCSI, Dec. 4, 1995.

Impactdata Launches Breakthrough Architecture for Network Storage, Nov. 13, 1996.

Impactdata..News Release: Impactdata Introduces New Storage Architecture for High Performance Computing. 2 Pages, Nov. 12, 1996.

Impactdata..News Release: Impactdata's Network Peripheral Adapter (NPA) Pushes Technology Envelope of Data Storage Management in High-Speed Computing Environments. 2 Pages, Nov. 12, 1996.

Impactdata..News Release: Impactdata and Storage Concepts Announce Integration of FibreRAID II Storage Solution with Impactdata's Distributed Storage Node Architecture (DSNA). 2 pages, Nov. 18, 1996.

**US 7,934,041 B2**

Page 6

Impactdata..News Release: Breece Hill Libraries Now Able to Attach Directly to High Speed Networks Peripheral Adapter from Impactdata. 2 Pages, Nov. 20, 1996.

Impactdata—DSNA Questions and Answers. 22 Pages.

Impactdata—Network Storage Solutions. 4 pages.

Network Storage Building Blocks. 2 Pages.

Impactdata—NPA (Network Peripheral Interface). 4 Pages.

Impactdata—CPI (Common Peripheral Interfae). 2 Pages.

Impactdata—SNC (Storage Node Controller). 2 Pages.

Impactdata—DSNA (Distributed Storage Node Architecture) Protocol. 2 Pages.

Impactdata—DS-50. 2 Pages.

Impactdata—Corporate Fact Sheet. 1 Page.

Raider-5 "Disk Array Manual for the UltraSCSI Controller". Part No. 261-0013-002. 191 Pages.

Impactdata—White Paper: Distributed Storage Node Architecture (DSNA). Jan. 1997.

Impactdata—DSNA Distributed Storage Node Architecture "Reference Guide". 44 Pages.

F1710 Logic Specification.

Translation of Final Office Action issued in JP 526873/2000 mailed May 14, 2008. 4 Pages.

Office Action issued in U.S. Appl. No. 11/851,837 dated Dec. 22, 2008, Hoese, 7 pages.

English Translation of Japanese Laid-Open Publication No. 5-181609. 9 pgs., Jul. 23, 1993.

English Translation of Japanese Laid-Open Publication No. 7-20994. 57 pgs, Jan. 24, 1995.

F1710 File Control Unit (FCU) Logical Specifications. 11 Pages, Dec. 9, 1997.

Questioning Mailed Jun. 8, 2010 from JP Patent Application 526873/2000. 8 pages.

Office Action Mailed Aug. 17, 2010 in U.S. Appl. No. 11/947,499 to Hoese. 6 pgs.

American National Standard for Information Systems: Fibre Channel—Cross-Point Switch Fabric Topology (FC-XS); X3T11/Project 959D/Rev 1.30. 114 pgs., Jun. 17, 1994.

Office Action Mailed Sep. 13, 2010 in U.S. Appl. No. 11/980,909.

Office Action Mailed Sep. 13, 2010 in U.S. Appl. No. 12/552,807.

Office Action Mailed Sep. 15, 2010 in U.S. Appl. No. 12/552,885.

Office Action Mailed Sep. 23, 2010 in U.S. Appl. No. 12/552,913.

Office Action Mailed Dec. 2, 2010 in U.S. Appl. No. 12/910,375.

Office Action Mailed Dec. 3, 2010 in U.S. Appl. No. 12/910,431.

Office Action Mailed Dec. 3, 2010 in U.S. Appl. No. 12/910,515.



FIG. 1



FIG. 2



FIG. 3

U.S. Patent

Apr. 26, 2011

Sheet 2 of 2

US 7,934,041 B2



FIG. 4

FIG. 5

CQ-1001 / Page 8 of 15

US 7,934,041 B2

## 1

### STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE

This application is a continuation of, and claims a benefit of priority under 35 U.S.C. 120 of the filing date of U.S. patent application Ser. No. 12/552,885 entitled "Storage Router and Method for Providing Virtual Local Storage" filed Sep. 2, 2009, which is a continuation of and claims the benefit of priority of U.S. application Ser. No. 11/851,724 entitled "Storage Router and Method for Providing Virtual Local Storage" filed Sep. 7, 2007, now U.S. Pat. No. 7,689,754 issued Mar. 30, 2010, which is a continuation of and claims the benefit of priority of U.S. patent application Ser. No. 11/442,878 entitled "Storage Router and Method for Providing Virtual Local Storage" filed May 30, 2006, now abandoned, which is a continuation of and claims the benefit of priority of U.S. patent application Ser. No. 11/353,826 entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Feb. 14, 2006, now U.S. Pat. No. 7,340,549 issued Mar. 4, 2008, which is a continuation of and claims the benefit of priority of U.S. patent application Ser. No. 10/658,163 entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Sep. 9, 2003 now U.S. Pat. No. 7,051,147 issued May 23, 2006, which is a continuation of and claims the benefit of benefit of priority of U.S. patent application Ser. No. 10/081,110 by inventors Geoffrey B. Hoese and Jeffery T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Feb. 22, 2002, now U.S. Pat. No. 6,789,152 issued on Sep. 7, 2004, which in turn is a continuation of and claims benefit of priority of U.S. application Ser. No. 09/354,682 by inventors Geoffrey B. Hoese and Jeffrey T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Jul. 15, 1999, now U.S. Pat. No. 6,421,753 issued on Jul. 16, 2002, which in turn is a continuation of and claims benefit of priority of U.S. patent application Ser. No. 09/001, 799, filed on Dec. 31, 1997, now U.S. Pat. No. 5,941,972 issued on Aug. 24, 1999, and hereby incorporates these applications and patents by reference in their entireties as if they had been fully set forth herein.

### TECHNICAL FIELD OF THE INVENTION

This invention relates in general to network storage devices, and more particularly to a storage router and method for providing virtual local storage on remote SCSI storage devices to Fibre Channel devices.

### BACKGROUND OF THE INVENTION

Typical storage transport mediums provide for a relatively small number of devices to be attached over relatively short distances. One such transport medium is a Small Computer System Interface (SCSI) protocol, the structure and operation of which is generally well known as is described, for example, in the SCSI-1, SCSI-2 and SCSI-3 specifications. High speed serial interconnects provide enhanced capability to attach a large number of high speed devices to a common storage transport medium over large distances. One such, serial interconnect is Fibre Channel, the structure and operation of which is described, for example, in Fibre Channel Physical and Signaling Interface (FC-PH), ANSI X3.230 Fibre Channel Arbitrated Loop (FC-AL), and ANSI X3.272 Fibre Channel Private Loop Direct Attach (FC-PLDA).

Conventional computing devices, such as computer workstations, generally access storage locally or through network interconnects. Local storage typically consists of a disk drive,

## 2

tape drive, CD-ROM drive or other storage device contained within, or locally connected to the workstation. The workstation provides a file system structure that includes security controls, with access to the local storage device through native low level block protocols. These protocols map directly to the mechanisms used by the storage device and consist of data requests without security controls. Network interconnects typically provide access for a large number of computing devices to data storage on a remote network server. The remote network server provides file system structure, access control, and other miscellaneous capabilities that include the network interface. Access to data through the network server is through network protocols that the server must translate into low level requests to the storage device. A workstation with access to the server storage must translate its file system protocols into network protocols that are used to communicate with the server. Consequently, from the perspective of a workstation, or other computing device, seeking to access such server data, the access is much slower than access to data on a local storage device.

### SUMMARY OF THE INVENTION

In accordance with the present invention, a storage router and method for providing virtual local storage on remote SCSI storage devices to Fibre Channel devices are disclosed that provide advantages over conventional network storage devices and methods.

According to one aspect of the present invention, a storage router and storage network provide virtual local storage on remote SCSI storage devices to Fibre Channel devices. A plurality of Fibre Channel devices, such as workstations, are connected to a Fibre Channel transport medium, and a plurality of SCSI storage devices are connected to a SCSI bus transport medium. The storage router interfaces between the Fibre Channel transport medium and the SCSI bus transport medium. The storage router maps between the workstations and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. The storage router then allows access from the workstations to the SCSI storage devices using native low level, block protocol in accordance with the mapping and the access controls.

According to another aspect of the present invention, virtual local storage on remote SCSI storage devices is provided to Fibre Channel devices. A Fibre Channel transport medium and a SCSI bus transport medium are interfaced with. A configuration is maintained for SCSI storage devices connected to the SCSI bus transport medium. The configuration maps between Fibre Channel devices and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. Access is then allowed from Fibre Channel initiator devices to SCSI storage devices using native low level, block protocol in accordance with the configuration.

A technical advantage of the present invention is the ability to centralize local storage for networked workstations without any cost of speed or overhead. Each workstation accesses its virtual local storage as if it were locally connected. Further, the centralized storage devices can be located in a significantly remote position even in excess of ten kilometers as defined by Fibre Channel standards.

Another technical advantage of the present invention is the ability to centrally control and administer storage space for connected users without limiting the speed with which the users can access local data. In addition, global access to data, backups, virus scanning and redundancy can be more easily accomplished by centrally located storage devices.

US 7,934,041 B2

3

A further technical advantage of the present invention is providing support for SCSI storage devices as local storage for Fibre Channel hosts. In addition, the present invention helps to provide extended capabilities for Fibre Channel and for management of storage subsystems.

BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. 1 is a block diagram of a conventional network that provides storage through a network server;

FIG. 2 is a block diagram of one embodiment of a storage network with a storage router that provides global access and routing;

FIG. 3 is a block diagram of one embodiment of a storage network with a storage router that provides virtual local storage;

FIG. 4 is a block diagram of one embodiment of the storage router of FIG. 3; and

FIG. 5 is a block diagram of one embodiment of data flow within the storage router of FIG. 4.

DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 is a block diagram of a conventional network, indicated generally at 10, that provides access to storage through a network server. As shown, network 10 includes a plurality of workstations 12 interconnected with a network server 14 via a network transport medium 16. Each workstation 12 can generally comprise a processor, memory, input/output devices, storage devices and a network adapter as well as other common computer components. Network server 14 uses a SCSI bus 18 as a storage transport medium to interconnect with a plurality of storage devices 20 (tape drives, disk drives, etc.). In the embodiment of FIG. 1, network transport medium 16 is a network connection and storage devices 20 comprise hard disk drives, although there are numerous alternate transport mediums and storage devices.

In network 10, each workstation 12 has access to its local storage device as well as network access to data on storage devices 20. The access to a local storage device is typically through native low level, block protocols. On the other hand, access by a workstation 12 to storage devices 20 requires the participation of network server 14 which implements a file system and transfers data to workstations 12 only through high level file system protocols. Only network server 14 communicates with storage devices 20 via native low level, block protocols. Consequently, the network access by workstations 12 through network server 14 is slow with respect to their access to local storage. In network 10, it can also be a logistical problem to centrally manage and administer local data distributed across an organization, including accomplishing tasks such as backups, virus scanning and redundancy.

FIG. 2 is a block diagram of one embodiment of a storage network, indicated generally at 30, with a storage router that provides global access and routing. This environment is significantly different from that of FIG. 1 in that there is no network server involved. In FIG. 2, a Fibre Channel high speed serial transport 32 interconnects a plurality of workstations 36 and storage devices 38. A SCSI bus storage transport medium interconnects workstations 40 and storage devices 42. A storage router 44 then serves to interconnect these mediums and provide devices on either medium global, trans-

4

parent access to devices on the other medium. Storage router 44 routes requests from initiator devices on one medium to target devices on the other medium and routes data between the target and the initiator. Storage router 44 can allow initiators and targets to be on either side. In this manner, storage router 44 enhances the functionality of Fibre Channel 32, by providing access, for example, to legacy SCSI storage devices on SCSI bus 34. In the embodiment of FIG. 2, the operation of storage router 44 can be managed by a management station 46 connected to the storage router via a direct serial connection.

In storage network 30, any workstation 36 or workstation 40 can access any storage device 38 or storage device 42 through native low level, block protocols, and vice versa. This functionality is enabled by storage router 44 which routes requests and data as a generic transport between Fibre Channel 32 and SCSI bus 34. Storage router 44 uses tables to map devices from one medium to the other and distributes requests and data across Fibre Channel 32 and SCSI bus 34 without any security access controls. Although this extension of the high speed serial interconnect provided by Fibre Channel is beneficial, it is desirable to provide security controls in addition to extended access to storage devices through a native low level, block protocol.

FIG. 3 is a block diagram of one embodiment of a storage network, indicated generally at 50, with a storage router that provides virtual local storage. Similar to that of FIG. 2, storage network 50 includes a Fibre Channel high speed serial interconnect 52 and a SCSI bus 54 bridged by a storage router 56. Storage router 56 of FIG. 3 provides for a large number of workstations 58 to be interconnected on a common storage transport and to access common storage devices 60, 62 and 64 through native low level, block protocols.

According to the present invention, storage router 56 has enhanced functionality to implement security controls and routing such that each workstation 58 can have access to a specific subset of the overall data stored in storage devices 60, 62 and 64. This specific subset of data has the appearance and characteristics of local storage and is referred to herein as virtual local storage. Storage router 56 allows the configuration and modification of the storage allocated to each attached workstation 58 through the use of mapping tables or other mapping techniques.

As shown in FIG. 3, for example, storage device 60 can be configured to provide global data 65 which can be accessed by all workstations 58. Storage device 62 can be configured to provide partitioned subsets 66, 68, 70 and 72, where each partition is allocated to one of the workstations 58 (workstations A, B, C and D). These subsets 66, 68, 70 and 72 can only be accessed by the associated workstation 58 and appear to the associated workstation 58 as local storage accessed using native low level, block protocols. Similarly, storage device 64 can be allocated as storage for the remaining workstation 58 (workstation E).

Storage router 56 combines access control with routing such that each workstation 58 has controlled access to only the specified partition of storage device 62 which forms virtual local storage for the workstation 58. This access control allows security control for the specified data partitions. Storage router 56 allows this allocation of storage devices 60, 62 and 64 to be managed by a management station 76. Management station 76 can connect directly to storage router 56 via a direct connection or, alternately, can interface with storage router 56 through either Fibre Channel 52 or SCSI bus 54. In the latter case, management station 76 can be a workstation or other computing device with special rights such that storage

US 7,934,041 B2

**5**

router **56** allows access to mapping tables and shows storage devices **60**, **62** and **64** as they exist physically rather than as they have been allocated.

The environment of FIG. **3** extends the concept of single workstation having locally connected storage devices to a storage network **50** in which workstations **58** are provided virtual local storage in a manner transparent to workstations **58**. Storage router **56** provides centralized control of what each workstation **58** sees as its local drive, as well as what data it sees as global data accessible by other workstations **58**. Consequently, the storage space considered by the workstation **58** to be its local storage is actually a partition (i.e., logical storage definition) of a physically remote storage device **60**, **62** or **64** connected through storage router **56**. This means that similar requests from workstations **58** for access to their local storage devices produce different accesses to the storage space on storage devices **60**, **62** and **64**. Further, no access from a workstation **58** is allowed to the virtual local storage of another workstation **58**.

The collective storage provided by storage devices **60**, **62** and **64** can have blocks allocated by programming means within storage router **56**. To accomplish this function, storage router **56** can include routing tables and security controls that define storage allocation for each workstation **58**. The advantages provided by implementing virtual local storage in centralized storage devices include the ability to do collective backups and other collective administrative functions more easily. This is accomplished without limiting the performance of workstations **58** because storage access involves native low level, block protocols and does not involve the overhead of high level protocols and file systems required by network servers.

FIG. **4** is a block diagram of one embodiment of storage router **56** of FIG. **3**. Storage router **56** can comprise a Fibre Channel controller **80** that interfaces with Fibre Channel **52** and a SCSI controller **82** that interfaces with SCSI bus **54**. A buffer **84** provides memory work space and is connected to both Fibre Channel controller **80** and to SCSI controller **82**. A supervisor unit **86** is connected to Fibre Channel controller **80**, SCSI controller **82** and buffer **84**. Supervisor unit **86** comprises a microprocessor for controlling operation of storage router **56** and to handle mapping and security access for requests between Fibre Channel **52** and SCSI bus **54**.

FIG. **5** is a block diagram of one embodiment of data flow within storage router **56** of FIG. **4**. As shown, data from Fibre Channel **52** is processed by a Fibre Channel (FC) protocol unit **88** and placed in a FIFO queue **90**. A direct memory access (DMA) interface **92** then takes data out of FIFO queue **90** and places it in buffer **84**. Supervisor unit **86** processes the data in buffer **84** as represented by supervisor processing **93**. This processing involves mapping between Fibre Channel **52** and SCSI bus **54** and applying access controls and routing functions. A DMA interface **94** then pulls data from buffer **84** and places it into a buffer **96**. A SCSI protocol unit **98** pulls data from buffer **96** and communicates the data on SCSI bus **54**. Data flow in the reverse direction, from SCSI bus **54** to Fibre Channel **52**, is accomplished in a reverse manner.

The storage router of the present invention is a bridge device that connects a Fibre Channel link directly to a SCSI bus and enables the exchange of SCSI command set information between application clients on SCSI bus devices and the Fibre Channel links. Further, the storage router applies access controls such that virtual local storage can be established in remote SCSI storage devices for workstations on the Fibre Channel link. In one embodiment, the storage router provides a connection for Fibre Channel links running the SCSI Fibre

**6**

Channel Protocol (FCP) to legacy SCSI devices attached to a SCSI bus. The Fibre Channel topology is typically an Arbitrated Loop (FC_AL).

In part, the storage router enables a migration path Fibre Channel based, serial SCSI networks by providing connectivity for legacy SCSI bus devices. The storage router can be attached to a Fibre Channel Arbitrated Loop and a SCSI bus to support a number of SCSI devices. Using configuration settings, the storage router can make the SCSI bus devices available on the Fibre Channel network as FCP logical units. Once the configuration is defined, operation of the storage router is transparent to application clients. In this manner, the storage router can form an integral part of the migration to new Fibre Channel based networks while providing a means to continue using legacy SCSI devices.

In one implementation (not shown), the storage router can be a rack mount or free standing device with an internal power supply. The storage router can have a Fibre Channel and SCSI port, and a standard, detachable power cord can be used, the FC connector can be a copper DB9 connector, and the SCSI connector can be a 68-pin type. Additional modular jacks can be provided for a serial port and an 802.3 10 BaseT port, i.e. twisted pair Ethernet, for management access. The SCSI port of the storage router can support SCSI direct and sequential access target devices and can support SCSI initiators, as well. The Fibre Channel port can interface to SCSI-3 FCP enabled devices and initiators.

To accomplish its functionality, one implementation of the storage router uses: a Fibre Channel interface based on the HEWLETT-PACKARD TACHYON HPFC-5000 controller and a GLM media interface; an Intel 80960RP processor, incorporating independent data and program memory spaces, and associated logic required to implement a stand alone processing system; and a serial port for debug and system configuration. Further, this implementation includes a SCSI interface supporting Fast-20 based on the SYMBIOS 53C8xx series SCSI controllers, and an operating system based upon the WIND RIVERS SYSTEMS VXWORKS or IXWORKS kernel, as determined by design. In addition, the storage router includes software as required to control basic functions of the various elements, and to provide appropriate translations between the FC and SCSI protocols.

The storage router has various modes of operation that are possible between FC and SCSI target and initiator combinations. These modes are: FC Initiator to SCSI Target; SCSI Initiator to FC Target; SCSI Initiator to SCSI Target; and FC Initiator to FC Target. The first two modes can be supported concurrently in a single storage router device and are discussed briefly below. The third mode can involve two storage router devices back to back and can serve primarily as a device to extend the physical distance beyond that possible via a direct SCSI connection. The last mode can be used to carry FC protocols encapsulated on other transmission technologies (e.g. ATM, SONET), or to act as a bridge between two FC loops (e.g. as a two port fabric).

The FC Initiator to SCSI Target mode provides for the basic configuration of a server using Fibre Channel to communicate with SCSI targets. This mode requires that a host system have an FC attached device and associated device drivers and software to generate SCSI-3 FCP requests. This system acts as an initiator using the storage router to communicate with SCSI target devices. The SCSI devices supported can include SCSI-2 compliant direct or sequential access (disk or tape) devices. The storage router serves to translate command and status information and transfer data between SCSI-3 FCP and SCSI-2, allowing the use of standard SCSI-2 devices in a Fibre Channel environment.

US 7,934,041 B2

7

The SCSI Initiator to FC Target mode provides for the configuration of a server using SCSI-2 to communicate with Fibre Channel targets. This mode requires that a host system has a SCSI-2 interface and driver software to control SCSI-2 target devices. The storage router will connect to the SCSI-2 bus and respond as a target to multiple target IDs. Configuration information is required to identify the target IDs to which the bridge will respond on the SCSI-2 bus. The storage router then translates the SCSI-2 requests to SCSI-3 FCP requests, allowing the use of FC devices with a SCSI host system. This will also allow features such as a tape device acting as an initiator on the SCSI bus to provide full support for this type of SCSI device.

In general, user configuration of the storage router will be needed to support various functional modes of operation. Configuration can be modified, for example, through a serial port or through an Ethernet port via SNMP (simple network management protocol) or the Telnet session. Specifically, SNMP manageability can be provided via a B02.3 Ethernet interface. This can provide for configuration changes as well as providing statistics and error information. Configuration can also be performed via TELNET or RS-232 interfaces with menu driven command interfaces. Configuration information can be stored in a segment of flash memory and can be retained across resets and power off cycles. Password protection can also be provided.

In the first two modes of operation, addressing information is needed to map from FC addressing to SCSI addressing and vice versa. This can be 'hard' configuration data, due to the need for address information to be maintained across initialization and partial reconfigurations of the Fibre Channel address space. In an arbitrated loop configuration, user configured addresses will be needed for AL_PAs in order to insure that known addresses are provided between loop reconfigurations.

With respect to addressing, FCP and SCSI 2 systems employ different methods of addressing target devices. Additionally, the inclusion of a storage router means that a method of translating device IDs needs to be implemented. In addition, the storage router can respond to commands without passing the commands through to the opposite interface. This can be implemented to allow all generic FCP and SCSI commands to pass through the storage router to address attached devices, but allow for configuration and diagnostics to be performed directly on the storage router through the FC and SCSI interfaces.

Management commands are those intended to be processed by the storage router controller directly. This may include diagnostic, mode, and log commands as well as other vendor-specific commands. These commands can be received and processed by both the FOP and SCSI interfaces, but are not typically bridged to the opposite interface. These commands may also have side effects on the operation of the storage router, and cause other storage router operations to change or terminate.

A primary method of addressing management commands though the FCP and SCSI interfaces can be through peripheral device type addressing. For example, the storage router can respond to all operations addressed to logical unit (LUN) zero as a controller device. Commands that the storage router will support can include INQUIRY as well as vendor-specific management commands. These are to be generally consistent with SCC standard commands.

The SCSI bus is capable of establishing bus connections between targets. These targets may internally address logical units. Thus, the prioritized addressing scheme used by SCSI subsystems can be represented as follows: BUS:TARGET:

8

LOGICAL UNIT. The BUS identification is intrinsic in the configuration, as a SCSI initiator is attached to only one bus. Target addressing is handled by bus arbitration from information provided to the arbitrating device. Target addresses are assigned to SCSI devices directly through some means of configuration, such as a hardware jumper, switch setting, or device specific software configuration. As such, the SCSI protocol provides only logical unit addressing within the Identify message. Bus and target information is implied by the established connection.

Fibre Channel devices within a fabric are addressed by a unique port identifier. This identifier is assigned to a port during certain well-defined states of the FC protocol. Individual ports are allowed to arbitrate for a known, user defined address. If such an address is not provided, or if arbitration for a particular-user address fails, the port is assigned a unique address by the FC protocol. This address is generally not guaranteed to be unique between instances. Various scenarios exist where the AL-PA of a device will change, either after power cycle or loop reconfiguration.

The FC protocol also provides a logical unit address field within command structures to provide addressing to devices internal to a port. The FCP_CMD payload specifies an eight byte LUN field. Subsequent identification of the exchange between devices is provided by the FQXID (Fully Qualified Exchange ID).

FC ports can be required to have specific addresses assigned. Although basic functionality is not dependent on this, changes in the loop configuration could result in disk targets changing identifiers with the potential risk of data corruption or loss. This configuration can be straightforward, and can consist of providing the device a loop-unique ID (AL_PA) in the range of "01h" to "EFh." Storage routers could be shipped with a default value with the assumption that most configurations will be using single storage routers and no other devices requesting the present ID. This would provide a minimum amount of initial configuration to the system administrator. Alternately, storage routers could be defaulted to assume any address so that configurations requiring multiple storage routers on a loop would not require that the administrator assign a unique ID to the additional storage routers.

Address translation is needed where commands are issued in the cases FC Initiator to SCSI Target and SCSI Initiator to FC Target. Target responses are qualified by the FQXID and will retain the translation acquired at the beginning of the exchange. This prevents configuration changes occurring during the course of execution of a command from causing data or state information to be inadvertently misdirected. Configuration can be required in cases of SCSI Initiator to FC Target, as discovery may not effectively allow for FCP targets to consistently be found. This is due to an FC arbitrated loop supporting addressing of a larger number of devices than a SCSI bus and the possibility of FC devices changing their AL-PA due to device insertion or other loop initialization.

In the direct method, the translation to BUS:TARGET: LUN of the SCSI address information will be direct. That is, the values represented in the FCP LUN field will directly map to the values in effect on the SCSI bus. This provides a clean translation and does not require SCSI bus discovery. It also allows devices to be dynamically added to the SCSI bus without modifying the address map. It may not allow for complete discovery by FCP initiator devices, as gaps between device addresses may halt the discovery process. Legacy SCSI device drivers typically halt discovery on a target device at the first unoccupied LUN, and proceed to the next target.

US 7,934,041 B2

9

This would lead to some devices not being discovered. However, this allows for hot plugged devices and other changes to the loop addressing.

In the ordered method, ordered translation requires that the storage router perform discovery on reset, and collapses the addresses on the SCSI bus to sequential FSP LUN values. Thus, the FCP LUN values 0-N can represent N+1 SCSI devices, regardless of SCSI address values, in the order in which they are isolated during the SCSI discovery process. This would allow the FCP initiator discovery process to identify all mapped SCSI devices without further configuration. This has the limitation that hot-plugged devices will not be identified until the next reset cycle. In this case, the address may also be altered as well.

In addition to addressing, according to the present invention, the storage router provides configuration and access controls that cause certain requests from FC Initiators to be directed to assigned virtual local storage partitioned on SCSI storage devices. For example, the same request for LUN 0 (local storage) by two different FC Initiators can be directed to two separate subsets of storage. The storage router can use tables to map, for each initiator, what storage access is available and what partition is being addressed by a particular request. In this manner, the storage space provided by SCSI storage devices can be allocated to FC initiators to provide virtual local storage as well as to create any other desired configuration for secured access.

Although the present invention has been described in detail, it should be understood that various changes, substitutions, and alterations can be made hereto without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. A storage router for providing virtual local storage on remote storage devices, comprising:
   a first controller operable to interface with a first transport medium, wherein the first medium is a serial transport media; and
   a processing device coupled to the first controller, wherein the processing device is configured to:
      maintain a map to allocate storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices, wherein each representation of a device connected to the first transport medium is associated with one or more representations of storage space on the remote storage devices;
      control access from the devices connected to the first transport medium to the storage space on the remote storage devices in accordance with the map; and
      allow access from devices connected to the first transport medium to the remote storage devices using native low level block protocol.

2. The storage router of claim 1, wherein the map associates a representation of storage space on the remote storage devices with multiple devices connected to the first transport medium.

3. The storage router of claim 1, wherein the storage space on the remote storage devices comprises storage space on multiple remote storage devices.

4. The storage router of claim 1, wherein the map associates a representation of a device connected to the first transport medium with a representation of an entire storage space of at least one remote storage device.

10

5. The storage router of claim 1, wherein the map resides at the storage router and is maintained at the storage router.

6. The storage router of claim 1, wherein the native low level block protocol is received at the storage router via the first transport medium and the processing device uses the received native low level block protocol to allow the devices connected to the first transport medium access to storage space specifically allocated to them in the map.

7. The storage router of claim 1, wherein the storage router is configured to receive commands according to a first low level block protocol from the device connected to the first transport medium and forward commands according to a second low level block protocol to the remote storage devices.

8. The storage router of claim 7, wherein the first low level block protocol is an FCP protocol and the second low level block protocol is a protocol other than FCP.

9. The storage router of claim 1, wherein the map comprises one or more tables.

10. The storage router of claim 1, wherein the virtual local storage is provided to the devices connected to the first transport medium in a manner that is transparent to the devices and wherein the storage space allocated to the devices connected to the first transport medium appears to the devices as local storage.

11. The storage router of claim 1, wherein the storage router provides centralized control of what the devices connected to the first transport medium see as local storage.

12. The storage router of claim 1, wherein the representations of storage space comprise logical unit numbers that represent a subset of storage on the remote storage devices.

13. The storage router of claim 12, wherein the storage router is operable to route requests to the same logical unit number from different devices connected to the first transport medium to different subsets of storage space on the remote storage devices.

14. The storage router of claim 1, wherein the representations of devices connected to the first transport medium are unique identifiers.

15. The storage router of claim 14, wherein the unique identifiers are world wide names.

16. The storage router of claim 1, wherein the storage router is configured to allow modification of the map in a manner transparent to and without involvement of the devices connected to the first transport medium.

17. The storage router of claim 1, wherein the processing device is a microprocessor.

18. The storage router of claim 1, wherein the processing device is a microprocessor and associated logic to implement a stand-alone processing system.

19. The storage router of claim 1, wherein the first transport medium is a fibre channel transport medium and further comprising a second transport medium connected to the remote storage devices that is a fibre channel transport medium.

20. A storage network comprising:
   a set of devices connected a first transport medium, wherein the first transport medium;
   a set of remote storage devices connected to a second transport medium;
   a storage router connected to the serial transport medium;
   a storage router connected to the first transport medium and second transport medium to provide virtual local storage on the remote storage devices, the storage router configured to:
      maintain a map to allocate storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with

US 7,934,041 B2

11

representations of storage space on the remote storage devices, wherein each representation of a device connected to the first transport medium is associated with one or more representations of storage space on the remote storage devices;

control access from the devices connected to the first transport medium to the storage space on the remote storage devices in accordance with the map; and

allow access from devices connected to the first transport medium to the remote storage devices using native low level block protocol.

**21**. The storage network of claim **20**, wherein the map associates a representation of storage space on the remote storage devices with multiple devices connected to the first transport medium.

**22**. The storage network of claim **20**, wherein the storage space on the remote storage devices comprises storage space on multiple remote storage devices.

**23**. The storage network of claim **20**, wherein the map associates a representation of a device connected to the first transport medium with a representation of an entire storage space of at least one remote storage device.

**24**. The storage network of claim **20**, wherein the map resides at the storage router and is maintained at the storage router.

**25**. The storage network of claim **20**, wherein the native low level block protocol is received at the storage router via the first transport medium and the storage router uses the received native low level block protocol to allow the devices connected to the first transport medium access to storage space specifically allocated to them in the map.

**26**. The storage router of claim **20**, wherein the storage router is configured to receive commands according to a first low level block protocol from the device connected to the first transport medium and forward commands according to a second low level block protocol to remote storage devices.

**27**. The storage network of claim **20**, wherein the first low level block protocol is an FCP protocol and the second low level block protocol is a protocol other than FCP.

**28**. The storage network of claim **20**, wherein the map comprises one or more tables.

**29**. The storage network of claim **20**, wherein the virtual local storage is provided to the devices connected to the first transport medium in a manner that is transparent to the devices and wherein the storage space allocated to the devices connected to the first transport medium appears to the devices as local storage.

**30**. The storage network of claim **20**, wherein the storage router provides centralized control of what the devices connected to the first transport medium see as local storage.

**31**. The storage network of claim **20**, wherein the representations of storage space comprise logical unit numbers that represent a subset of storage on the remote storage devices.

**32**. The storage network of claim **31**, wherein the storage router is operable to route requests to the same logical unit number from different devices connected to the first transport medium to different subsets of storage space on the remote storage devices.

**33**. The storage network of claim **20**, wherein the representations of devices connected to the first transport medium are unique identifiers.

**34**. The storage network of claim **33**, wherein the unique identifiers are world wide names.

**35**. The storage network of claim **20**, wherein the storage router is configured to allow modification of the map in a

12

manner transparent to and without involvement of the devices connected to the first transport medium.

**36**. The storage network of claim **20**, wherein the first transport medium is a fibre channel transport medium and the second transport medium is a fibre channel transport medium.

**37**. A method for providing virtual local storage on remote storage devices comprising:

connecting a storage router between a set of devices connected to a first transport medium and a set of remote storage devices, wherein the first transport medium is a serial transport medium;

maintaining a map at the storage router to allocate storage space on the remote storage devices to devices connected to the first transport medium by associating representations of the devices connected to the first transport medium with representations of storage space on the remote storage devices, wherein each representation of a device connected to the first transport medium is associated with one or more representations of storage space on the remote storage devices;

controlling access from the devices connected to the first transport medium to the storage space on the remote storage devices in accordance with the map; and

allowing access from devices connected to the first transport medium to the remote storage devices using native low level block protocol.

**38**. The method of claim **37**, wherein the map associates a representation of storage space on the remote storage devices with multiple devices connected to the first transport medium.

**39**. The method of claim **37**, wherein the storage space on the remote storage devices comprises storage space on multiple remote storage devices.

**40**. The method of claim **37**, wherein the map associates a representation of a device connected to the first transport medium with a representation of an entire storage space of at least one remote storage device.

**41**. The method of claim **37**, wherein the map resides at the storage router and is maintained at the storage router.

**42**. The method of claim **37**, further comprising:

receiving the native low level block protocol at the storage router via the first transport medium;

using the received native low level block protocol at the storage router to allow the devices connected to the first transport medium access to storage space specifically allocated to them in the map.

**43**. The method of claim **37**, further comprising receiving commands at the storage router according to a first low level block protocol from the device connected to the first transport medium and forwarding commands according to a second low level block protocol to the remote storage devices.

**44**. The method of claim **43**, wherein the first low level block protocol is an FCP protocol and the second low level block protocol is a protocol other than FCP.

**45**. The method of claim **37**, wherein the map comprises one or more tables.

**46**. The method of claim **37**, wherein the virtual local storage is provided to the devices connected to the first transport medium in a manner that is transparent to the devices and wherein the storage space allocated to the devices connected to the first transport medium appears to the devices as local storage.

**47**. The method of claim **37**, wherein the storage router provides centralized control of what the devices connected to the first transport medium see as local storage.

**48**. The method of claim **37**, wherein the representations of storage space comprise logical unit numbers that represent a subset of storage on the remote storage devices.

US 7,934,041 B2

13

**49**. The method of claim **48**, wherein the storage router is operable to route requests to the same logical unit number from different devices connected to the first transport medium to different subsets of storage space on the remote storage devices.

**50**. The method of claim **37**, wherein the representations of devices connected to the first transport medium are unique identifiers.

**51**. The method of claim **50**, wherein the unique identifiers are world wide names.

**52**. The method of claim **51**, wherein the storage router is configured to allow modification of the map in a manner

14

transparent to and without involvement of the devices connected to the first transport medium.

**53**. The method of claim **1** wherein connecting the storage router between a set of devices connected to a first transport medium and a set of remote storage devices further comprises connecting the storage router between a first fibre channel transport medium and a second fibre channel transport medium.

* * * * *



US007051147B2

(12) **United States Patent**
Hoese et al.

(10) **Patent No.:** US 7,051,147 B2
(45) **Date of Patent:** *May 23, 2006

(54) **STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE**

(75) Inventors: **Geoffrey B. Hoese**, Austin, TX (US); **Jeffry T. Russell**, Cibolo, TX (US)

(73) Assignee: **Crossroads Systems, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/658,163**

(22) Filed: **Sep. 9, 2003**

(65) **Prior Publication Data**

US 2004/0054838 A1    Mar. 18, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 10/081,110, filed on Feb. 22, 2002, now Pat. No. 6,789,152, which is a continuation of application No. 09/354,682, filed on Jul. 15, 1999, now Pat. No. 6,421,753, which is a continuation of application No. 09/001,799, filed on Dec. 31, 1997, now Pat. No. 5,941,972.

(51) **Int. Cl.**
*G06F 13/00*    (2006.01)

(52) **U.S. Cl.** ........................ **710/305**; 710/11; 709/258

(58) **Field of Classification Search** ................ 710/1–5, 710/8–13, 22–28, 104–105, 305–306, 325, 710/250, 126–131, 36–38; 709/250, 258; 714/42; 711/112, 113, 110
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,082,406 | A | 3/1963 | Stevens |
| 4,092,732 | A | 5/1978 | Ouchi |
| 4,415,970 | A | 11/1983 | Swenson et al. |
| 4,455,605 | A | 6/1984 | Cormier et al. |
| 4,504,927 | A | 3/1985 | Callan |

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0810 530 A2    12/1997

(Continued)

OTHER PUBLICATIONS

DIGITAL StorageWorks, Using Your HSZ70 Array Controller in a SCSI Controller Shelf (DS-BA356-M Series), *User's Guide*, pp. 1-1 through A-5 with index, Jan. 1998.

*Primary Examiner*—Christopher Shin
(74) *Attorney, Agent, or Firm*—Sprinkle IP Law Group

(57) **ABSTRACT**

A storage router and storage network provide virtual local storage on remote storage devices to Fiber Channel devices. A plurality of Fiber Channel devices, such as workstations, are connected to a Fiber Channel transport medium, and a plurality of storage devices are connected to a second Fiber Channel transport medium. The storage router interfaces between the Fiber Channel transport media. The storage router maps between the workstations and the storage devices and implements access controls for storage space on the storage devices. The storage router then allows access from the workstations to the storage devices using native low level, block protocol in accordance with the mapping and the access controls.

**39 Claims, 2 Drawing Sheets**



**Cisco Systems, Inc. and Quantum Corporation v. Crossroads Systems, Inc.**
CQ-1001 / Page 1 of 14

US 7,051,147 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4,533,996 | A | 8/1985 | Gartung et al. | 5,487,077 | A | 1/1996 | Hassner et al. |
| 4,573,152 | A | 2/1986 | Greene et al. | 5,491,812 | A | 2/1996 | Pisello et al. |
| 4,603,380 | A | 7/1986 | Easton et al. | 5,495,474 | A | 2/1996 | Olnowich et al. |
| 4,620,295 | A | 10/1986 | Aiden, Jr. | 5,496,576 | A | 3/1996 | Jeong |
| 4,644,462 | A | 2/1987 | Matsubara et al. | 5,504,857 | A | 4/1996 | Baird et al. |
| 4,695,948 | A | 9/1987 | Blevins et al. | 5,507,032 | A | 4/1996 | Kimura |
| 4,697,232 | A | 9/1987 | Brunelle et al. | 5,511,169 | A | 4/1996 | Suda |
| 4,751,635 | A | 6/1988 | Kret | 5,519,695 | A | 5/1996 | Purohit et al. |
| 4,787,028 | A | 11/1988 | Finforck et al. | 5,530,845 | A | 6/1996 | Hiatt et al. |
| 4,807,180 | A | 2/1989 | Takeuchi et al. | 5,535,352 | A | 7/1996 | Bridges et al. |
| 4,811,278 | A | 3/1989 | Bean et al. | 5,537,585 | A | 7/1996 | Blickerstaff et al. |
| 4,821,179 | A | 4/1989 | Jensen et al. | 5,544,313 | A | 8/1996 | Shachnai et al. |
| 4,825,406 | A | 4/1989 | Bean et al. | 5,548,791 | A | 8/1996 | Casper et al. |
| 4,827,411 | A | 5/1989 | Arrowood et al. | 5,564,019 | A | 10/1996 | Beausoleil et al. |
| 4,835,674 | A | 5/1989 | Collins et al. | 5,568,648 | A | 10/1996 | Coscarella et al. |
| 4,864,532 | A | 9/1989 | Reeve et al. | 5,581,709 | A | 12/1996 | Ito et al. |
| 4,897,874 | A | 1/1990 | Lidensky et al. | 5,581,714 | A | 12/1996 | Amini et al. |
| 4,947,367 | A | 8/1990 | Chang et al. | 5,581,724 | A | 12/1996 | Belsan et al. |
| 4,961,224 | A | 10/1990 | Yung | 5,596,562 | A | 1/1997 | Chen |
| 5,072,378 | A | 12/1991 | Manka | 5,596,736 | A | 1/1997 | Kerns |
| 5,077,732 | A | 12/1991 | Fischer et al. | 5,598,541 | A | 1/1997 | Malladi |
| 5,077,736 | A | 12/1991 | Dunphy, Jr. et al. | 5,613,082 | A | 3/1997 | Brewer et al. |
| 5,124,987 | A | 6/1992 | Milligan et al. | 5,621,902 | A | 4/1997 | Cases et al. |
| 5,155,845 | A | 10/1992 | Beal et al. | 5,632,012 | A | 5/1997 | Belsan et al. |
| 5,163,131 | A | 11/1992 | Row et al. | 5,634,111 | A | 5/1997 | Oeda et al. |
| 5,185,876 | A | 2/1993 | Nguyen et al. | 5,638,518 | A | 6/1997 | Malladi |
| 5,193,168 | A | 3/1993 | Corrigan et al. | 5,642,515 | A | 6/1997 | Jones et al. |
| 5,193,184 | A | 3/1993 | Belsan et al. | 5,659,756 | A | 8/1997 | Hefferon et al. |
| 5,202,856 | A | 4/1993 | Glider et al. | 5,664,107 | A | 9/1997 | Chatwani et al. |
| 5,210,866 | A | 5/1993 | Milligan et al. | 5,680,556 | A | 10/1997 | Begun et al. |
| 5,212,785 | A | 5/1993 | Powers et al. | 5,701,491 | A | 12/1997 | Dunn et al. |
| 5,214,778 | A | 5/1993 | Glider et al. | 5,712,976 | A | 1/1998 | Falcon, Jr. et al. |
| 5,226,143 | A | 7/1993 | Baird et al. | 5,727,218 | A | 3/1998 | Hotchkin |
| 5,239,632 | A | 8/1993 | Larner | 5,729,705 | A | 3/1998 | Weber |
| 5,239,643 | A | 8/1993 | Blount et al. | 5,743,847 | A | 4/1998 | Nakamura et al. |
| 5,239,654 | A | 8/1993 | Ing-Simmons | 5,748,924 | A | 5/1998 | Llorens et al. |
| 5,247,638 | A | 9/1993 | O'Brien et al. | 5,751,975 | A | 5/1998 | Gillespie et al. |
| 5,247,692 | A | 9/1993 | Fujimura | 5,768,623 | A | 6/1998 | Judd et al. |
| 5,257,386 | A | 10/1993 | Saito | 5,774,683 | A | 6/1998 | Gulick |
| 5,297,287 | A | 3/1994 | Cox et al. | 5,781,715 | A | 7/1998 | Sheu |
| 5,301,290 | A | 4/1994 | Tetzlaff et al. | 5,802,278 | A | 9/1998 | Isfeld et al. |
| 5,315,657 | A | 5/1994 | Abadi et al. | 5,805,816 | A | 9/1998 | Picazo, Jr. et al. |
| 5,317,739 | A | 5/1994 | Elko et al. | 5,809,328 | A | 9/1998 | Nogales et al. |
| 5,331,673 | A | 7/1994 | Elko et al. | 5,812,754 | A | 9/1998 | Lui et al. |
| 5,347,384 | A | 9/1994 | McReynolds et al. | 5,835,496 | A | 11/1998 | Yeung et al. |
| 5,361,347 | A | 11/1994 | Glider et al. | 5,845,107 | A | 12/1998 | Fisch et al. |
| 5,367,646 | A | 11/1994 | Pardillos et al. | 5,848,251 | A | 12/1998 | Lomelino et al. |
| 5,379,385 | A | 1/1995 | Shomler | 5,857,080 | A | 1/1999 | Jander et al. |
| 5,379,398 | A | 1/1995 | Cohn et al. | 5,860,137 | A | 1/1999 | Raz et al. |
| 5,388,243 | A | 2/1995 | Glider et al. | 5,864,653 | A | 1/1999 | Tavallaei et al. |
| 5,388,246 | A | 2/1995 | Kasai | 5,867,648 | A | 2/1999 | Foth et al. |
| 5,394,526 | A | 2/1995 | Crouse et al. | 5,884,027 | A | 3/1999 | Garbus et al. |
| 5,396,596 | A | 3/1995 | Hashemi et al. | 5,889,952 | A | 3/1999 | Hunnicutt et al. |
| 5,403,639 | A | 4/1995 | Belsan et al. | 5,913,045 | A | 6/1999 | Gillespie et al. |
| 5,410,667 | A | 4/1995 | Belsan et al. | 5,923,557 | A | 7/1999 | Eidson |
| 5,410,697 | A | 4/1995 | Baird et al. | 5,933,824 | A | 8/1999 | DeKoning et al. |
| 5,414,820 | A | 5/1995 | McFarland et al. | 5,935,260 | A | 8/1999 | Ofer |
| 5,416,915 | A | 5/1995 | Mattson et al. | 5,941,969 | A | 8/1999 | Ram et al. |
| 5,418,909 | A | 5/1995 | Jachowski et al. | 5,941,972 | A | * | 8/1999 | Hoese et al. ................ 710/315 |
| 5,420,988 | A | 5/1995 | Elliott | 5,953,511 | A | 9/1999 | Sescila et al. |
| 5,423,026 | A | 6/1995 | Cook et al. | 5,959,994 | A | 9/1999 | Boggs et al. |
| 5,423,044 | A | 6/1995 | Sutton et al. | 5,974,530 | A | 10/1999 | Young |
| 5,426,637 | A | 6/1995 | Derby et al. | 5,978,379 | A | * | 11/1999 | Chan et al. ................ 370/403 |
| 5,430,855 | A | 7/1995 | Wash et al. | 5,991,797 | A | 11/1999 | Futral et al. |
| 5,450,570 | A | 9/1995 | Richek et al. | 6,000,020 | A | * | 12/1999 | Chin et al. ................ 711/162 |
| 5,452,421 | A | 9/1995 | Beardsley et al. | 6,021,451 | A | 2/2000 | Bell et al. |
| 5,459,857 | A | 10/1995 | Ludlam et al. | 6,041,381 | A | 3/2000 | Hoese |
| 5,463,754 | A | 10/1995 | Beausoleil et al. | 6,055,603 | A | 4/2000 | Ofer et al. |
| 5,465,382 | A | 11/1995 | Day, III et al. | 6,065,087 | A | 5/2000 | Keaveny et al. |
| 5,469,576 | A | 11/1995 | Dauerer et al. | 6,070,253 | A | 5/2000 | Tavallaei et al. |
| 5,471,609 | A | 11/1995 | Yudenfriend | 6,073,209 | A | 6/2000 | Bergsten |
| | | | | 6,073,218 | A | 6/2000 | DeKoning et al. |
| | | | | 6,075,863 | A | 6/2000 | Krishnan et al. |

CQ-1001 / Page 2 of 14

**US 7,051,147 B2**

Page 3

| | | | | |
|---|---|---|---|---|
| 6,081,849 A | 6/2000 | Born et al. | | |
| 6,098,149 A | 8/2000 | Ofer et al. | | |
| 6,108,684 A | 8/2000 | DeKoning et al. | | |
| 6,118,766 A | 9/2000 | Akers | | |
| 6,131,119 A | 10/2000 | Fukui | | |
| 6,134,617 A | 10/2000 | Weber | | |
| 6,141,737 A | 10/2000 | Krantz et al. | | |
| 6,145,006 A | 11/2000 | Vishlitsky et al. | | |
| 6,148,004 A | 11/2000 | Nelson et al. | | |
| 6,185,203 B1 * | 2/2001 | Berman | 370/351 | |
| 6,209,023 B1 | 3/2001 | Dimitroff et al. | | |
| 6,219,771 B1 | 4/2001 | Kikuchi et al. | | |
| 6,223,266 B1 | 4/2001 | Sartore | | |
| 6,230,218 B1 | 5/2001 | Casper et al. | | |
| 6,260,120 B1 | 7/2001 | Blumenau et al. | | |
| 6,330,629 B1 | 12/2001 | Kondo et al. | | |
| 6,341,315 B1 | 1/2002 | Arroyo et al. | | |
| 6,343,324 B1 | 1/2002 | Hubis et al. | | |
| 6,363,462 B1 | 3/2002 | Bergsten | | |
| 6,421,753 B1 * | 7/2002 | Hoese et al. | 710/305 | |
| 6,425,035 B1 * | 7/2002 | Hoese et al. | 710/105 | |
| 6,425,036 B1 | 7/2002 | Hoese et al. | | |
| 6,484,245 B1 | 11/2002 | Sanada et al. | | |
| 6,529,996 B1 | 3/2003 | Nguyen et al. | | |
| 6,738,854 B1 * | 5/2004 | Hoese et al. | 710/305 | |
| 6,763,419 B1 * | 7/2004 | Hoese et al. | 709/250 | |
| 6,789,152 B1 * | 9/2004 | Hoese et al. | 710/305 | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0827059 A2 | 3/1998 |
| GB | 2296798 A | 7/1996 |
| GB | 2297636 A | 8/1996 |
| GB | 2341715 | 3/2000 |
| JP | 6301607 | 10/1994 |
| JP | 8-230895 | 9/1996 |
| WO | WO 98/36357 | 8/1998 |
| WO | WO 99/34297 A1 | 7/1999 |

OTHER PUBLICATIONS

DIGITAL StorageWorks, HSZ70 Array Controller HSOF Version 7.0 (EK-HSZ70-CG.A01), *Configuration Manual*, pp. 1-2 through G15 with index, Jul. 1997.

DIGITAL StorageWorks, HSZ70 Array Controller HSOF Version 7.0, *CLI Reference Manual*, pp. 1-156, Jul. 1997.

Decision Returning Petition mailed Feb. 28, 2005.

Block-Based Distributed File Systems, Anthony J. McGregor, Jul. 1997.

Compaq StorageWorks HSG80 Array Controller ACS Version 8.3 (Maintenance and Service Guide) Nov. 1998.

Compaq StorageWorks HSG80 Array Controller ACS Version 8.3 (Configuration and CLI Reference Guide) Nov. 1998.

CRD-5500 SCSI RAID Controller User's Manual CMD Technology, Inc. pp. 1-1 to 6-25, revised Nov. 21, 1996.

DIGITAL Storage Works, HSZ70 Array Controller, HSOF Version 7.0 EK-HSZ70-CG. A01, Digital Equipment Corporation, Maynard, Massachusetts.

DIGITAL StorageWorks HSZ70 Array Controller HSOF Version 7.0 EK-HSZ270-RM. A01 CLI Reference Manual.

DIGITAL StorageWorks HSZ70 Array Controller HSOF Version 7.0 EK-HSZ70-SV. A01, 1997.

DIGITAL StorageWorks HSG80 Array Controller ACS Version 8.0 (User's Guide Jan. 1998).

DP5380 Asynchronous SCSI Interface, National Semiconductor Corporation, Arlington, TX, May 1989, pp. 1-32.

Emerson, "Ancor Communications: Performance evaluation of switched fibre channel I/O system using—FCP for SCSI" Feb. 1, 1995, IEEE, pp. 479-484.

Fibre Channel and ATM: The Physical Layers, Jerry Quam WESCON/94, published Sep. 27-29, 1994. pp. 648-652.

Fiber Channel storage interface for video-on-demand servers by Anazaloni, et al, Jun. 15, 1905.

Gen5 S-Series XL System Guide Revision 1.01 by Chen, Jun. 18, 1905.

Graphical User Interface for MAXSTRAT Gen5/Gen-S Servers User's guide 1.1, Jun. 11, 1996.

High Performance Data transfers Using Network-Attached Peripherals at the national Storage Laboratory by Hyer, Feb. 26, 1993.

IFT-3000 SCSI to SCSI Disk array Controller Instruction Manual Revision 2.0 by Infotrend Technologies, Inc., 1995.

Implementing a Fibre Channel SCSI transport by Snively, 1994.

"InfoServer 150—Installation and Owner's Guide", EK-INFSV-OM-001, Digital Equipment Corporation, Maynard, Massachusettes 1991, Chapters 1 and 2.

InforServer 150VXT Photograph.

Infoserver 100 System Operations Guide, First Edition Digital Equipment Corporation, 1990.

Johnson, D.B., et al., "The Peregrine High Performance RPC System", Software-Practice and Experience, 23(2):201-221, Feb. 1993.

Local-Area networks for the IBM PC by Haugdahl.

Misc. Reference Manual Pages, SunOS 5.09.

New serial I/Os speed storage subsystems by Bursky, Feb. 6, 1995.

Petal: Distributed Virtual Disks, Edward K. Lee and Chandramohan A. Thekkath, ACM SIGPLAN Notices, vol. 31, Issue 9, Sep. 1996, pp. 84-92.

Pictures of internal components of the InfoServer 150, taken from http://bindarydinosaurs.couk/Museum/Digital/infoserver/infoserver.php in Nov. 2004.

Raidtec FibreArray and Raidtec FlexArray UltraRAID Systems, Windows IT PRO Article, Oct. 1997.

S.P. Joshi, "Ethernet controller chip interfaces with variety of 16-bit processors," electronic Design, Hayden Publishing Co., Inc., Rochelle Part, NJ, Oct. 14, 1982. pp. 193-200.

Simplest Migration to Fibre Channel Technology Article, Digital Equipment Corporation, Nov. 10, 1997, published on PR Newswire.

Systems Architectures Using Fibre Channel, Roger Cummings, Twelfth IEEE Symposium on Mass Storage Systems, Copyright 1993 IEEE. pp. 251-256.

Dot Hill's Request to Exceed Page Limit in Motion for Summary Judgment filed Jun. 29, 2005. Case No. A-03-CV-754 (SS).

Request for Ex Parte Reexamination for 6,425,035. Third Party Requester: William A. Blake.

Request for Ex Parte Reexamination for 6,425,035. Third Party Requester: Natu J. Patel.

Office Action dated Jan. 21, 2003 for 10/174,720 (CROSS1120-8).

Office Action dated Feb. 27, 2001 for 09/354,682 (CROSS1120-1).

Office Action dated Aug. 11, 2000 for 09/354,682 (CROSS1120-1).

Office Action dated Dec. 16, 1999 for 09/354,682 (CROSS1120-1).

Office Action dated Nov. 6, 2002 for 10/023,786 (CROSS1120-4).

Office Action dated Jan. 21, 2003 for 10/081,110 (CROSS1120-5).

Appx19693

US 7,051,147 B2

Page 4

Office Action in Ex Parte Reexamination 90/007,127, mailed Feb. 7, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,127 filed on Apr. 6, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,125 and 90/007,317 filed on Apr. 6, 2005.

Office Action in Ex Parte Reexamination 90/007,126, mailed Feb. 7, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,126 filed on Apr. 6, 2005.

Office Action in Ex Parte Reexamination 90/007,124, mailed Feb. 7, 2005.

Office Action in Ex Parte Reexamination 90/007,123, mailed Feb. 7, 2005.

Reply to Office Action Under Ex Parte Reexamination Dated Feb. 2, 2007 for 90/007,123 filed on Apr. 5, 2005.

European Office Action issued Apr. 1, 2004 in Application No. 98966104.6-2413.

Fiber Channel (FCS)/ATM Interworking: A Design Solution by Anzaloni, et al.

Copies of the following are on the attached CD-Rom.

Defendant's First Supplemental Trial Exhibit List, Crossroads Systems, Inc., v. Chaparral Network Storage, Inc., C.A. No. A-00CA-217-SS (W.D. Tex. 2001). (CD-Rom).

Defendant's Third Supplemental Trial Exhibit List, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001) (CD-Rom).

Defendant Chaparral Network Storage, Inc.'s First Supplemental Trial Exhibit List (D1 through D271) (CD-ROM Chaparral Exhibits ExList_Def), Sep. 2, 2001.

Plaintiff's Fourth Amended Trial Exhibit List, Crossroads Systems, Inc. v. Chaparral Network Storage, Inc, C.A. No. A-00CA-217-SS (W.D. Tex. 2001) (CD-Rom), Sep. 11, 2001.

Trail Transcripts, Crossroads Systems, Inc. v. Chaparral Network Storage, Inc., C.A. No. A-00CA-217-SS (W.D. Tex. 2001). (CD-Rom).

Trail Transcripts, Crossroads Systems, Inc. v. Pathlight Technology, Inc., C.A. No. A-00CA-248-SS (W.D. Tex. 2001). (CD-Rom).

Datasheet for CrossPoint 4100 Fibre Channel to SCSI Router (Dedek Ex 41 (ANCT 117-120)) (CD-ROM Chaparral Exhibits D012).

Symbios Logic- Software Interface Specification Series 3 SCSI RAID Controller Software Release 02.xx (Engelbrecht Ex 2 (LSI 1421-1658)) (CD-ROM Chaparral Exhibits D013), Dec. 3, 1997.

Press Release- Symbios Logic to Demonstrate Strong Support for Fibre Channel at Fall Comdex (Engelbrecht 12 (LSI 2785-86)) (CD-ROM Chaparral Exhibits D016), Nov. 13, 1996.

OEM Datasheet on the 3701 Controller (Engelbrecht 13 (LSI 01837-38)) (CD-ROM Chaparral Exhibits D017), Jun. 17, 1905.

Nondisclosure Agreement Between Adaptec and Crossroads Dated Oct. 17, 1996 (Quisenberry Ex 25 (CRDS 8196)) (CD-ROM Chaparral Exhibits D020).

Organizational Presentation on the External Storage Group (Lavan Ex 1 (CNS 182242-255)) (CD-ROM Chaparral Exhibits D021), Apr. 11, 1996.

Bridge. C, Bridge Between SCSI-2 and SCSI-3 FCP (Fibre Channel Protocol) (CD-ROM Chaparral Exhibits P214).

Bridge Phase II Architecture Presentation (Lavan Ex 2 (CNS 182287-295)) (CD-ROM Chaparral Exhibits D022), Apr. 12, 1996.

Attendees/Action Items from Apr. 12, 1996 Meeting at BTC (Lavan Ex 3 (CNS 182241)) (CD-ROM Chaparral Exhibits D023), Apr. 12, 1996.

Brooklyn Hardware Engineering Requirements Documents, Revision 1.4 (Lavan Ex 4 (CNS 178188-211)) (CD-ROM Chaparral Exhibits D024) by Pecone, May 26, 1996.

Brooklyn Single-Ended SCSI RAID Bridge Controller Hardware OEM Manual, Revision 2.1 (Lavan EX 5 (CNS 177169-191)) (CD-ROM Chaparral Exhibits D025), Mar. 21, 1996.

Coronado Hardware Engineering Requirements Document, Revision 0.0 (Lavan Ex 7 (CNS 176917-932)) (CD-ROM Chaparral Exhibits D027) by O'Dell, Sep. 30, 1996.

ESS/FPG Organization (Lavan Ex 8 (CNS 178639-652)) (CD-ROM Chaparral Exhibits D028), Dec. 6, 1996.

Adaptec MCS ESS Presents: Intelligent External I/O Raid Controllers "Bridge" Strategy (Lavan Ex 9 (CNS 178606-638)). (CD-ROM Chaparral Exhibits D029), Feb. 6, 1996.

AEC-7313 Fibre Channel Daughter Board (for Brooklyn) Engineering Specification, Revision 1.0 (Lavan Ex 10 (CNS 176830-850)) (CD-ROM Chaparral Exhibits D030), Feb. 27, 1997.

Bill of Material (Lavan Ex 14 (CNS 177211-214)) (CD-ROM Chaparral Exhibits D034), Jul. 24, 1997.

AEC- 4412B, AEC-7412/B2 External RAID Controller Hardware OEM Manual, Revision 2.0 (Lavan Ex 15 (CNS 177082-123)) (CD-ROM Chaparral Exhibits D035), Jun. 27, 1997.

Coronado II, AEC-7312A Fibre Channel Daughter (for Brooklyn) Hardware Specification, Revision 1.2 (Lavan Ex 16 (CNS 177192-210)) (CD-ROM Chaparral Exhibits D036) by Tom Yang, Jul. 18, 1997.

AEC-4412B, AEC7412/3B External RAID Controller Hardware OEM Manual, Revision 3.0. (Lavan Ex 17 (CNS 177124-165)) (CD-ROM Chaparral Exhibits D037), Aug. 25, 1997.

Memo Dated Aug. 15, 1997 to AEC-7312A Evaluation Unit Customers re: B001 Release Notes (Lavan Ex 18 (CNS 182878-879)) (CD-ROM Chaparral Exhibits D038).

Brooklyn Main Board (AES-0302) MES Schedule (Lavan Ex 19 (CNS 177759-763)) (CD-ROM Chaparral Exhibits D039), Feb. 11, 1997.

News Release-Adaptec Adds Fibre Channel Option to its External RAID Controller Family (Lavan Ex 20 (CNS 182932-934)) (CD-ROM Chaparral Exhibits D040), May 6, 1997.

AEC-4412B/7412B User's Guide, Rev. A (Lavan Ex 21) (CD-ROM Chaparral Exhibits D041), Jun. 19, 1905.

Data Book- AIC-7895 PCI Bus Master Single Chip SCSI Host Adapter (Davies Ex 1 (CNS 182944-64)) (CD-ROM Chaparral Exhibits D046), May 21, 1996.

Data Book- AIC-1160 Fibre Channel Host Adapter ASIC (Davies Ex 2 (CNS 181800-825)) (CD-ROM Chaparral Exhibits D047), Jun. 18, 1905.

Viking RAID Software (Davies Ex 3 (CNS 180969-181026)) (CD-ROM Chaparral Exhibits D048), Jun. 18, 1905.

Header File with Structure Definitions (Davies Ex 4 (CNS 180009-018)) (CD-ROM Chaparral Exhibits D049), Aug. 8, 1996.

US 7,051,147 B2

Page 5

C++ SourceCode for the SCSI Command Handler (Davies Ex 5 (CNS 179136-168)) (CD-ROM Chaparral Exhibits D050), Aug. 8, 1996.

Header File Data Structure (Davies Ex 6 (CNS 179997-180008)) (CD-ROM Chaparral Exhibits D051), Jan. 2, 1997.

SCSI Command Handler (Davies Ex 7 (CNS 179676-719)) (CD-ROM Chaparral Exhibits D052), Jan. 2, 1997.

Coronado: Fibre Channel to SCSI Intelligent RAID Controller Product Brief (Kalwitz Ex I (CNS 182804-805)) (CD-ROM Chaparral Exhibits D053).

Bill of Material (Kalwitz Ex 2 (CNS 181632-633)) (CD-ROM Chaparral Exhibits D054), Mar. 17, 1997.

Emails Dated Jan. 13-Mar. 31, 1997 from P. Collins to Mo re: Status Reports (Kalwitz Ex 3 (CNS 182501-511)) (CD-ROM Chaparral Exhibits D055).

Hardware Schematics for the Fibre Channel Daughtercard Coronado (Kalwitz Ex 4 (CNS 181639-648)) (CD-ROM Chaparral Exhibits D056).

Adaptec Schematics re AAC-340 (Kalwitz Ex 14 (CNS 177215-251)) (CD-ROM Chaparral Exhibits D057).

Bridge Product Line Review (Manzanares Ex 3 (CNS 177307-336)) (CD-ROM Chaparral Exhibits D058).

AEC Bridge Series Products-Adaptec External Controller RAID Products Pre-Release Draft, v.6 (Manzanares Ex 4 (CNS 174632-653)). (CD-ROM Chaparral Exhibits D059), Oct. 28, 1997.

Hewlett-Packard Roseville Site Property Pass for Brian Smith (Dunning Ex 14 (HP 489) (CD-ROM Chaparral Exhibits D078), Nov. 7, 1996.

Distribution Agreement Between Hewlett-Packard and Crossroads (Dunning Ex 15 (HP 326-33) (CD-ROM Chaparral Exhibits D079).

HPFC-5000 Tachyon User's Manuel, First Edition (PTI 172419-839) (CD-ROM Chaparral Exhibits D084), May 1, 1996.

X3T10 994D—(Draft) Information Technology: SCSI-3 Architecture Model, Rev. 1.8 (PTI 165977) (CD-ROM Chaparral Exhibits D087).

X3T10 Project 1047D: Information Technology- SCSI-3 Controller Commands (SCC), Rev, 6c (PTI 166400-546) (CD-ROM Chaparral Exhibits D088), Sep. 3, 1996.

X3T10 995D- (Draft) SCSI-3 Primary Commands, Rev. 11 (Wanamaker Ex 5 (PTI 166050-229)) (CD-ROM Chaparral Exhibits D089), Nov. 13, 1996.

VBAR Volume Backup and Restore (CRDS 12200-202) (CD-ROM Chaparral Exhibits D099).

Preliminary Product Literature for Infinity Commstor's Fibre Channel to SCSI Protocol Bridge (Smith Ex 11; Quisenberry Ex 31 (SPLO 428-30) (CD-ROM Chaparral Exhibits D143), Aug. 19, 1996.

Letter dated Jul. 12, 1996 from J. Boykin to B. Smith re: Purchase Order for Evaluation Units from Crossroads (Smith Ex 24) CRDS 8556-57) (CD-ROM Chaparral Exhibits D144), Jul. 12, 1996.

CrossPoint 4100 Fibre Channel to SCSI Router Preliminary Datasheet (Hulsey Ex 9 (CRDS 16129-130)) (CD-ROM Chaparral Exhibits D145), Nov. 1, 1996.

CrossPoint 4400 Fibre Channel to SCSI Router Preliminary Datasheet (Bardach Ex. 9 Quisenberry Ex 33 (CRDS 25606-607)) (CD-ROM Chaparral Exhibits D153), Nov. 1, 1996.

Fax Dated Jul. 22, 1996 from L. Petti to B. Smith re: Purchase Order from Data General for FC2S Fibre to Channel SCSI Protocol Bridge Model 11 (Smith Ex 25; Quisenberry Ex 23; Bardach Ex 11 (CRDS 8552-55;8558) (CD-ROM Chaparral Exhibits D155).

Email Dated Dec. 20, 1996 from J. Boykin to B. Smith re: Purchase Order for Betas in Feb. and Mar. (Hoese Ex 16, Quisenberry Ex 25; Bardach Ex 12 (CRDS 13644-650) (CD-ROM Chaparral Exhibits D156).

Infinitiy Commstor Fibre Channel Demo for Fall Comdex, 1996 (Hoese Ex 15, Bardach Ex 13 (CRDS 27415) (CD-ROM Chaparral Exhibits D157).

Fax Dated Dec. 19, 1996 from B. Bardach to T. Rarich re: Purchase Order Information (Bardach Ex. 14; Smith Ex 16 (CRDS 4460)) (CD-ROM Chaparral Exhibits D158).

Miscellaneous Documents Regarding Comdex (Quisenberry Ex 2 (CRDS 27415-465)) (CD-ROM Chaparral Exhibits D165).

CrossPoint 4100 Fibre Channel to SCSI Router Preliminary Datasheet (Quisenberry Ex 3 (CRDS 4933-34) (CD-ROM Chaparral Exhibits D166) (CD-ROM Chaparral Exhibits D166).

CrossPoint 4400 Fibre to Channel to SCSI Router Preliminary Datasheet; Crossroads Company and Product Overview (Quisenberry Ex 4 (CRDS 25606; 16136)) (CD-ROM Chaparral Exhibits D167).

Crossroads Purchase Order Log (Quisenberry Ex 9 (CRDS 14061-062)) (CD-ROM Chaparral Exhibits D172).

RAID Manager 5 with RDAC 5 for UNIX V.4 User's Guide (LSI-01854) (CD-ROM Chaparral Exhibits P062), Sep. 1, 1996.

Letter dated May 12, 1997 from Alan G. Leal to Barbara Bardach enclosing the original OEM License and Purchase Agreement between Hewlett-Package Company and Crossroads Systems, Inc. (CRDS 02057) (CD-ROM Chaparral Exhibits P130).

CR4x00 Product Specification (CRDS 43929) (CD-ROM Chaparral Exhibits P267), Jun. 1, 1998.

Symbios Logic—Hardware Function Specification for the Symbios Logic Series 3 Fibre Channel Disk Array Controller Model 3701 (Engelbrecht Ex 3 (LSI-1659-1733) (CD-ROM Pathlight Exhibits D074).

Report of the Working Group on Storage I/O for Large Scale Computing; Department of Computer Science Duke University: CS-1996-21 (PTI 173330-347). (CD-ROM Pathlight Exhibits D098).

Brian Allison's 1999 Third Quarter Sales Plan (PDX 38 ) CNS 022120-132)) (CD-ROM Pathlight Exhibits D201), Jun. 5, 2001.

Brooklyn SCSI-SCSI Intellegent External RAID Bridge Definition Phase External Documentation (CD-ROM Pathlight Exhibits D129).

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*



FIG. 4

FIG. 5

U.S. Patent

May 23, 2006

Sheet 2 of 2

US 7,051,147 B2

CQ-1001 / Page 7 of 14

US 7,051,147 B2

**1**

## STORAGE ROUTER AND METHOD FOR PROVIDING VIRTUAL LOCAL STORAGE

### RELATED APPLICATIONS

This application is a continuation of and claims the benefit of the filing dates of U.S. patent application Ser. No. 10/081,110 by inventors Geoffrey B. Hoese and Jeffry T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Feb. 22, 2002, now U.S. Pat. No. 6,789,152 which in turn is a continuation of U.S. application Ser. No. 09/354,682 by inventors Geoffrey B. Hoese and Jeffry T. Russell, entitled "Storage Router and Method for Providing Virtual Local Storage" filed on Jul. 15, 1999, now U.S. Pat. No. 6,421,753, which in turn is a continuation of U.S. patent application Ser. No. 09/001,799, filed on Dec. 31, 1997, now U.S. Pat. No. 5,941,972, and hereby incorporates these applications by reference in their entireties as if they had been fully set forth herein.

### TECHNICAL FIELD OF THE INVENTION

This invention relates in general to network storage devices, and more particularly to a storage router and method for providing virtual local storage on remote SCSI storage devices to Fibre Channel devices.

### BACKGROUND OF THE INVENTION

Typical storage transport mediums provide for a relatively small number of devices to be attached over relatively short distances. One such transport medium is a Small Computer System Interface (SCSI) protocol, the structure and operation of which is generally well known as is described, for example, in the SCSI-1, SCSI-2 and SCSI-3 specifications. High speed serial interconnects provide enhanced capability to attach a large number of high speed devices to a common storage transport medium over large distances. One such serial interconnect is Fibre Channel, the structure and operation of which is described, for example, in *Fibre Channel Physical and signaling Interface* (FC-PH), ANSI X3.230 *Fibre Channel Arbitrated Loop* (FC-AL), and ANSI X3.272 *Fibre Channel Private Loop Direct Attach* (FC-PLDA).

Conventional computing devices, such as computer workstations, generally access storage locally or through network interconnects. Local storage typically consists of a disk drive, tape drive, CD-ROM drive or other storage device contained within, or locally connected to the workstation. The workstation provides a file system structure, that includes security controls, with access to the local storage device through native low level, block protocols. These protocols map directly to the mechanisms used by the storage device and consist of data requests without security controls. Network interconnects typically provide access for a large number of computing devices to data storage on a remote network server. The remote network server provides file system structure, access control, and other miscellaneous capabilities that include the network interface. Access to data through the network server is through network protocols that the server must translate into low level requests to the storage device. A workstation with access to the server storage must translate its file system protocols into network protocols that are used to communicate with the server. Consequently, from the perspective of a workstation, or other computing device, seeking to access such server data, the access is much slower than access to data on a local storage device.

**2**

### SUMMARY OF THE INVENTION

In accordance with the present invention, a storage router and method for providing virtual local storage on remote SCSI storage devices to Fibre Channel devices are disclosed that provide advantages over conventional network storage devices and methods.

According to one aspect of the present invention, a storage router and storage network provide virtual local storage on remote SCSI storage devices to Fibre Channel devices. A plurality of Fibre Channel devices, such as workstations, are connected to a Fibre Channel transport medium, and a plurality of SCSI storage devices are connected to a SCSI bus transport medium. The storage router interfaces between the Fibre Channel transport medium and the SCSI bus transport medium. The storage router maps between the workstations and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. The storage router then allows access from the workstations to the SCSI storage devices using native low level, block protocol in accordance with the mapping and the access controls.

According to another aspect of the present invention, virtual local storage on remote SCSI storage devices is provided to Fibre Channel devices. A Fibre Channel transport medium and a SCSI bus transport medium are interfaced with. A configuration is maintained for SCSI storage devices connected to the SCSI bus transport medium. The configuration maps between Fibre Channel devices and the SCSI storage devices and implements access controls for storage space on the SCSI storage devices. Access is then allowed from Fibre Channel initiator devices to SCSI storage devices using native low level, block protocol in accordance with the configuration.

A technical advantage of the present invention is the ability to centralize local storage for networked workstations without any cost of speed or overhead. Each workstation access its virtual local storage as if it work locally connected. Further, the centralized storage devices can be located in a significantly remote position even in excess of ten kilometers as defined by Fibre Channel standards.

Another technical advantage of the present invention is the ability to centrally control and administer storage space for connected users without limiting the speed with which the users can access local data. In addition, global access to data, backups, virus scanning and redundancy can be more easily accomplished by centrally located storage devices.

A further technical advantage of the present invention is providing support for SCSI storage devices as local storage for Fibre Channel hosts. In addition, the present invention helps to provide extended capabilities for Fibre Channel and for management of storage subsystems.

### BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present invention and the advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. **1** is a block diagram of a conventional network that provides storage through a network server;

FIG. **2** is a block diagram of one embodiment of a storage network with a storage router that provides global access and routing;

US 7,051,147 B2

3

FIG. **3** is a block diagram of one embodiment of a storage network with a storage router that provides virtual local storage;

FIG. **4** is a block diagram of one embodiment of the storage router of FIG. **3**; and

FIG. **5** is a block diagram of one embodiment of data flow within the storage router of FIG. **4**.

DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** is a block diagram of a conventional network, indicated generally at **10**, that provides access to storage through a network server. As shown, network **10** includes a plurality of workstations **12** interconnected with a network server **14** via a network transport medium **16**. Each workstation **12** can generally comprise a processor, memory, input/output devices, storage devices and a network adapter as well as other common computer components. Network server **14** uses a SCSI bus **18** as a storage transport medium to interconnect with a plurality of storage devices **20** (tape drives, disk drives, etc.). In the embodiment of FIG. **1**, network transport medium **16** is an network connection and storage devices **20** comprise hard disk drives, although there are numerous alternate transport mediums and storage devices.

In network **10**, each workstation **12** has access to its local storage device as well as network access to data on storage devices **20**. The access to a local storage device is typically through native low level, block protocols. On the other hand, access by a workstation **12** to storage devices **20** requires the participation of network server **14** which implements a file system and transfers data to workstations **12** only through high level file system protocols. Only network server **14** communicates with storage devices **20** via native low level, block protocols. Consequently, the network access by workstations **12** through network server **14** is slow with respect to their access to local storage. In network **10**, it can Also be a logistical problem to centrally manage and administer local data distributed across an organization, including accomplishing tasks such as backups, virus scanning and redundancy.

FIG. **2** is a block diagram of one embodiment of a storage network, indicated at **30**, with a storage router that provides global access and routing. This environment is significantly different from that of FIG. **1** in that there is no network server involved. In FIG. **2**, a Fibre Channel high speed serial transport **32** interconnects a plurality of workstations **36** and storage devices **38**. A SCSI bus storage transport medium interconnects workstations **40** and storage devices **42**. A storage router **44** then serves to interconnect these mediums and provide devices on either medium global, transparent access to devices on the other medium. Storage router **44** routes requests from initiator devices on one medium to target devices on the other medium and routes data between the target and the initiator. Storage router **44** can allow initiators and targets to be on either side. In this manner, storage router **44** enhances the functionality of Fibre Channel **32** by providing access, for example, to legacy SCSI storage devices on SCSI bus **34**. In the embodiment of FIG. **2**, the operation of storage router **44** can be managed by a management station **46** connected to the storage router via a direct serial connection.

In storage network **30**, any workstation **36** or workstation **40** can access any storage device **38** or storage device **42** through native low level, block protocols, and vice versa. This functionality is enabled by storage router **44** which

4

routes requests and data as a generic transport between Fibre Channel **32** and SCSI bus **34**. Storage router **44** uses tables to map devices from one medium to the other and distributes requests and data across Fibre Channel **32** and SCSI bus **34** without any security access controls. Although this extension of the high speed serial interconnect provided by Fibre Channel **32** is beneficial, it is desirable to provide security controls in addition to extended access to storage devices through a native low level, block protocol.

FIG. **3** is a block diagram of one embodiment of a storage network, indicated generally at **50**, with a storage router that provides virtual local storage. Similar to that of FIG. **2**, storage network **50** includes a Fibre Channel high speed serial interconnect **52** and a SCSI bus **54** bridged by a storage router **56**. Storage router **56** of FIG. **3** provides for a large number of workstations **58** to be interconnected on a common storage transport and to access common storage devices **60**, **62** and **64** through native low level, block protocols.

According to the present invention, storage router **56** has enhanced functionality to implement security controls and routing such that each workstation **58** can have access to a specific subset of the overall data stored in storage devices **60**, **62** and **64**. This specific subset of data has the appearance and characteristics of local storage and is referred to herein as virtual local storage. Storage router **56** allows the configuration and modification of the storage allocated to each attached workstation **58** through the use of mapping tables or other mapping techniques.

As shown in FIG. **3**, for example, storage device **60** can be configured to provide global data **65** which can be accessed by all workstations **58**. Storage device **62** can be configured to provide partitioned subsets **66**, **68**, **70** and **72**, where each partition is allocated to one of the workstations **58** (workstations A, B, C and D). These subsets **66**, **68**, **70** and **72** can only be accessed by the associated workstation **58** and appear to the associated workstation **58** as local storage accessed using native low level, block protocols. Similarly, storage device **64** can be allocated as storage for the remaining workstation **58** (workstation E).

Storage router **56** combines access control with routing such that each workstation **58** has controlled access to only the specified partition of storage device **62** which forms virtual local storage for the workstation **58**. This access control allows security control for the specified data partitions. Storage router **56** allows this allocation of storage devices **60**, **62** and **64** to be managed by a management station **76**. Management station **76** can connect directly to storage router **56** via a direct connection or, alternately, can interface with storage router **56** through either Fibre Channel **52** or SCSI bus **54**. In the latter case, management station **76** can be a workstation or other computing device with special rights such that storage router **56** allows access to mapping tables and shows storage devices **60**, **62** and **64** as they exist physically rather than as they have been allocated.

The environment of FIG. **3** extends the concept of a single workstation having locally connected storage devices to a storage network **50** in which workstations **58** are provided virtual local storage in a manner transparent to workstations **58**. Storage router **56** provides centralized control of what each workstation **58** sees as its local drive, as well as what data it sees as global data accessible by other workstations **58**. Consequently, the storage space considered by the workstation **58** to be its local storage is actually a partition (i.e., logical storage definition) of a physically remote storage device **60**, **62** or **64** connected through storage router **56**. This means that similar requests from workstations **58** for

US 7,051,147 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

access to their local storage devices produce different accesses to the storage space on storage devices **60**, **62** and **64**. Further, no access from a workstation **58** is allowed to the virtual local storage of another workstation **58**.

The collective storage provided by storage devices **60**, **62** and **64** can have blocks allocated by programming means within storage router **56**. To accomplish this function, storage router **56** can include routing tables and security controls that define storage allocation for each workstation **58**. The advantages provided by implementing virtual local storage in centralized storage devices include the ability to do collective backups and other collective administrative functions more easily. This is accomplished without limiting the performance of workstations **58** because storage access involves native low level, block protocols and does not involve the overhead of high level protocols and file systems required by network servers.

FIG. **4** is a block diagram of one embodiment of storage router **56** of FIG. **3**. Storage router **56** can comprise a Fibre Channel controller **80** that interfaces with Fibre Channel **52** and a SCSI controller **82** that interfaces with SCSI bus **54**. A buffer **84** provides memory work space and is connected to both Fibre Channel controller **80** and to SCSI controller **82**. A supervisor unit **86** is connected to Fibre Channel controller **80**, SCSI controller **82** and buffer **84**. Supervisor unit **86** comprises a microprocessor for controlling operation of storage router **56** and to handle mapping and security access for requests between Fibre Channel **52** and SCSI bus **54**.

FIG. **5** is a block diagram of one embodiment of data flow within storage router **56** of FIG. **4**. As shown, data from Fibre Channel **52** is processed by a Fibre Channel (FC) protocol unit **88** and placed in a FIFO queue **90**. A direct memory access (DMA) interface **92** then takes data out of FIFO queue **90** and places it in buffer **84**. Supervisor unit **86** processes the data in buffer **84** as represented by supervisor processing **93**. This processing involves mapping between Fibre Channel **52** and SCSI bus **54** and applying access controls and routing functions. A DMA interface **94** then pulls data from buffer **84** and places it into a buffer **96**. A SCSI protocol unit **98** pulls data from buffer **96** and communicates the data on SCSI bus **54**. Data flow in the reverse direction, from SCSI bus **54** to Fibre Channel **52**, is accomplished in a reverse manner.

The storage router of the present invention is a bridge device that connects a Fibre Channel link directly to a SCSI bus and enables the exchange of SCSI command set information between application clients on SCSI bus devices and the Fibre Channel links. Further, the storage router applies access controls such that virtual local storage can be established in remote SCSI storage devices for workstations on the Fibre Channel link. In one embodiment, the storage router provides a connection for Fibre Channel links running the SCSI Fibre Channel Protocol (FCP) to legacy SCSI devices attached to a SCSI bus. The Fibre Channel topology is typically an Arbitrated Loop (FC_AL).

In part, the storage router enables a migration path to Fibre Channel based, serial SCSI networks by providing connectivity for legacy SCSI bus devices. The storage router can be attached to a Fibre Channel Arbitrated Loop and a SCSI bus to support a number of SCSI devices. Using configuration settings, the storage router can make the SCSI bus devices available on the Fibre Channel network as FCP logical units. Once the configuration is defined, operation of the storage router is transparent to application clients. In this manner, the storage router can form an integral part of the migration to new Fibre Channel based networks while providing a means to continue using legacy SCSI devices.

In one implementation (not shown), the storage router can be a rack mount or free standing device with an internal power supply. The storage router can have a Fibre Channel and SCSI port, and a standard, detachable power cord can be used, the FC connector can be a copper DB9 connector, and the SCSI connector can be a 68-pin type. Additional modular jacks can be provided for a serial port and a 802.3 10BaseT port, i.e. twisted pair Ethernet, for management access. The SCSI port of the storage router an support SCSI direct and sequential access target devices and can support SCSI initiators, as well. The Fibre Channel port can interface to SCSI-3 FCP enabled devices and initiators.

To accomplish its functionality, one implementation of the storage router uses: a Fibre Channel interface based on the HEWLETT-PACKARD TACHYON HPFC-5000 controller and a GLM media interface; an Intel 80960RP processor, incorporating independent data and program memory spaces, and associated logic required to implement a stand alone processing system; and a serial port for debug and system configuration. Further, this implementation includes a SCSI interface supporting Fast-20 based on the SYMBIOS 53C8xx series SCSI controllers, and an operating system based upon the WIND RIVERS SYSTEMS VXWORKS or IXWORKS kernel, as determined by design. In addition, the storage router includes software as required to control basic functions of the various elements, and to provide appropriate translations between the FC and SCSI protocols.

The storage router has various modes of operation that are possible between FC and SCSI target and initiator combinations. These modes are: FC Initiator to SCSI Target; SCSI Initiator to FC Target; SCSI Initiator to SCSI Target; and FC Initiator to FC Target. The first two modes can be supported concurrently in a single storage router device are discussed briefly below. The third mode can involve two storage router devices back to back and can serve primarily as a device to extend the physical distance beyond that possible via a direct SCSI connection. The last mode can be used to carry FC protocols encapsulated on other transmission technologies (e.g. ATM, SONET), or to act as a bridge between two FC loops (e.g. as a two port fabric).

The FC Initiator to SCSI Target mode provides for the basic configuration of a server using Fibre Channel to communicate with SCSI targets. This mode requires that a host system have an FC attached device and associated device drivers and software to generate SCSI-3 FCP requests. This system acts as an initiator using the storage router to communicate with SCSI target devices. The SCSI devices supported can include SCSI-2 compliant direct or sequential access (disk or tape) devices. The storage router serves to translate command and status information and transfer data between SCSI-3 FCP and SCSI-2, allowing the use of standard SCSI-2 devices in a Fibre Channel environment.

The SCSI Initiator to FC Target mode provides for the configuration of a server using SCSI-2 to communicate with Fibre Channel targets. This mode requires that a host system has a SCSI-2 interface and driver software to control SCSI-2 target devices. The storage router will connect to the SCSI-2 bus and respond as a target to multiple target IDs. Configuration information is required to identify the target IDs to which the bridge will respond on the SCSI-2 bus. The storage router then translates the SCSI-2 requests to SCSI-3 FCP requests, allowing the use of FC devices with a SCSI host system. This will also allow features such as a tape

US 7,051,147 B2

7

device acting as an initiator on the SCSI bus to provide full support for this type of SCSI device.

In general, user configuration of the storage router will be needed to support various functional modes of operation. Configuration can be modified, for example, through a serial port or through an Ethernet port via SNMP (simple network management protocol) or a Telnet session. Specifically, SNMP manageability can be provided via an 802.3 Ethernet interface. This can provide for configuration changes as well as providing statistics and error information. Configuration can also be performed via TELNET or RS-232 interfaces with menu driven command interfaces. Configuration information can be stored in a segment of flash memory and can be retained across resets and power off cycles. Password protection can also be provided.

In the first two modes of operation, addressing information is needed to map from FC addressing to SCSI addressing and vice versa. This can be 'hard' configuration data, due to the need for address information to be maintained across initialization and partial reconfigurations of the Fibre Channel address space. In an arbitrated loop configuration, user configured addresses will be needed for AL_PAs in order to insure that known addresses are provided between loop reconfigurations.

With respect to addressing, FCP and SCSI 2 systems employ different methods of addressing target devices. Additionally, the inclusion of a storage router means that a method of translating device IDs needs to be implemented. In addition, the storage router can respond to commands without passing the commands through to the opposite interface. This can be implemented to allow all generic FCP and SCSI commands to pass through the storage router to address attached devices, but allow for configuration and diagnostics to be performed directly on the storage router through the FC and SCSI interfaces.

Management commands are those intended to be processed by the storage router controller directly. This may include diagnostic, mode, and log commands as well as other vendor-specific commands. These commands can be received and processed by both the FCP and SCSI interfaces, but are not typically bridged to the opposite interface. These commands may also have side effects on the operation of the storage router, and cause other storage router operations to change or terminate.

A primary method of addressing management commands though the FCP and SCSI interfaces can be through peripheral device type addressing. For example, the storage router can respond to all operations addressed to logical unit (LUN) zero as a controller device. Commands that the storage router will support can include INQUIRY as well as vendor-specific management commands. These are to be generally consistent with SCC standard commands.

The SCSI bus is capable of establishing bus connections between targets. These targets may internally address logical units. Thus, the prioritized addressing scheme used by SCSI subsystems can be represented as follows: BUS:TARGET: LOGICAL UNIT. The BUS identification is intrinsic in the configuration, as a SCSI initiator is attached to only one bus. Target addressing is handled by bus arbitration from information provided to the arbitrating device. Target addresses are assigned to SCSI devices directly, though some means of configuration, such as a hardware jumper, switch setting, or device specific software configuration. As such, the SCSI protocol provides only logical unit addressing within the Identify message. Bus and target information is implied by the established connection.

8

Fibre Channel devices within a fabric are addressed by a unique port identifier. This identifier is assigned to a port during certain well-defined states of the FC protocol. Individual ports are allowed to arbitrate for a known, user defined address. If such an address is not provided, or if arbitration for a particular user address fails, the port is assigned a unique address by the FC protocol. This address is generally not guaranteed to be unique between instances. Various scenarios exist where the AL-PA of a device will change, either after power cycle or loop reconfiguration.

The FC protocol also provides a logical unit address field within command structures to provide addressing to devices internal to a port. The FCP_CMD payload specifies an eight byte LUN field. Subsequent identification of the exchange between devices is provided by the FQXID (Fully Qualified Exchange ID).

FC ports can be required to have specific addresses assigned. Although basic functionality is not dependent on this, changes in the loop configuration could result in disk targets changing identifiers with the potential risk of data corruption or loss. This configuration can be straightforward, and can consist of providing the device a loop-unique ID (AL_PA) in the range of "01h" to "EFh." Storage routers could be shipped with a default value with the assumption that most configurations will be using single storage routers and no other devices requesting the present ID. This would provide a minimum amount of initial configuration to the system administrator. Alternately, storage routers could be defaulted to assume any address so that configurations requiring multiple storage routers on a loop would not require that the administrator assign a unique ID to the additional storage routers.

Address translation is needed where commands are issued in the cases FC Initiator to SCSI Target and SCSI Initiator to FC Target. Target responses are qualified by the FQXID and will retain the translation acquired at the beginning of the exchange. This prevents configuration changes occurring during the course of execution of a command from causing data or state information to be inadvertently misdirected. Configuration can be required in cases of SCSI Initiator to FC Target, as discovery may not effectively allow for FCP targets to consistently be found. This is due to an FC arbitrated loop supporting addressing of a larger number of devices than a SCSI bus and the possibility of FC devices changing their AL-PA due to device insertion or other loop initialization.

In the direct method, the translation to BUS:TARGET: LUN of the SCSI address information will be direct. That is, the values represented in the FCP LUN field will directly map to the values in effect on the SCSI bus. This provides a clean translation and does not require SCSI bus discovery. It also allows devices to be dynamically added to the SCSI bus without modifying the address map. It may not allow for complete discovery by FCP initiator devices, as gaps between device addresses may halt the discovery process. Legacy SCSI device drivers typically halt discovery on a target device at the first unoccupied LUN, and proceed to the next target. This would lead to some devices not being discovered. However, this allows for hot plugged devices and other changes to the loop addressing.

In the ordered method, ordered translation requires that the storage router perform discovery on reset, and collapses the addresses on the SCSI bus to sequential FCP LUN values. Thus, the FCP LUN values 0-N can represent N+1 SCSI devices, regardless of SCSI address values, in the order in which they are isolated during the SCSI discovery process. This would allow the FCP initiator discovery pro-

US 7,051,147 B2

**9**

cess to identify all mapped SCSI devices without further configuration. This has the limitation that hot-plugged devices will not be identified until the next reset cycle. In this case, the address may also be altered as well.

In addition to addressing, according to the present invention, the storage router provides configuration and access controls that cause certain requests from FC Initiators to be directed to assigned virtual local storage partitioned on SCSI storage devices. For example, the same request for LUN 0 (local storage) by two different FC Initiators can be directed to two separate subsets of storage. The storage router can use tables to map, for each initiator, what storage access is available and what partition is being addressed by a particular request. In this manner, the storage space provided by SCSI storage devices can be allocated to FC initiators to provide virtual local storage as well as to create any other desired configuration for secured access.

Although the present invention has been described in detail, it should be understood that various changes, substitutions and alterations can be made hereto without departing from the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

**1**. A storage router for providing virtual local storage on remote storage devices to a device, comprising:

a buffer providing memory work space for the storage router;

a first Fibre Channel controller operable to connect to and interface with a first Fibre Channel transport medium;

a second Fibre Channel controller operable to connect to and interface with a second Fibre Channel transport medium; and

a supervisor unit coupled to the first and second Fibre Channel controllers and the buffer, the supervisor unit operable:

to maintain a configuration for remote storage devices connected to the second Fibre Channel transport medium that maps between the device and the remote storage devices and that implements access controls for storage space on the remote storage devices; and

to process data in the buffer to interface between the first Fibre Channel controller and the second Fibre Channel controller to allow access from Fibre Channel initiator devices to the remote storage devices using native low level, block protocol in accordance with the configuration.

**2**. The storage router of claim **1**, wherein the configuration maintained by the supervisor unit includes an allocation of subsets of storage space to associated Fibre Channel devices, wherein each subset is only accessible by the associated Fibre Channel device.

**3**. The storage router of claim **2**, wherein the Fibre Channel devices comprise workstations.

**4**. The storage router of claim **2**, wherein the remote storage devices comprise hard disk drives.

**5**. The storage router of claim **1**, wherein each of the first Fibre Channel controller comprises:

a Fibre Channel (FC) protocol unit operable to connect to the Fibre Channel transport medium;

a first-in-first-out queue coupled to the Fibre Channel protocol unit; and

a direct memory access (DMA) interface coupled to the first-in-first-out queue and to the buffer.

**6**. A storage network, comprising:

a first Fibre Channel transport medium;

a second Fibre Channel transport medium;

**10**

a plurality of workstations connected to the first Fibre Channel transport medium;

a plurality of storage devices connected to the second Fibre Channel transport medium; and

a storage router interfacing between the first Fibre Channel transport medium and the second Fibre Channel transport medium, the storage router providing virtual local storage on the storage devices to the workstations and operable:

to map between the workstations and the storage devices;

to implement access controls for storage space on the storage devices; and

to allow access from the workstations to the storage devices using native low level, block protocol in accordance with the mapping and access controls.

**7**. The storage network of claim **6**, wherein the access controls include an allocation of subsets of storage space to associated workstations, wherein each subset is only accessible by the associated workstation.

**8**. The storage network of claim **6**, wherein the storage devices comprise hard disk drives.

**9**. The storage network of claim **6**, wherein the storage router comprises:

a buffer providing memory work space for the storage router;

a first Fibre Channel controller operable to connect to and interface with the first Fibre Channel transport medium, the first Fibre Channel controller further operable to pull outgoing data from the buffer and to place incoming data into the buffer;

a second Fibre Channel controller operable to connect to and interface with the second Fibre Channel transport medium, the second Fibre Channel controller further operable to pull outgoing data from the buffer and to place incoming data into the buffer; and

a supervisor unit coupled to the first and second Fibre Channel controllers and the buffer, the supervisor unit operable:

to maintain a configuration for the storage devices that maps between workstations and storage devices and that implements the access controls for storage space on the storage devices; and

to process data in the buffer to interface between the first Fibre Channel controller and the second Fibre Channel controller to allow access from workstations to storage devices in accordance with the configuration.

**10**. A method for providing virtual local storage on remote storage devices to Fibre Channel devices, comprising:

interfacing with a first Fibre Channel transport medium;

interfacing with a second Fibre Channel transport medium;

maintaining a configuration for remote storage devices connected to the second Fibre Channel transport medium that maps between Fibre Channel devices and the remote storage devices and that implements access controls for storage space on the remote storage devices; and

allowing access from Fibre Channel initiator devices to the remote storage devices using native low level, block protocol in accordance with the configuration.

**11**. The method of claim **10**, wherein maintaining the configuration includes allocating subsets of storage space to associated Fibre Channel devices, wherein each subset is only accessible by the associated Fibre Channel device.

US 7,051,147 B2

11    12

**12**. The method of claim **11**, wherein the Fibre Channel devices comprise workstations.

**13**. The method of claim **11**, wherein the remote storage devices comprise hard disk drives.

**14**. An apparatus for providing virtual local storage on a remote storage device to a device operating according to a Fibre Channel protocol, comprising:

a first controller operable to connect to and interface with a first transport medium, wherein the first transport medium is operable according to the Fibre Channel protocol;

a second controller operable to connect to and interface with a second transport medium, wherein the second transport medium is operable according to the Fibre Channel protocol; and

a supervisor unit coupled to the first controller and the second controller, the supervisor unit operable to control access from the device connected to the first transport medium to the remote storage device connected to the second transport medium using native low level, block protocols according to a map between the device and the remote storage device.

**15**. The apparatus of claim **14**, wherein the supervisor unit is further operable to maintain a configuration wherein the configuration includes the map between the device and the remote storage device, and further wherein the map includes virtual LUNs that provide a representation of the storage device.

**16**. The apparatus of claim **15**, wherein the map only exposes the device to LUNs that the device may access.

**17**. The apparatus of claim **14**, wherein the supervisor unit is further operable to maintain a configuration including the map, wherein the map provides a mapping from a host device ID to a virtual LUN representation of the remote storage device to a physical LUN of the remote storage device.

**18**. The apparatus of claim **14**, wherein the remote storage device further comprises storage space partitioned into virtual local storage for the device connected to the first transport medium.

**19**. The apparatus of claim **18**, wherein the supervisor unit is further operable to prevent the device from accessing any storage on the remote storage device that is not part of a virtual local storage partition assigned to the device.

**20**. The apparatus of claim **14**, wherein the first controller and the second controller further comprise a single controller.

**21**. A system for providing virtual local storage on remote storage devices, comprising:

a first controller operable to connect to and interface with a first transport medium operable according to a Fibre Channel protocol;

a second controller operable to connect to and interface with a second transport medium operable according to the Fibre Channel protocol;

at least one device connected to the first transport medium;

at least one storage device connected to the second transport medium; and

an access control device coupled to the first controller and the second controller, the access control device operable to:

map between the at least one device and a storage space on the at least one storage device; and

control access from the at least one device to the at least one storage device using native low level, block protocol in accordance with the map.

**22**. The system of claim **21**, wherein the access control device is further operable to maintain a configuration wherein the configuration includes the map between the at least one device and the at least one storage device, and further wherein the map includes virtual LUNs that provide a representation of the at least one storage device.

**23**. The system of claim **22**, wherein the map only exposes the at least one device to LUNs that the at least one device may access.

**24**. The system of claim **21**, wherein the access control device is further operable to maintain the map, wherein the map provides a mapping from a host device ID to a virtual LUN representation of the at least one storage device to a physical LUN of the at least one storage device.

**25**. The system of claim **21**, wherein the at least one storage device further comprises storage space partitioned into virtual local storage for the at least one device.

**26**. The system of claim **25**, wherein the access control unit is further operable to prevent at least one device from accessing any storage on the at least one storage device that is not part of a virtual local storage partition assigned to the at least one device.

**27**. The system of claim **21**, wherein the first controller and the second controller further comprise a single controller.

**28**. A method for providing virtual local storage on remote storage devices, comprising:

mapping between a device connected to a first transport medium and a storage device connected to a second transport medium, wherein the first transport medium and the second transport medium operate according to a Fibre Channel protocol;

implementing access controls for storage space on the storage device; and

allowing access from the device connected to the first transport medium to the storage device using native low level, block protocols.

**29**. The method of claim **28**, further comprising maintaining a configuration wherein the configuration includes a map between the device and the one storage device, and further wherein the map includes virtual LUNs that provide a representation of the storage device.

**30**. The method of claim **29**, wherein the map only exposes the device to LUNs that the device may access.

**31**. The method of claim **28**, further comprising maintaining a configuration including a map from a host device ID to a virtual LUN representation of the storage device to a physical LUN of the storage device.

**32**. The method of claim **28**, further comprising partitioning storage space on the storage device into virtual local storage for the device.

**33**. The method of claim **32**, further comprising preventing the device from accessing any storage on the storage device that is not part of a virtual local storage partition assigned to the device.

**34**. A system for providing virtual local storage, comprising:

a host device;

a storage device remote from the host device, wherein the storage device has a storage space;

a first controller;

a second controller

a first transport medium operable according to a Fibre Channel protocol, wherein the first transport medium connects the host device to the first controller;

US 7,051,147 B2

13

a second transport medium operable according to the Fibre Channel protocol, wherein the second transport medium connects the second controller to the storage device;

a supervisor unit coupled to the first controller and the second controller, the supervisor unit operable to:

maintain a configuration that maps between the host device and at least a portion of the storage space on the storage device; and

implement access controls according to the configuration for the storage space on the storage device using native low level, block protocol.

**35**. The system of claim **34**, wherein the supervisor unit is further operable to:

maintain a configuration that maps from the host device to a virtual representation of at least a portion of the storage space on the storage device to the storage device; and

14

allow the host device to access only that portion of the storage space that is contained in the map.

**36**. The system of claim **35**, wherein the configuration comprises a map from a host device ID to a virtual LUN representation of the storage device to a physical LUN of the storage device.

**37**. The system of claim **34**, wherein the storage device further comprises storage space partitioned into virtual local storage for the host device.

**38**. The system of claim **37**, wherein the supervisor unit is further operable to prevent the host device from accessing any storage on the storage device that is not part of a virtual local storage partition assigned to the host device.

**39**. The apparatus of claim **34**, wherein the first controller and the second controller further comprise a single controller.

* * * * *

Appx19704